**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
591 Telegraph Canyon Rd, #376
Chula Vista, CA  91910
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
Email: christina@chumphreylaw.com

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.parras@towerlegalgroup.com

[Attorneys for Plaintiffs]

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

FERNANDO COPPEL, ELIZABETH FLORES, MIRIAM GARCIA, PABLO MARTINEZ, TYLER MITCHELL, MICHELI ORTEGA, JUDITH URIOSTEGUI, ELIZABETH USSELMAN, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the SWBG, LLC 401(K) PLAN (FKA SEAWORLD PARKS AND ENTERTAINMENT 401(K) PLAN),

Plaintiffs,

v.

SEAWORLD PARKS & ENTERTAINMENT, INC.; SWBG, LLC; BOARD OF DIRECTORS OF SWBG, LLC, INVESTMENT COMMITTEE OF 401(K) FOR SWBG, LLC; ORLANDO CORPORATE OPERATIONS GROUP, LLC; MARK G. SWANSON, CEO, ELIZABETH GULACSY, CFO, AND IRS FORM 5500 SIGNATORY; and DOES 1 through 50,

Defendants.

Case No. **'21 CV 1430 CAB RBB**

**CLASS ACTION COMPLAINT**

Plaintiffs Fernando Coppel, Elizabeth Flores, Miriam Garcia, Pablo Martinez, Tyler Mitchell, Micheli Ortega, Judith Uriostegui, and Elizabeth Usselman (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the SWBG, LLC 401(K) PLAN (FKA SEAWORLD PARKS & ENTERTAINMENT 401(K) PLAN) (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the former Plan sponsor, SEAWORLD PARKS & ENTERTAINMENT, INC., current Plan sponsor, SWBG, LLC ("SWBG"), the Board of Directors of SWBG, LLC, the Investment Committee of 401(k) for SWBG, LLC ("Committee"), Orlando Corporate Operations Group, LLC ("OCOG"), Mark G. Swanson, CEO, Elizabeth Gulacsy, CFO, and IRS Form 5500 Signatory, and John Does 1-50 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1.     This action is brought by current and former employees / participants / beneficiaries of Defendants to recover mismanaged 401k retirement funds.   The 401k plan has become the dominant source of retirement savings for most Americans.   Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers.   This action is filed to recover in excess of $53,523,698.53 in funds owed back to the plan on behalf of employees / participants / beneficiaries.   These retirement funds are significant to the welfare of the class.

2.     Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26 U.S.C. §401 ("401(k) plans).   These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the

employers by increasing the "net" compensation their employees receive via tax deferment.  To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

3.    The Defendants chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of Defendant organizations have benefitted financially for years from the same tax benefits.  However, Defendants have not followed ERISA's standard of care.  This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

4.    SWBG, LLC, is a subsidiary of SeaWorld Entertainment, Inc., an American theme park and entertainment company headquartered in Orlando Florida.  The company owns or licenses a portfolio of recognized brands, including SeaWorld, Busch Gardens®, Aquatica®, Discovery Cove®, Sesame Place®, and Sea Rescue®.  The company has developed a portfolio of 12 differentiated theme parks that are grouped in key markets across the United States.  During 2019, the company hosted approximately 22.6 million guests in its theme parks and generated total revenues of $1.40 billion and reported net income of $89.5 million.[1]

5.    The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established on March 1, 2010, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan.  As of December 31, 2019, the Plan had 17,049 participants with account balances and $309,637,655.00 in assets.

6.    Effective January 1, 2016, the Plan Governing Document was amended to reflect a change in the Plan Sponsor from SeaWorld Parks & Entertainment, Inc., to SWBG, LLC, and a corresponding change was made to the Plan name from SeaWorld Parks & Entertainment 401(k) Plan to SWBG, LLC 401(k) Plan.  No other

---

[1] Seaworld Entertainment 2019 Annual Report, p. 3.

CLASS ACTION COMPLAINT

changes to the Plan or Plan document were identified in connection with that Amendment. Since the Amendment, SWBG, LLC, has been the sponsor and administrator of the Plan as defined under 29 U.S.C §§ 1002(16)(B) and 1002(16)(A)(i).

7.  ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

8.  This case is another example of a large plan filling its 401(k) plan with expensive funds when identical, cheaper funds were available, and overpaying Covered Service Providers, when the Plan had more than sufficient bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds. Specifically, SWBG and its individual members breached their fiduciary duties of prudence and loyalty to the Plan by:

a. Offering and maintaining higher cost share classes when identical lower cost class shares were available. This resulted in the participants paying additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns;

b. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan;

c. Failing to engage in a competitive bidding process by submitting a Request for Proposal to multiple service providers including recordkeepers,

shareholder service and financial advisers;

d.  Imprudently choosing and retaining expensive funds that consistently failed to meet or exceed industry benchmarks or had sufficient history to be offered in the plan; and

e.  Failing to offer and retain a diverse pool of investment funds in accordance with the industry standard (a separate cause of action).

9.     Plaintiffs were injured during the Relevant Time Period by the Defendants' lack of loyalty, imprudent skill and flawed processes in breach of their fiduciary duties: (1) Defendants offered Plaintiffs, and Plaintiffs invested in, higher cost fund shares when otherwise identical lower cost shares were available which caused participants diminished investment returns in their 401(k) accounts; (2) Defendants permitted Plaintiffs and other Plan participants to be charged excessive service fees, which reduced participants' Plan account balances and caused them diminished investment returns; (3) Defendants chose and continually offered Plaintiffs, and Plaintiffs invested in, funds that continually failed to meet or exceed industry benchmarks for rates of return, which reduced their Plan account balances and caused them diminished investment returns; and (4) Defendants chose and continually offered Plaintiffs, and Plaintiffs invested in, a pool of investment that was not sufficiently diverse to hedge risks according to industry standards, which reduced their Plan account balances and caused them diminished investment returns.

10.     Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U. S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

## JURISDICTION AND VENUE

11.　Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

12.　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

13.　This Court has personal jurisdiction over Defendants because it transacts business in this District, resides in this District, and/or has significant contacts with this District, one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

14.　Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

## THE PARTIES

***Plaintiffs***

15.　Plaintiff Fernando Coppel resides in La Jolla, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Coppel was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action.

16.　Plaintiff Elizabeth Flores resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea

World Drive, San Diego, California 92019. Flores was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

17.     Plaintiff Miriam Garcia resides in Chula Vista, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Garcia is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2001 and upon information and belief invested in some or all of the funds which are at issue in this action.

18.     Plaintiff Pablo Martinez resides in Boulder City, Nevada, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Martinez was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

19.     Plaintiff Tyler Mitchell resides in Santee, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Mitchell was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

20.     Plaintiff Micheli Ortega resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Ortega is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2014 and upon information and belief invested in some or all of the funds which are at issue in this action.

21.     Plaintiff Judith Uriostegui resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Uriostegui is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2014 and invested in some or all of the funds which are at issue in this action.

22.     Plaintiff Elizabeth Usselman resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Usselman was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

23.     Coppel, Flores, Garcia, Martinez, Mitchell, Ortega, Uriostegui, and Usselman (Plaintiffs) have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and flawed actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan; by paying excessive fees to Covered Service Providers, and investing in a menu of options that were not well diversified. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

**Defendants**

24.     Defendant SEAWORLD PARKS & ENTERTAINMENT, INC ("SPE") is the former sponsor and administrator of the Plan and maintains its principal place of business at 6240 Sea Harbor Drive, Orlando, FL  32821.  This entity is registered with the State of California and upon information and belief, operates as a co-sponsor and administrator and/or fiduciary of the Plan.

25.     Defendant SWBG, LLC ("SWBG") is the current sponsor and administrator of the Plan and maintains its principal place of business at 6240 Sea Harbor Drive, Orlando, FL  32821.  This entity is not registered with the State of California.

//

//

//

CLASS ACTION COMPLAINT

26.     Defendant Orlando Corporate Operations Group, LLC ("OCOG") also maintains its principal place of business at 6240 Sea Harbor Drive, Orlando, FL 32821.  This entity is registered with the State of California and upon information and belief, operates as a co-sponsor and administrator and/or fiduciary of the Plan.

27.     The Board of the Directors of SWBG, LLC, appointed the 401(k) Investment Committee to control and manage the operation and the administration of the Plan.

28.     Defendant "Does" or the names of the individuals on the Board of Directors and 401(k) Investment Committee during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

29.     Upon information and belief, Defendants Mark G. Swanson, C.E.O. and Elizabeth Gulacsy, C.F.O, for both SWBG and OCOG, were members of the 401(k) Investment Committee and in their capacity as officers of the corporation and/or committee members, had discretionary authority to control the operation, management, and administration of the Plan.

30.     "[W]here, as here, a committee or entity is named as the plan fiduciary, the corporate officers or trustees who carry out the fiduciary functions are themselves fiduciaries and cannot be shielded from liability by the company." *Stewart v. Thorpe Holding Co. Profit Sharing Plan*, 207 F.3d 1143, 1156 (9th Cir. 2000).

31.     SWBG, OCOG, the BOD, the Committee, and the Directors and Officers and signatories to the IRS Form 5500 are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available

1  to participants for the investment of their contributions and provision of their
2  retirement income.

3  ***Parties in Interest***

4      32.    Finally, although not named Defendants, the Covered Service Providers
5  serve as "Parties of Interest" to this Litigation.  Massachusetts Mutual Life Insurance
6  Company ("MassMutual") served as the recordkeeper of the Plan until December 31,
7  2019, when Prudential Retirement Insurance and Annuity Company ("Prudential")
8  replaced MassMutual as recordkeeper.   LPL Financial, LLC, ("LPL") was the
9  designated "shareholder service provider" to the Plan until sometime in 2014.
10 Alliant Retirement Services, LLC (FMA Alliant Insurance Services, LLC)
11 ("Alliant") became the designed "Financial Adviser" beginning in 2014.

12                    **DEFENDANTS' FIDUCIARY OBLIGATIONS**

13     33.    ERISA and common law trusts imposes strict fiduciary duties of loyalty
14 and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A)
15 requires a plan fiduciary to "discharge his duties with respect to a plan solely in the
16 interest of the participants and beneficiaries" for the "exclusive purpose of (i)
17 providing benefits to participants and their beneficiaries; and (ii) defraying
18 reasonable expenses of administering the plan."

19     34.    29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to
20 discharge his obligations "with the care, skill, prudence, and diligence under the
21 circumstances then prevailing that a prudent man acting in a like capacity and
22 familiar with such matters would use in the conduct of an enterprise of like character
23 and with like aims."

24     35.    ERISA and common law further imposes an independent obligation
25 upon Defendants as Plan fiduciaries to diversify the investment options of the Plan.
26 U.S. Code §1104(a)(1)(C) requires a plan fiduciary to "discharge his duties with
27 respect to a plan solely in the interest of the participants and beneficiaries… by
28 diversifying the investments of the plan so as to minimize the risk of large losses…"

36.    ERISA and common law further imposes an independent obligation upon Defendants as Plan fiduciaries to follow the documents and instruments governing the Plan, including the plan documents, its amendments, summary plan descriptions, and other formally issued plan documents.  U.S. Code §1104(a)(1)(D) requires a plan fiduciary to act "in accordance with the documents and instruments governing the plan insofar as documents and instruments are considered consistent with the provisions of [Title I] or Title V."

37.    A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

38.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." MassMutual, Prudential, LPL, and Alliant are all "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

39.    29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

40.    Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

41.    "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); see *Eaves v. Penn*, 587 F.2d at 463.

//

//

42.    The Defendants' 401(k) plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements or if it fails to follow the terms of the plan document.  26 U.S.C.A. §§ 401(a), 501(a). The Defendants have the burden of proof when challenging the Commissioner of Internal Revenue's determination that a defined contribution plan is disqualified from favorable tax treatment.   26 U.S.C.A. §§ 401(a), 501(a).

43.    Defendants' repeated depletion and allocation of trust asset prices (reducing daily gross asset values (GAVs) resulting in net asset value prices/(NAVs)) post each evening at MassMutual's website for participants) and excessive compensation to covered service providers (CSP) show a repeated negligence for tax laws and raises questions beyond the trust's losses as to whether they were even "qualified" to serve as fiduciaries. Their own plan's "birth certificate" or IRS Determination Letter states that tax-exemption "…will depend on its effect in operation…1.401-1(b)(3))."

> Your plan's continued qualification in its present form will depend on its effect in operation (Income Tax Regulations Section 1.401-1(b)(3)). We may review the status of the plan in operation periodically.

## DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES

44.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

//

//

45. Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. Thus, violations and damages continue over time.

46. The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[2]

47. "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth $100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International* (9th Cir. 2016) 843 F.3d 1187, 1198.

---

[2] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

48.    The marketplace for retirement plan services is established and competitive. As of December 31, 2019, the Plan had 17,049 participants with account balances and $309,637,655.00 in assets.    As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.

## THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS

49.    Each year since formation of the plan/trust on March 1, 2010, the Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and downloaded from www.efast.dol.gov) indicated on page 2 that their Plan and Trust's "Funding Arrangement" line 9a(3) was "Trust" and the Plan and Trust's "Benefit Arrangement" line 9b(3) was also via a "Trust."

50.    This trust funding/benefit is echoed by Justice Sotomayer's comments in *Thole v. US Bank* (2020) 140 S.Ct. 1615, 1625 [emphasis added]:

**"ERISA expressly required the creation of a trust in which petitioners are the beneficiaries: "[A]ll assets" of the plan "shall be held in trust" for petitioners' "exclusive" benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1). These requirements exist regardless whether the employer establishes a defined-benefit or defined-contribution plan.  §1101(a). Similarly, the Plan Document governing petitioners' defined-benefit plan states that, at "'all times,'" all plan   assets "'shall'" be in a "'trust fund'" managed for the participants' and beneficiaries' "'exclusive benefit.'"  App. 60– 61. ***This arrangement confers on the "participants [and] beneficiaries" of a defined-benefit plan an equitable stake, or a "common interest," in "the financial integrity of the plan." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 142, n. 9 (1985)."**

51.    The underlying allegations in this Complaint are based on the Defendants' actions at the time the conduct was certified and reported to the U.S. Departments of Treasury and Labor. The Plan Document used herein was the Massachusetts Mutual Life Insurance Company VOLUME SUBMITTER PROFIT SHARING/401(k) PLAN or sometimes referred to as the Defined Contribution Plan

-15-

and Trust Document or "prototype" or "volume submitter." The Defendants did not provide all Plan governing documents on written requests on behalf of the employees representing the class so this information will need to be requested in discovery.

52.    In addition to the prototype Plan Document, the underlying allegations in this Complaint are also based on Plaintiffs' documents as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar. The below chart summarizes the source of allegations:



53.    The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans."

//
//
//
//
//
//

CLASS ACTION COMPLAINT

# FACTUAL ALLEGATIONS

**A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Share Classes as Plan Investment Options.**

54.    The Plan offers 29 investment options,[3] with 28 mutual funds and one guaranteed investment contract fund (similar to a stable value fund).   Defendants select the Plan's investment options.

55.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds. Each share represents an investor's part ownership in the fund and the income it generates.

56.    Mutual fund companies are regulated by the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940. The Securities Act of 1933 requires mutual fund companies to prepare and register with the SEC mutual fund shares offered to the public and to make a prospectus describing the mutual fund shares available to prospective investors.

57.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

58.    A single mutual fund is effectively one portfolio managed by one investment adviser or team that may be offered through multiple "classes" of its shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will

//

---

[3] There was no "brokerage window" option made available where the participant, through a designated brokerage account, could buy and sell a wide range of investments that are outside the limited scope of Plan's 29 menu options.

CLASS ACTION COMPLAINT

charge different marketing, distribution and service expenses depending on the class chosen.

59.    For example, one share class in a mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund, while a different class share in that same fund with the same advisors and the same investments charges an annual expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan.

60.    A Plan's fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "**significantly different costs**."[1]  Adherence to these duties requires *regular performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.[2]*

61.    Since the inception of the Plan on March 1, 2010, Defendants have offered higher cost mutual fund share classes as investment options for the Plan even though 90% of the time lower cost class shares of those exact same mutual funds with the same attributes were readily available to the Plan throughout its duration. All of the funds had sufficient assets and attributes to qualify for the lowest cost share classes available.

//

//

//

---

[1] Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007) ("Cost-conscious management is fundamental to prudence in the investment function.").
[2] Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 718-19 (2d Cir. 2013).

1

2

**Summary Table**

| | 2019 | | 2018 | | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total # of funds | 29 | | 29 | | 29 | | 29 | | 28 | |
| *Funds with Cheaper Available Share Classes* | 26 | 90% | 26 | 90% | 26 | 90% | 26 | 90% | 25 | 89% |

7    62.  The following chart illustrates the differences in the operating costs and

8  returns between the share classes chosen by Defendants and the least expense share

9  class available as of 1/1/2015.  These are funds that Defendants chose to include in

10  the menu of fund options prior to 2015 and have continued to offer to participants as

11  of December 31, 2019.  The fund name listed in the first row and shaded grey

12  represents the share class chosen by Defendants.  The second fund name listed and

13  <u>not</u> shaded represents the cheaper share class Defendants could have chosen which

14  was available to them throughout the duration of the Plan.  The bolded line

15  represents the difference in costs (expenses charged), 12-month yield and the

16  investment returns for the one- and annualized three-, five- and ten-year performance

17  periods ending 12/31/2019. Additionally, to highlight the harm caused by the

18  Defendants' imprudent selection of high-cost share classes, the five-year cumulative

19  returns are included.  <u>The average annual return difference calculated from the</u>

20  <u>cumulative total return (far right column) is higher than both the expense ratio and</u>

21  <u>annualized five-year return in all but one case</u>. <u>This difference represents the loss of</u>

22  <u>compounding associated with higher expenses, a concept that will be explored</u>

23  <u>further below.</u>

24  //

25  //

26  //

27

28

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century Mid Cap Value Inv* | 0.98 | 1.46 | 28.88 | 7.75 | 8.63 | 51.27 | |
| *American Century Mid Cap Value R6* | 0.63 | 1.79 | 29.31 | 8.14 | 9.00 | 53.86 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.33** | **-0.43** | **-0.39** | **-0.37** | **-2.59** | **-0.52** |
| *American Century One Choice In Ret Inv* | 0.75 | 1.70 | 15.85 | 6.96 | 4.96 | 27.39 | |
| *American Century One Choice In Ret R6* | 0.40 | 2.48 | 16.26 | 7.28 | 5.29 | 29.40 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.78** | **-0.41** | **-0.32** | **-0.33** | **-2.01** | **-0.40** |
| *American Century One Choice 2020 Inv* | 0.77 | 1.52 | 16.02 | 7.19 | 5.15 | 28.54 | |
| *American Century One Choice 2020 R6* | 0.42 | 2.06 | 16.45 | 7.51 | 5.47 | 30.51 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.54** | **-0.43** | **-0.32** | **-0.32** | **-1.97** | **-0.39** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century One Choice 2025 Inv* | 0.77 | 1.45 | 17.37 | 7.79 | 5.55 | 31.01 | |
| *American Century One Choice 2025 R6* | 0.42 | 2.34 | 17.77 | 8.13 | 5.88 | 33.07 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.89** | **-0.40** | **-0.34** | **-0.33** | **-2.06** | **-0.41** |
| *American Century One Choice 2030 Inv* | 0.79 | 1.53 | 18.57 | 8.33 | 5.94 | 33.44 | |
| *American Century One Choice 2030 R6* | 0.44 | 2.06 | 18.99 | 8.68 | 6.25 | 35.41 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.53** | **-0.42** | **-0.35** | **-0.31** | **-1.97** | **-0.39** |
| *American Century One Choice 2035 Inv* | 0.82 | 1.42 | 20.01 | 8.94 | 6.35 | 36.05 | |
| *American Century One Choice 2035 R6* | 0.47 | 2.44 | 20.37 | 9.23 | 6.67 | 38.11 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-1.02** | **-0.36** | **-0.29** | **-0.32** | **-2.06** | **-0.41** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century One Choice 2040 Inv* | 0.84 | 1.46 | 21.32 | 9.59 | 6.76 | 38.69 | |
| *American Century One Choice 2040 R6* | 0.49 | 2.02 | 21.71 | 9.91 | 7.09 | 40.85 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.56** | **-0.39** | **-0.32** | **-0.33** | **-2.16** | **-0.43** |
| *American Century One Choice 2045 Inv* | 0.87 | 1.29 | 22.72 | 10.22 | 7.19 | 41.50 | |
| *American Century One Choice 2045 R6* | 0.52 | 2.34 | 23.16 | 10.57 | 7.54 | 43.83 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-1.05** | **-0.44** | **-0.35** | **-0.35** | **-2.33** | **-0.47** |
| *American Century One Choice 2050 Inv* | 0.89 | 1.34 | 24.08 | 10.73 | 7.49 | 43.50 | |
| *American Century One Choice 2050 R6* | 0.54 | 1.89 | 24.38 | 11.08 | 7.83 | 45.78 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.55** | **-0.30** | **-0.35** | **-0.34** | **-2.28** | **-0.46** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Funds Capital World Gr&Inc R5* | 0.47 | 1.93 | 25.68 | 12.24 | 8.18 | 48.16 | |
| *American Funds Capital World Gr&Inc R6* | 0.42 | 1.98 | 25.74 | 12.29 | 8.22 | 48.44 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.05** | **-0.06** | **-0.05** | **-0.04** | **-0.28** | **-0.06** |
| *American Funds Europacific Growth R5* | 0.51 | 1.32 | 27.37 | 12.40 | 7.36 | 42.63 | |
| *American Funds Europacific Growth R6* | 0.46 | 1.36 | 27.40 | 12.45 | 7.41 | 42.96 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.04** | **-0.03** | **-0.05** | **-0.05** | **-0.33** | **-0.07** |
| *BNY Mellon Bond Market Index Inv* | 0.40 | 2.77 | 8.12 | 3.58 | 2.57 | 13.53 | |
| *BNY Mellon Bond Market Index I* | 0.15 | 2.53 | 8.49 | 3.84 | 2.84 | 15.03 | |
| **Cost of Expensive Share Classes** | **-0.25** | **0.24** | **-0.37** | **-0.26** | **-0.27** | **-1.50** | **-0.30** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *Clearbridge Appreciation I* | 0.66 | 1.33 | 30.21 | 15.26 | 11.25 | 70.41 | |
| *Clearbridge Appreciation IS* | 0.57 | 1.41 | 30.32 | 15.37 | 11.36 | 71.26 | |
| **Cost of Expensive Share Classes** | **-0.09** | **-0.08** | **-0.11** | **-0.11** | **-0.11** | **-0.85** | **-0.17** |
| *Columbia Mid Cap Index A* | 0.45 | 1.14 | 25.66 | 8.73 | 8.52 | 50.50 | |
| *Columbia Mid Cap Index Inst2* | 0.20 | 1.35 | 25.99 | 9.02 | 8.79 | 52.39 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.21** | **-0.33** | **-0.29** | **-0.27** | **-1.89** | **-0.38** |
| *Columbia Small Cap Index A* | 0.45 | 1.02 | 22.30 | 7.90 | 9.05 | 54.22 | |
| *Columbia Small Cap Index Inst2* | 0.20 | 1.18 | 22.61 | 8.17 | 9.33 | 56.21 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.16** | **-0.31** | **-0.27** | **-0.28** | **-1.99** | **-0.40** |
| *Invesco Developing Markets Y* | 1.00 | 0.51 | 24.31 | 13.93 | 6.43 | 36.56 | |
| *Invesco Developing Markets R6* | 0.83 | 0.68 | 24.53 | 14.13 | 6.62 | 37.78 | |
| **Cost of Expensive Share Classes** | **-0.17** | **-0.17** | **-0.22** | **-0.20** | **-0.19** | **-1.22** | **-0.24** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *Loomis Sayles Small Cap Growth Retail* | 1.20 | 0.00 | 26.23 | 16.99 | 11.23 | 70.26 | |
| *Loomis Sayles Small Cap Growth N* | 0.82 | 0.00 | 26.65 | 17.41 | 11.63 | 73.34 | |
| **Cost of Expensive Share Classes** | **-0.38** | **0.00** | **-0.42** | **-0.42** | **-0.40** | **-3.08** | **-0.62** |
| *MFS Value R4* | 0.58 | 1.92 | 30.08 | 11.34 | 9.40 | 56.71 | |
| *MFS Value R6* | 0.47 | 2.01 | 30.18 | 11.45 | 9.51 | 57.50 | |
| **Cost of Expensive Share Classes** | **-0.11** | **-0.09** | **-0.10** | **-0.11** | **-0.11** | **-0.79** | **-0.16** |
| *Western Asset Core Plus Bond I* | 0.45 | 3.63 | 12.28 | 5.76 | 4.66 | 25.58 | |
| *Western Asset Core Plus Bond IS* | 0.42 | 3.66 | 12.32 | 5.79 | 4.67 | 25.64 | |
| **Cost of Expensive Share Classes** | **-0.03** | **-0.03** | **-0.04** | **-0.03** | **-0.01** | **-0.06** | **-0.01** |

63.     Defendants offered higher cost share classes rather than readily available lower cost options to Plan participants for a decade before finally acknowledging their imprudent actions and changing share classes in January 2020. Defendants, however, did not seek to correct the harm caused to their participants by putting the Plan back into the condition it would have been in had the breaches not occurred as mandated by ERISA and the IRS. By choosing and maintaining higher

cost share classes for a decade instead of available lower cost shares as illustrated above, Defendants caused Plan participants/beneficiaries harm by not just forcing them to pay higher fees, but also lost yield and returns they rely on for retirement income as a result of those higher fees on nearly every mutual fund offered through the Plan. In doing so, Defendants undermined the very purpose of the trust: Employee Retirement Income Security for participants/beneficiaries. The erosive effect of excessive fees and the resulting lost returns compounds over time.

64.    In acknowledgement that service provider fees were excessive and that lower cost share classes are beneficial, Defendants appear to have shifted a limited number of funds into lower (but not the lowest available) share classes in 2016. Defendants, however, failed to correct the harm caused by previous excessive fees and imprudently continued to add new funds after 2015 which did not offer the lowest share class available to participants.  Again, all of the funds had sufficient assets and attributes to qualify for the lowest cost share classes available:

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century One Choice 2055 Inv* | 0.89 | 1.32 | 24.54 | 10.89 | 7.61 | 44.30 | |
| *American Century One Choice 2055 R6* | 0.54 | 1.95 | 24.85 | 11.23 | 7.96 | 46.66 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.63** | **-0.31** | **-0.34** | **-0.35** | **-2.36** | **-0.47** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century One Choice 2060 Inv* | 0.89 | 1.34 | 24.88 | 11.03 | N/A | N/A | |
| *American Century One Choice 2060 R6* | 0.54 | 1.69 | 25.45 | 11.43 | N/A | N/A | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.35** | **-0.57** | **-0.40** | | | |
| *American Funds AMCAP R5* | 0.39 | 0.70 | 26.67 | 15.07 | 10.98 | 68.35 | |
| *American Funds AMCAP R6* | 0.34 | 0.75 | 26.74 | 15.15 | 11.04 | 68.81 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.05** | **-0.07** | **-0.08** | **-0.06** | **-0.46** | **-0.09** |
| *American Funds US Government Sec R5* | 0.29 | 2.17 | 5.60 | 2.76 | 2.23 | 11.66 | |
| *American Funds US Government Sec R6* | 0.23 | 2.22 | 5.59 | 2.79 | 2.29 | 11.99 | |
| **Cost of Expensive Share Classes** | **-0.06** | **-0.05** | **0.01** | **-0.03** | **-0.06** | **-0.33** | **-0.07** |

CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *Pioneer Select Mid Cap Growth Y* | 0.79 | 0.00 | 33.01 | 17.60 | 11.40 | 71.56 | |
| *Pioneer Select Mid Cap Growth K* | 0.67 | 0.00 | 33.21 | 17.75 | 11.53 | 72.57 | |
| **Cost of Expensive Share Classes** | **-0.12** | **0.00** | **-0.20** | **-0.15** | **-0.13** | **-1.01** | **-0.20** |
| *PIMCO Income Adm* | 1.34 | 5.56 | 7.78 | 5.42 | 5.40 | 30.08 | |
| *PIMCO Income Instl* | 1.09 | 5.81 | 8.05 | 5.68 | 5.66 | 31.69 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.25** | **-0.27** | **-0.26** | **-0.26** | **-1.61** | **-0.32** |
| *Principal SmallCap Value II Instl* | 0.98 | 0.88 | 23.19 | 4.08 | 6.28 | 35.60 | |
| *Principal SmallCap Value II R6* | 0.96 | 0.91 | 23.24 | 4.11 | 6.30 | 35.73 | |
| **Cost of Expensive Share Classes** | **-0.02** | **-0.03** | **-0.05** | **-0.03** | **-0.02** | **-0.13** | **-0.03** |

65.    The extra fees cost Plan participants over a million dollars per year. For example, the class A shares of the target-date funds alone cost participants over $900,000 in 2015 over their least expensive option.

66.    Empirically speaking, revenue sharing burdens on mutual fund investors are always more costly than the revenue sharing credit offered by that same mutual

fund share class they buy. Since costs are inversely correlated to a fund investor's returns when comparing identical mutual funds (just different share classes of the same SEC-registered mutual fund), the Defendants' actions were even more erosive to the trust's growth (and in turn the participants/beneficiaries account values) because of the loss of additional compounded growth for trust.

67.    At the time of the plan's inception, Defendants demonstrated a lack of basic skill and loyalty when selecting investments. As an example, by merely comparing the annualized five-year returns ending 12/31/2009 of two share classes of the exact same fund selected by the Defendants in 2010 they couldn't help but see the growth disparity. The share class they selected had an annualized five-year growth rate of 16.72% while its otherwise identical, but lower cost sister share class posted a 19.29% return over the same period (2.57% more). Using simple math, the Defendants would conclude that receiving twenty-five basis points in revenue sharing was less than half of the investment loss each year of fifty-one basis points (2.57 divided by 5 equals 0.514%) incurred by the trust and participants/beneficiaries. Of the twenty-five available mutual funds selected by the Defendants the same imprudent selection problem exists for twenty-two (approximately 90%) of mutual funds' share classes selected by the Defendants (at inception of the plan on 3/1/2010). This is simply the reverse of compounded interest or yield investors seek and Einstein discussed when he noted that **compound interest is the most powerful force in the universe**: "Compound interest is the 8th wonder of the world. ***He who understands it, earns it; he who doesn't, pays it.***"

68.    It is important to note that fifty-basis points or one-half of one percent (0.5%) directly reduces the expected rate of return commensurately for the participants/beneficiaries' account by ten percent (10%) or more. Applying the typical annual return of stocks and bonds of 5% per year according to Buffett and the Wharton School, the following hypothetical is presented to demonstrate the

imprudence of selecting inappropriate share classes:   Using the median income at www.usdebtclock.org of $35,431 (and the average savings percent of 7%) fifty basis points in reduced returns due to excessive costs is a lost opportunity to make an additional $2,480 (assuming 4.5% versus 5% over ten years).

69.    While Defendants may argue that the fees are necessary and allowed, they miss the larger argument that one-tenth of that, $248, is NOT "reasonable" for recordkeeping. With respect to the current situation, while the numbers *may* differ, the principal holds true. Rather than incurring unnecessary losses, Defendants could have simply demanded the recordkeeper (MassMutual) accept a more reasonable charge of $40 annually for each of the 17,208 participants/beneficiaries (listed on line 6g of the Defendants' 2010 Annual Return/Report of Employee Benefit Plan) or they would request a proposal (RFP) from other recordkeepers.

70.    As discussed later in the complaint, a forty dollar per "record" or "account" charge is a more reasonable and equitable payment method instead of asset-based" pay. Based on the plan's financials since 2010 that show an average annual growth rate of sixteen percent (16%) per annum, the lifetime average revenue sharing of fifty-basis points given the Rule of 72 means covered service providers (CSP) pay would double every 4.5 years. As it stands, MassMutual's pay nearly tripled between 2010 and 2019 despite the fact that the number of participants that had to be record kept remained largely flat.

71.    If flat rate per capita charges were used by the Defendants then MassMutual's sub-accounting costs would have been only $400 dollars over ten years ($40 * 10) and the participants/beneficiaries would have kept two thousand more dollars each in compounded returns (again based on the median income and savings rates). Finally, the trust would have had an estimated $35 million MORE dollars in it (2,000 * 17,208).

//

//

72.     Defendants were aware that higher operating costs would reduce the amount Plan participants realized returns on their investments because Defendants included the following statement regarding fees in the Plan's 29 CFR 2550.404a-5 annual disclosures to the participants: "The cumulative effect of fees and expenses can substantially reduce the growth of your retirement savings. However, fees and expenses are only two of the many factors to consider when deciding what investment is appropriate for you.  For more information about the long-term effect of fees and expenses, visit the U.S. Department of Labor's Web site at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. " Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

73.     The Plan's recordkeeper until December 31, 2019, MassMutual, and other Covered Service Providers, LPL and Alliant (collectively, "CSPs"), were on the receiving end of excessive fees being charged to participants. The money taking side originates at the mutual fund end.  Each mutual fund takes the revenue sharing daily (1/365th) from the gross asset value (GAV) of their mutual funds at 4pm (accrued for weekends and holidays). The resulting net asset values (NAVs) are updated by MassMutual every evening so participants/beneficiaries' account balances match the trust's total fund NAVs. The trust is the funds' holder of record.

74.     Upon information and belief, at the end of every month, the mutual funds transmit their revenue sharing dollars to MassMutual. Despite being the keeper of records MassMutual does not track which participants actually paid the cost of their recordkeeping (paid through SEC Rule 12b-1 and/or "sub-transfer agency" fees). So, in the event MassMutual were to allocate "pro-rata" (based on account size) those revenue sharing credits that exceed their "required revenue" to run the plan, those credits would go to current holders of those funds. Effectively, a participant could be credited with another participant's payment. The Defendants

1   must monitor their services agreements when billing based on assets (not per person)

2   so an agreement to pay twenty basis points for recordkeeping in year one when the

3   agreement is first executed will become out of date in one or two years as the plan's

4   assets rapidly grow. As already noted, the Plan grew at 16% annually from 2010 to

5   2019 so pay raises of 16% could occur for MassMutual, LPL and/or Alliant for pay

6   based on assets. Even if MassMutual hypothetically credited money that exceeded

7   "required revenue" back to participants individually, any credits would be late (so

8   separated persons miss their credits) and inequitably attributed and would destroy the

9   compounding effect of the revenue sharing funds.

10      75.    Lastly, the information available for Defendants to make an informed

11  assessment as to costs and returns available for each share class and to make the

12  assessments noted above was made available in each fund's annual prospectus at the

13  time the choices were made.  For example, Defendants have included the Columbia

14  Mid Cap Index Fund Class A as an investment option available to participants since

15  2010. The information provided in the Columbia Mid Cap Index annual prospectuses

16  clearly show a significant difference in fees and investment returns between the

17  Class A and Institutional Share Class.   The Defendants' actions to choose high-cost

18  *index* funds merely continues to cause the Plaintiffs to question their skill and

19  loyalty. The two Columbia Index funds had an R5 or Institutional share class

20  available for twenty basis points (0.2%/yr), but the Defendants selected the "A"

21  share classes that cost 0.45%/yr. Logically one would ask why since they are index

22  funds which are by their nature chosen for low-cost reasons, however, reading the

23  Defendants' Forms 5500 makes the motive clearer:

24      a.    "MassMutual received estimated 12b-1 Fees of 0.25% with respect to
            plan assets held in the Columbia Small Cap Index Fund (MF-B2)"

25      b.    "MassMutual received estimated 12b-1 Fees of 0.25% with respect to
            plan assets held in the Columbia Mid Cap Index Fund (MF-B8)."

26  //

27  //

28  //

76.     ". . . **Rule 12b-1 fees depress mutual fund returns**. . . . [U]sing fund assets to compensate intermediaries increases a fund's expense ratio . . . [C]osts associated with *distribution of shares should be borne by the investor directly out of their own assets*."[4] [Emphasis added]

77.     The 2015 prospectus warns that "[t]hese payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the Fund over another investment." The relevant information provided in the 2020 prospectus and 2015 prospectus is quoted below, with the fees, expenses and returns for comparison highlighted. The same information was available for Defendants to review and analyze at the time decisions were being made in 2010 also:

**Columbia Mid Cap Index**

**2019 Prospectus Expense Data**

**SUMMARY OF THE FUND**

**Investment Objective**

Columbia Mid Cap Index Fund (the Fund) seeks total return before fees and expenses that corresponds to the total return of the Standard & Poor's (S&P) MidCap 400® Index.

**Fees and Expenses of the Fund**

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. An investor transacting in a class of Fund shares without any front-end sales charge, contingent deferred sales charge, or other asset-based fee for sales or distribution may be required to pay a commission to the financial intermediary for effecting such transactions. Such commission rates are set by the financial intermediary and are not reflected in the tables for example below.

**Annual Fund Operating Expenses** (expenses that you pay each year as a percentage of the value of your investment)

//

---

[4] *Issues in Mutual Fund Revenue Sharing Payments* by John a. Haslem, Professor emeritus of Finance in the Robert H. Smith School of Business at the University of Maryland, jhaslem@rhsmith.umd.edu, 2012.

|  | Class A | Class Inst | Class Inst2 | Class3 |
|---|---|---|---|---|
| Management fees | 0.20% | 0.20% | 0.20% | 0.20% |
| Distribution and service (12b-1) fees | 0.25% | 0.00% | 0.00% | 0.00% |
| Other Expenses | 0.13% | 0.13% | 0.07% | 0.03% |
| **Total Annual Fund Operating Expenses** | 0.58% | 0.33% | 0.27% | 0.23% |
| Less: Fee waivers and/or expense reimbursements[5] | (0.13%) | (0.13%) | (0.07%) | (0.03%) |
| Total Annual Fund Operating Expenses After Fee Waiver | 0.45% | 0.20% | 0.20% | 0.20% |

## 2020 Prospectus Performance Data

## Average Annual Total Returns (for periods ended December 31, 2019)

|  | Share Class Inception Date | 1 Year | 5 Years | 10 Years |
|---|---|---|---|---|
| **Class A** | 05/31/2000 |  |  |  |
| returns before taxes |  | 25.66% | 8.52% | 12.20% |
| returns after taxes on distributions |  | 24.03% | 6.60% | 10.71% |
| **Class Inst** returns before taxes | 03/31/2000 | 25.95% | 8.79% | 12.49% |
| **Class Inst2** returns before taxes | 11/08/2012 | 25.99% | 8.79% | 12.50% |
| **Class Inst3** returns before taxes | 03/01/2017 | 25.97% | 8.80% | 12.49% |
| **S&P MidCap 400 Index** (reflects no deductions for fees, expenses or taxes) |  | 26.20% | 9.03% | 12.72% |

---

[5] Columbia Management Investment Advisers, LLC and certain of its affiliates have contractually agreed to waive fees and/or to reimburse expenses (excluding transaction costs and certain other investment related expenses, interest, taxes, acquired fund fees and expenses, and infrequent and/or unusual expenses) through June 30, 2021, unless sooner terminated at the sole discretion of the Fund's Board of Trustees. Under this agreement, the Fund's net operating expenses subject to applicable exclusions, will not exceed the annual rates of 0.45% for Class A, 0.20% for Class Inst2 and 0.20% for Class Inst3.

## 2015 Prospectus Expense Data

**Investment Objective**

Columbia Mid Cap Index Fund (the Fund) seeks total return before fees and expenses that corresponds to the total return of the Standard & Poor's (S&P) MidCap 400® Index.

**Fees and Expenses of the Fund**

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund.

**Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment)**

|  | Class A | Class I | Class R5 | Class Z |
|---|---|---|---|---|
| Management Fees[6] | 0.20% | 0.20% | 0.20% | 0.20% |
| Distribution and/or service (12b-1) fees[7] | 0.25% | 0.00% | 0.00% | 0.00% |
| Other Expenses[7] | 0.21% | 0.01% | 0.06% | 0.21% |
| **Total annual Fund operating expenses** | **0.66%** | **0.21%** | 0.26% | 0.41% |
| Less: Fee waivers and/or expense reimbursements[8] | (0.21%) | (0.01%) | (0.06%) | (0.21%) |
| **Total annual Fund operating expenses after fee waivers and/or expense reimbursements** | **0.45%** | **0.20%** | 0.20% | 0.20% |

[6] Management fees reflect the combination of advisory and administrative services fees under one agreement providing for a single management fee. Advisory fees and administrative services payable pursuant to separate prior agreements amounted to 0.10% and 0.10% of average daily net assets of the Fund, respectively.

[7] Other expenses for Class A, Class R5 and Class Z shares have been restated to reflect current fees paid by the fund

[8] Columbia Management Investment Advisers, LLC and certain of its affiliates have contractually agreed to waive fees and/or to reimburse expenses (excluding transaction costs and certain other investment related expenses, interest, taxes, acquired fund fees and expenses, and extraordinary expenses) until June 30, 2016, unless sooner terminated at the sole discretion of the Fund's Board of Trustees. Under this agreement, the Fund's net operating expenses, subject to applicable exclusions, will not exceed the annual rates of 0.45% for Class A, 0.20% for Class I, 0.20% for Class R5 and 0.20% for Class Z.

CLASS ACTION COMPLAINT

## 2015 Prospectus Performance Data

**Average Annual Total Returns (for periods ended December 31, 2014)**

|  | Share Class Inception Date | 1 Year | 5 Years | 10 Years |
|---|---|---|---|---|
| **Class A** | 05/31/2000 | | | |
| returns before taxes | | 9.2% | 16% | 9.31% |
| returns after taxes on distributions | | 7.67% | 14.99% | 8.24% |
| returns after taxes on distributions and sale of Fund shares | | 6.40% | 12.93% | 7.49% |
| **Class I** returns before taxes | 09/27/2010 | 9.63% | 16.34% | 9.59% |
| **Class R5** returns before taxes | 11/08/2012 | 9.51% | 16.33% | 9.58% |
| **Class Z** returns before taxes | 03/31/2000 | 9.52% | 16.31% | 9.57% |
| **S&P MidCap 400 Index** (reflects no deductions for fees, expenses or taxes) | | 9.77% | 16.53% | 9.71% |

78.    The Columbia Mid-Cap 2015 Prospectus also included a section entitled "Choosing Your Share Class" that set forth the eligibility requirements for investing in each class.  The Class A shares Defendants chose are made available to the general public for investment, require a minimum $2000 investment and charge maximum distribution and/or service fees of .25%.  On the other hand, the R5 class shares are available to group retirement plans that maintain plan-level or omnibus accounts with the fund with no minimum investment and charge no (0) maximum distribution and/or service fees. Similar information above can be provided for 90% of the funds, including the target-date funds, in the Plan.

//

CLASS ACTION COMPLAINT

79.     Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above.  In devising and implementing strategies for the investment and management of trust assets, **trustees are obligated to "minimize costs**."  Uniform Prudent Investor Act (the "UPIA") §7.  44.  Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants.  A chart attached hereto as Exhibit A demonstrates that for each of the 26 of the 29 available funds where Defendants could have offered a cheaper share class, the share classes all shared the same manager, manager start date, manager tenure, allocations in stocks, bonds, cash, same percentage of top holdings, number of holdings, turnover rate, average price/earnings ratios, price/book ratios, and average market cap.

80.     Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by:

a.    The offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available; and

b.    Defendants continued to add high-cost A shares in 2015 with the addition of the American Century One Choice 2055 target-date fund vintage. Subsequently, they replaced the A shares with the less expensive, but still high-cost "Inv" shares in 2016.

81.      Common sense reasons for the Defendants to "systematically and regularly" review (1) CSP covered service providers (CSP) and (2) the investment menu for participants/beneficiaries is because the Defendants must annually file certified Forms 5500 Schedule H, Line 4d if there were any "non-exempt payments

to parties in interest." To avoid perjury the Defendants must ensure the plan and trust's providers as well as funds' manager's fees are "necessary for operation of the plan." If they are not, the Defendants need to consider removal to comply with answering "NO" on Line 4d of Schedule H (stating there were no non-exempt transactions). That means that reviewing the trust's providers and funds every three to six months gives the Defendants time to avoid a "failure to act" violation. Coupled with the fact that 1) thousands of workers leave each year (sweeping out an average of $1,719,403 of plan assets each month (or over $20 million per year) based on the Defendants' 2010 to 2019 Forms 5500) and 2) because Standard and Poor's stated in SPIVA: 2020 Mid-Year Active vs. Passive Scorecard that: "Through June, more than 87% (87.2%) of all domestic stock fund managers had underperformed the broad S&P Composite 1500 Index since June 2005."

https://www.spglobal.com/spdji/en/documents/spiva/spiva-us-mid-year-2020.pdf.

The point being that participants who suffer harm from excessive payments and lagging returns continually leave the plan thus guaranteeing losses with little recourse for recovery.

82. The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in millions of dollars of damages to participants.

**B.    Defendants Paid MassMutual, LPL, and Alliant (CSPs) Unreasonable Fees, Failed to Monitor CSPs, and Failed to make Requests for Proposals from Other CSPs**

83. Defendants have a duty to prudently select covered service providers (CSP). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the

importance of prudently selecting service providers.[9] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided." *Id*. Furthermore, "such process should be designed to avoid self-dealing, conflicts of interest or other improper influence." *Id*.   Although the DOL has offered such general guidance, it has also cautioned that prudent selection of a service provider "will depend upon the particular facts and circumstances." *Id*.

### *MassMutual*

84.     Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

85.     The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

86.     The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

87.     There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based

---

[9] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

on service and price, and vigorously compete for business by offering the best service for the best price.

88.     Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

89.     Recordkeepers for defined contribution plans are generally compensated in two ways: First, through direct payments from the plan (participants) or employer; and second, through indirect payments via a practice known as revenue sharing.

90.     In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of Fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

91.     Because revenue sharing arrangements pay recordkeepers asset-based fees, prudent fiduciaries monitor the total amount of revenue sharing a recordkeeper receives to ensure that the recordkeeper is not receiving unreasonable compensation. A prudent fiduciary ensures that the recordkeeper rebates to the plan all revenue sharing payments that exceed a reasonable per participant recordkeeping fee that can be obtained from the recordkeeping market through competitive bids.

92.     Because revenue sharing payments are asset based, they bear no relation to the actual cost to provide services or the number of plan participants and can result in payment of unreasonable recordkeeping fees. To put it another way, recordkeepers (or any other CSP) receiving unchecked revenue sharing compensation accrue significant ongoing pay increases simply as a result of participants putting money

aside biweekly for retirement. Additional funds come from interest, dividends and capital gains. Based on the Form 5500 record between 2014 and 2019, contributions totaled $168,338,193 (or an average of $28,056,366/year); these contributions triggered additional revenue sharing.

93.    Based on the number of Plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plan is approximately $40 per participant (15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey: https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf. Failing to align CSP fees with industry benchmarks shifts the burden to the Defendants to justify allowing participants to pay unreasonably high fees.

94.    At the Plan's inception in 2010, Defendants chose MassMutual to serve as the recordkeeper.  MassMutual maintained its role as recordkeeper until late 2019, when Defendants appointed Prudential as the Plan's recordkeeper.

95.    According to PlanSponsor Magazine's 2019 survey, MassMutual was the nation's 10th largest recordkeeper by number of defined contribution plans with 20,716 plans and approximately 2.5 million participants.[10]

96.    Based on the direct and indirect compensation levels shown on the Plan's Form 5500s filed with the Department of Labor between 2010 and 2019, the Plan paid much more than a reasonable fee for MassMutual's services, resulting in the Plan paying millions of dollars in excessive recordkeeping fees.  The below chart demonstrates that the Plan consistently paid more than $40 per participant throughout the duration of the Plan with the exception of 2010.

//

//

//

---

[10] https://www.plansponsor.com/research/2019-recordkeeping-survey/#Introduction and https://www.plansponsor.com/massmutual-points-scale-reason-empower-deal/.

CLASS ACTION COMPLAINT

97.     Indirect payments for 2019 were estimated based on the calculated rates from the previous three years. Actual indirect payments for 2019 could not be determined because the funds were "in transit" on December 31, 2019 and there was no schedule of assets listing the funds and assets.   Based on past disclosures and the investment lineup previously offered by the Plan, Plaintiffs believe the Plan continued to pay excessive compensation to MassMutual throughout the entire 2019 year.

98.     The unreasonable fees paid to MassMutual through its revenue sharing arrangements directly resulted from Defendants' choice of improper mutual fund share classes and failing to monitor MassMutual and compare it with other service providers and market rates.

### *LPL and Alliant*

99.      Upon information and belief, LPL's services to the Plan were improperly coded in the Defendants' Form 5500 and the services they did provide were principally motivated by compensation rather than what was in the best interest of the Plan participants. The Defendants are responsible for CSP oversight.

100.   According to the 2010 Form 5500 Schedule A, Part I, line 3(a) and (b), Defendants acted at the time to direct pay (commissions) of $5,001 while

simultaneously stating on the same certified filing, Schedule C, line 2(a)(b) Service Code 53 and (c) "Shareholder Service Prov" (taken to mean "SHAREHOLDER SERVICE PROVIDER") and (g) $82,312 in indirect compensation.

101.   A typical shareholder service provider's website identifies some of their services as:

      • Shareholder accounting and recordkeeping services

      • Distribution of dividends and capital gains

      • Manage systematic investments and withdrawals

      • Online portal for investor activity, statements, and confirms

      • Provide daily shareholder cash management

      • Support lost shareholder recovery and escheatment

      • Prepare and deliver account confirmations and statements (mail and on-line)

      • Support NSCC processing and provide dealer services

      • Calculate and report Rule 12b-1, commission and other intermediary payments

102.   To be reasonably paid over $80,000, according to the Fee Benchmarker® (Advisor Fee Almanac, 6th Edition, 2017), LPL would have to have spent over 200 hours servicing the Plan.

103.   However, based on the services typically provided by LPL and confirmed through information found online in LPL's "ERISA § 408 "RETIREMENT PLAN BROKERAGE ACCOUNT ERISA 408(B)(2) DISCLOSURE INFORMATION --- APPLICABLE FOR ERISA RETIREMENT PLANS"" Plaintiffs believe that LPL was hired to provide investment guidance and recommendations. The following is information from their disclosures:

      "Below is information about the compensation that LPL and your Representative may receive in connection with its provision of brokerage services to the Plan and certain conflicts of interest that may be raised in connection with this compensation."

//

//

INDIRECT COMPENSATION

Distribution and/or Servicing Fees, 12b-1 Fees and Trail Payments - For certain of our services, we are paid by third parties rather than or in addition to being paid directly by the Plan. For example, a mutual fund underwriter, variable annuity issuer or distributor, or other product sponsor may pay LPL an ongoing amount that is based on the value of the Plan's investment in the product. These ongoing payments are often called distribution and/or service fees, 12b-1 fees or trails."

104.   Plaintiffs believe based on https://freeerisa.benefitspro.com/static/popups/legends.aspx   Service Code 53 is actually for "Insurance brokerage commissions and fees." Plaintiffs believe that this fact is supported by the description of entities' services who are acting as "SHAREHOLDER SERVICE PROVIDER" which clearly is NOT what LPL does for SEAS 401k (based on hundreds of other LPL clients' Forms 5500 Plaintiffs's experts reviewed).



**RETIREMENT PLAN BROKERAGE ACCOUNT ERISA 408(B)(2) DISCLOSURE INFORMATION APPLICABLE FOR ERISA RETIREMENT PLANS**

- Janus Capital Management LLC
- John Hancock Funds
- JP Morgan Investment Management
- Lazard Asset Management
- Legg Mason Partners
- Lord Abbett
- Mainstay
- Managers Investment Group
- MFS
- NATIXIS
- Neuberger Berman Management, Inc.
- Nuveen
- Oppenheimer Funds
- Pacific Life
- PIMCO
- Pioneer Investments

- Principal Funds
- Prudential
- Putnam Investments
- Russell Invesments
- Sentinel Investments
- Stadion Money Management LLC
- SunAmerica
- TIAA-CREF
- Thornburg Investment Management, Inc.
- Touchstone Investments
- Transamerica Capital, Inc.
- Transparent Value
- Van Eck Securities Corporation
- Virtus Investments
- Voya Investment Management
- Wells Fargo Funds Management, LLC

105.   Many of the mutual funds listed above appear in the Defendants' plan and represent some of the funds that LPL has a "selling agreement" with.  Regulated by the U.S. Securities and Exchange Commission (SEC), LPL was forced to admit this in writing. Without the benefit of LPL's service agreement but based on the available information, upon information and belief, LPL acted in their own self-interest to ensure investments from fund companies they had selling arrangements

-44-

1    with were well-represented in the Plan. Defendants acted to incorporate these
2    investments into the Plan to the detriment of participants/beneficiaries and benefit of
3    LPL.

4         106.    The trust's investments paid them indirectly as confirmed by the
5    Defendants' own Forms 5500—BASED ON "THE VALUE OF THE PLAN'S
6    INVESTMENT IN THE PRODUCT."

7         107.    That means the trust ownership of one of these mutual funds
8    recommended by LPL binds every participant in the plan as far as harm occurs by
9    the depletion of the price (gross asset values (GAV)) of said mutual funds each day
10   by these extra SEC Rule 12b-1 and/or "sub-transfer agency" fees.

11        108.   Further evidence illustrates how Defendants actions benefited LPL. The
12   next year, 2011, LPL's Schedule A compensation almost doubled to $9,146 and their
13   Schedule C Indirect Compensation increase to $156,987. Pay increases continued
14   through   2013.   The   reason   these   pay   raises   occurred   is   because
15   participants/beneficiaries saved money, they rolled over money and investments
16   increased when the trust used those dollars and invested in the "LPL recommended"
17   mutual funds. The pay increases were not a reflection of any increase in labor.

18        109.    The root cause is found at the beginning of this section. The
19   Defendants' have a flawed and reckless provider selection process that Plaintiffs
20   believe is "tainted by failure of effort, competence, or loyalty." *Braden v. Wal-Mart*
21   *Stores* (2009) 588 F.3d 595, 596.

22        110.    Upon information and belief, LPL was NOT necessary for the SEAS
23   401k plan operation. Therefore, any payment to them creates a DOL/IRS prohibited
24   transaction for that associated plan year. LPL did not double their hours on the SEAS
25   401k plan over the course of one year. Upon information and belief LPL did not send
26   a 2011 ERISA Section 408(b)(2) Service and Compensation notice to the Defendants
27   listing a new increased list of services—Plaintiffs reviewed them and the services are

28

the same. Further, the Defendants' Forms 5500 2011 - 2013 Schedule C Service
Codes did NOT change.

**ThinkAdvisor**

### Dually Registered Firm Must Pay SEC $1.2M Over 12b-1 Fees

The SEC order also finds that Centaurus received revenue sharing ... the Division of Enforcement's Share Class Selection Disclosure Initiative, ...
1 month ago



**IN  InvestmentNews**

### Crown Capital settles with SEC over 12b-1 fees

The SEC launched its Share Class Selection Disclosure Initiative in February 2018 to target advisory firms that recommended high-fee mutual ...
5 hours ago



111.    a "Over the past several years, the Securities and Exchange Commission ("Commission") has ***filed numerous actions in which an investment adviser failed to make required disclosures relating to its selection of mutual fund share classes that paid the adviser*** (as a dually registered broker-dealer) or its related entities or individuals a fee ***pursuant to Rule 12b-1 of the Investment Company Act of 1940*** ("12b-1" fee) ***when a lower-cost share class for the same fund was available to clients***. The Share Class Selection Disclosure Initiative (the "SCSD Initiative") is ***intended to identify and promptly remedy potential widespread violations of this nature***."

112.    Plaintiffs note the U.S. Securities and Exchange Commission (SEC) Division of Enforcement has advertised its ***Share Class Selection Disclosure Initiative***,   https://www.sec.gov/enforce/announcement/scsd-initiative   to   ***warn investors like the Defendants of behavior akin to LPL's regarding who should sell or choose "expensive" share classes of mutual funds***.

CLASS ACTION COMPLAINT

1    113.    The SEC has stated that: ***"The Commission may file enforcement***
2    ***actions alleging violations of these provisions against investment advisers that fail***
3    ***to disclose to their clients conflicts of interest, including those conflicts associated***
4    ***with the receipt of 12b-1 fees for investing client funds in, or recommending that***
5    ***clients invest in, a 12b-1 fee paying share class when a lower-cost share class was***
6    ***available to clients for the same fund. A 12b-1 fee is a fee paid by a mutual fund***
7    ***on an ongoing basis from its assets for shareholder services, distribution, and***
8    ***marketing expenses. Each share class of a fund represents an interest in the same***
9    ***portfolio of securities.*** Therefore, ***when there is a lower-cost share class available***
10   ***that does not charge a 12b-1 fee (or charges a lower 12b-1 fee), it is usually in the***
11   ***client's best interest to invest in the lower-cost share class rather than the 12b-1 fee***
12   ***paying share class because the client's returns would not be reduced by the 12b-1***
13   ***fees."*** The U.S. Securities and Exchange Commission (SEC) has been warning
14   fiduciaries for years to avoid these extra fees.

15   114.    What is true for LPL applies to Alliant Insurance Services, LLC, and
16   Alliant Retirement Services, as well who provided Consulting (general) according to
17   Defendants' Form 5500 Schedule C service code 16. Given that Alliant appeared as
18   a CSP on the Schedule C in 2014, the year after LPL's last inclusion and their receipt
19   of indirect compensation that is within the range received by LPL during their
20   tenure, Plaintiffs believe that their services were similar in nature. While there were a
21   handful of investment changes in 2014 and 2015, they maintained a similar lack of
22   demonstrated effort or skill in managing the investments.  Alliant made a total of
23   $1,005,669 during 2014 to 2019 plan years (or an average of almost $168,000
24   (163,540, 232,444, 179,199, 135,934, 148,625, 145,927 respectively)).

25   115.    Because the Defendants never acted to exchange the share classes of
26   the mutual funds with their least expensive option, it is unclear what value LPL and
27   Alliant brought to the Plan and its participants/beneficiaries. The vast majority of
28   funds in the plan caused financial harm through high costs and lagging returns. The

target-date funds and Columbia index funds are notable examples because they were selected at the Plan's inception and remained in the plan through 2019. If LPL and Alliant added no value then any fee paid to them is unreasonable.

116.  The mutual funds paid CSPs annual revenue sharing fees based on a percentage of the total Plan assets invested in the fund, which were ultimately paid by Plan participants who invested in those funds. The Plan participants realized lower returns on their investments because they paid higher fund operating expenses. In fact, over time participant returns were reduced by a greater amount than the fee itself so the widespread use of higher cost share classes to pay service provider costs instead of direct billing unduly harmed participants.

117.  For example, in 2015, the Loomis Sayles Small Cap Growth Retail class shares charged 1.19% in total expenses annually to Plan participants invested in the fund. The 1.19% is over 40% more expensive than the Class N shares (0.83%) whose minimum initial investment requirements are waived for "Certain Retirement Plans held in an omnibus fashion".   Furthermore, based on this imprudent decision, cumulative returns over the five-year period between 2015 and 2019 reflect an average yearly loss of 0.62%, which equates to an average yearly loss, or harm to participants, of more than 60% over merely the difference in fees.

118.  As previously noted, over 90% of the funds offered to the participants had less expensive share classes available. The difference in share class expenses ranged from 0.05% to 0.60%. In 2015, 14 of the 28 funds had 12b-1 fees (all 0.25%), while 24 of the 28 funds had sub-transfer agent fees ranging from 0.10% to 0.35%. Combined 12b-1 and sub-transfer agent fees range from 0.00% (Vanguard 500 Index) to 0.60% (American Century target-date funds). This disparity guarantees that participants pay wildly different rates of fees, as well as vastly different amounts of fees for the exact same level of service. As illustrated above, Defendant's use of higher cost share classes to pay service provider costs is the most inequitable, inefficient and expensive method available.

119.    Lastly, upon information and belief, Defendants failed to perform comparisons of its CSPs with the marketplace for other plans of similar size.  For example, Plan Participants paid ALLIANT INSURANCE SERVICES, LLC ("Alliant", EIN# 33-0785439) $163,440 according to Defendants' 2014 Form 5500 for "Financial Advisor" services.  In that same year, "ALLIANT RETIREMENT SERVICES") also EIN #33-0785439) charged the similarly sized LHC Group 401(k) plan $38,354 in direct compensation (as opposed to revenue sharing indirect compensation).

120.   Defendants failed to use the Plan's bargaining power to leverage its CSPs to charge lower administrative fees for the Plan participants.

121.   Defendants failed to take any or adequate action to monitor, evaluate or reduce LPL or Alliant's fees, such as:

   a.  Choosing mutual fund share classes with lower revenue sharing for the Plan;

   b.  Seeking competing bids from other providers for recordkeeping services;

   c.  Monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or

   d.  upon information and belief, negotiating with LPL or Alliant to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan.

122.    The amount of compensation paid to CSPs vastly exceeds any relative DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit." Despite periodic acknowledgements that fees were too high Defendants failed to correct previous excessive fee prohibited transactions. Evidence of such would be found on Schedule G of the Form 5500 and the filing of IRS Form 5330 (Excise tax for Benefit Plans) which is reported in the Independent Auditors' Report attached to the Form 5500. Correction includes U.S. Departments of Treasury //

1  and Labor 20% and 100% (tier 2) excise taxes respectively for every affected plan

2  year.

3  **C.**    **Defendants Selected and Maintained Imprudent Funds that Fell Below**

4  **the Reasonable Standard of Care**

5      123.   An ERISA plan fiduciary's breach of the duty of prudence hinges on

6  infirmities in the selection process for investment and a failure to investigate

7  alternatives; when beneficiaries claim the fiduciary made an imprudent investment,

8  actual knowledge of the breach will usually require some knowledge of how the

9  fiduciary selected the investment. Employee Retirement Income Security Act of

10  1974 § 404, 29 U.S.C.A. § 1104(a)(1).

11      124.    The Investment Policy Statement (IPS), meeting minutes and other

12  information used at the time the investments were selected and subsequently

13  monitored are in sole possession of the Defendants and are material for a trier of fact

14  to determine what level of effort, skill and participant loyalty were applied to the

15  investment selection and monitoring process.

16      125.    Accordingly, most courts carefully analyze first whether the fiduciary

17  conducted an adequate investigation. *Bussian v. RJR Nabisco, Inc. II*, 223 F.3d 286,

18  302.  If so, courts typically look to whether the decision was reasonable in light of

19  the beneficiaries' interests.

20      126.    Plaintiffs are not arguing from a vantage point of hindsight, but rather

21  arguing that the harm caused would have been avoided by prudent fiduciaries

22  utilizing Plan document guidelines and information readily available at the time of

23  selection and throughout the subsequent monitoring periods.  Additionally, Plaintiffs

24  are not merely arguing that Defendants should offer institutional share classes

25  instead of retail or that Defendants needed to scour the universe for cheaper

26  alternatives, rather *more* prudent options were available within the prospectuses of

27  90% of the funds the Defendants chose. While reckless and imprudent fund selection

28  and flawed and inadequate monitoring is identified, the lack of effort and

indifference to what participants/beneficiaries paid within the share class options of the funds they chose is a key element of this complaint. It took a decade of significant underperformance before the Defendants acknowledged their failures and modified their review and monitoring processes.

127.   Plaintiffs do not have access to the Defendants' Investment Policy Statement (IPS), a plan document, but do have the MassMutual Sample investment policy.[11] It states:

> a.   "The particular investments should pursue the following standards:
>
> > i.   Performance equal to or greater than the median return for an appropriate, style-specific benchmark and peer group over a specified time period.
> >
> > ii.   Specific risk and risk-adjusted return measures should be established and agreed to by [Plan Sponsor/investment committee] and be within a reasonable range relative to an appropriate, style-specific benchmark and peer group.
> >
> > iii.   Demonstrated adherence to the stated investment objective.
> >
> > iv.   Competitive fees compared to similar investments."

128.   Applying these standards which are similar to those at Fidelity, Vanguard, T. Rowe, etc., the Defendants' initial selection processes do not match these elements. For example, the ClearBridge Appreciation Fund added in 2013 had a prior annual median return of a loss of (0.56%) per year (from 1997 to 2012). Clearbridge Appreciation lagged its primary prospectus benchmark in seven of the ten years prior to Defendants' selection the fund. Not surprisingly, the fund continued to lag in five of the seven years after its inclusion and was kept as an option after Prudential took over recordkeeping functions in 2020.

129.   In addition, using U.S. Securities and Exchange Commission (SEC) prospectus data pulled for the time when the Defendants' conduct would have been

---

[11] Plaintiffs anticipate obtaining the IPS in discovery.

performed (based on their own Forms 5500 Schedules and financial statements located at www.efast.dol.gov), seventy-four percent (74%) of the 2010 trust assets were invested in funds that paid out the highest amount of revenue sharing (0.60%):

  i.  American Century Livestrong Income Portfolio A;

  ii.  American Century Livestrong 2015 Portfolio A;

  iii.  American Century Livestrong 2020 Portfolio A

  iv.  American Century Livestrong 2025 Portfolio A

  v.  American Century Livestrong 2030 Portfolio A

  vi.  American Century Livestrong 2035 Portfolio A

  vii.  American Century Livestrong 2040 Portfolio A

  viii.  American Century Livestrong 2045 Portfolio A

  ix.  American Century Livestrong 2050 Portfolio A.

130. The American Century target-date funds were added at the Plan's inception with a negligible track record and maintained through 2019 despite poor returns, high fees and overt conflicts of interest. It is notable that these funds paid out the highest indirect revenue and as the default investment quickly attracted over 70% of the Plan's assets. Despite having every reason not to select them initially and, after doing so remove them, Defendants, in clear evidence of imprudence, continued to hold them for ten years.

131. Simply looking at one of the American Century target date funds which held the majority of participants/beneficiaries' savings ("Our diversified target-date funds automatically adjust as their target goal date approaches."), the 2025 fund, this fund (like all of its "sister" funds) existed for only five years at the time of the Defendants' actions to add them in 2010 (formed 8/31/2004). More importantly, the prospectuses for 2009 back to 2005 indicated the Defendants selected fund had reported an arithmetic total loss versus prospectus benchmark of -11.19% (or a median annual loss of -4.2% per year (-8.68%; 8.50%; -0.79%; -6.03%; -4.19%)) respectively for year 2009 back to the year 2005). The Defendants could

have chosen from one hundred and thirty-three (133) other target date funds like Fidelity, Vanguard, T. Rowe, etc. (with longer track records across a variety of market cycles, larger asset bases (indicating they frequently survived the vetting process of other plan fiduciaries) and readily available options without SEC Rule 12b-1 and/or "sub-transfer agency" fees)).

132.   In addition, he Defendants' 2010 Annual Return/Report of Employee Benefit Plan to the U.S. Departments of Treasury and Labor indicated the "American Century One Choice 2025 A" share class cost 1.11%/yr when the identical institutional share cost 0.66% annually ("American Century One Choice 2025 I") was available to the Defendants.

133.   The target-date funds' prospectus language conveys the Defendants' lack of loyalty and imprudence: "The distributor also may pay fees related to obtaining data regarding intermediary or financial advisor activities to assist American Century Investments with sales reporting, business intelligence, and training and education opportunities. These payments may create a conflict of interest by influencing the intermediary to recommend the funds over another investment. *American Century Investments does not pay any fees to financial intermediaries on R6 Class shares."* Defendants never selected the lowest cost R6 share class.

134.   Given Buffett's assertion that stocks are expected to grow at GDP + dividends (~5% per year if the yield was 2%), the Defendants' selection and retention process managed to choose this costly share class that had earned the exact inverse practically during their review period of late 2009/early 2010 and back to the funds' inception. That means that the worker's average $10,000 balance would be reduced by -$1,930.85 over five years in this fund at that rate. In reality, after the Defendants' addition in 2010, the fund's total loss up to 2020 was -23% or -2.82%/year. This actual loss for 2010 to 2020 depleted a worker's $10,000 balance by $2,700. Given the fact they are most typically the "default" funds (for those not

electing a fund) and the ease of use and popularity of these funds possessing over 74% of worker's savings, an estimated 2,606 workers invested in this fund and have lost $7,035,391.79 in just this 2025 fund alone due to the Defendants' imprudent investment management processes. The cheaper and higher yielding share class would have fared somewhat better if the Defendants had exhibited greater skill and slightly more loyalty to the participants/beneficiaries. The sum of the loss would have been -8.94% versus -11.19% and a median annual loss of -3.71% versus -4.2% (-8.25%; 8.83%; -0.29%; -5.52%; -3.71% respectively for years 2009 back to 2005).

135.   Going out on a limb with "other people's money" is the opposite of the job of a "good steward." The Defendants' choice of the target funds for their trust was risky and reckless at the time of the conduct and data revealed that the Defendants' selection: (1) had a short track record, (2) was one of the most costly at the time,  (3) was critically important to be thorough because the selection had great impact as over 70% of the trust (mostly rollover money) would be invested in the selection process of the Defendants.  This previous improper selection compounded over time resulting in a continuing violation through 2019.

136.   On 12/31/2009, according to prospectus, the Defendants' selection had "Assets ($millions): 83.6" while Vanguard's and Fidelity's 2025 fund's investors' dollars were approximately 130x and 106x bigger, which may have been more viable options that American Century: (i) "Assets ($millions): 10,949.0"; (ii)."Assets ($millions): 8,880.9."

137.   Based on the selected funds information at the time of the conduct prior to plan inception, these target date funds and other funds were not a "prudent" selection as the relevant data regarding those funds do not match with the MassMutual Sample Investment Policy which states: "The particular investments should pursue the  following standards: 1. Performance equal to or greater than the median return for an appropriate, style-specific benchmark and peer group over a

1  specified time period." Further, many other publicly available investment policies
2  and samples state: "The Fiduciary will use the least expensive share class available."

3        138.    Actual IPS language notwithstanding, recently a court observed that
4  *"[b]ecause the institutional share classes are otherwise identical to the Investor*
5  *share classes, but with lower fees, a prudent fiduciary would know immediately that*
6  *a switch is necessary*. Thus, the "manner that is reasonable and appropriate to the
7  particular investment action, and strategies involved…in this case would *mandate a*
8  *prudent fiduciary – who indisputably has knowledge of institutional share classes*
9  *and that such share classes provide identical investments at lower costs – to switch*
10 *share classes immediately*." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, slip op.
11 at 13 (C.D. Cal. Aug. 16, 2017). This, the Defendants failed to do in breach of their
12 fiduciary duty.

13       139.    "Accordingly, fiduciary breaches violate substantive rights held
14 directly by the participant. This is precisely the type of harm that "sharpens the
15 presentation of issues upon which the court so largely depends for illumination."
16 *Sprint, 554 U.S. at 288* (citation omitted). "The invasion of that legal interest thus
17 provides standing." See *Scanlan v. Eisenberg, 669 F.3d 838, 846 (7th Cir. 2012)*
18 (*finding Article III injury because "dereliction of their fiduciary duties is a direct*
19 *invasion of Scanlan's protected interest in the prudent and loyal administration of*
20 *the trust*"); Restatement (Second) of Trusts § 200 ("No one except a beneficiary or
21 one suing on his behalf can maintain a suit against the trustee to enforce the trust or
22 to enjoin redress for a breach of trust.")

23       140.    To maintain tax exemption, Defendants must precisely follow the terms
24 of the plan's written documents such as these policies. Should they fail, as stated in
25 the Defendants' plan's IRS Determination letter, the IRS requires compliance with
26 the written form of the plan's documents to retain a tax-exempt trust and prevent
27 taxation of employee contributions. The IRS disregards statutes of limitations--26
28

CFR 601.202: Closing agreements, Rev. Proc. 2008-50, Correction Principles, ref: §6 of Rev. Proc. 2008-50:

a.      "(5) Identification of Failures. A complete description of the failures, the years in which the failures occurred, including closed years (that is, years for which the statutory period has expired), and the number of employees affected by each failure."

b.      "Full correction includes all taxable years, whether or not the taxable year is closed. The correction method should restore the Plan and its participants to the position they would have been in had the failure not occurred."

141.      Defendant's lack of skill and effort caused ten years of excessive fees and lagging returns relative to lower cost share classes of the exact same funds, much less relative to benchmarks. What is frequently lost in understanding the harm is that between 2010 and 2019, the trust had to liquidate $206,328,361 in assets to pay former participants/beneficiaries. The losses these participants suffered since as early as the Plan's inception are fully actualized and concrete.

142.      SECTION 6. CORRECTION PRINCIPLES AND RULES OF GENERAL APPLICABILITY (https://www.irs.gov/irb/2019-19_IRB#REV-PROC-2019-19) states the following:

a.      ".01 Correction principles; rules of general applicability. The general correction principles in section 6.02 and rules of general applicability in sections 6.03 through 6.13 apply for purposes of this revenue procedure.

b.      ".02 Correction principles. Generally, a failure is not corrected unless full correction is made with respect to all participants and beneficiaries, and for all taxable years (whether or not the taxable year is closed)."

c.      ***"Even if correction is made for a closed taxable year, the tax liability associated with that year will not be redetermined because of the correction. Correction is determined taking into account the terms of the plan at the time of the failure. Correction should be accomplished taking into account***

1    ***the following principles: (1) Restoration of benefits. The correction method***
2    ***should restore the plan to the position it would have been in had the failure***
3    ***not occurred, including restoration of current and former participants and***
4    ***beneficiaries to the benefits and rights they would have had if the failure***
5    ***had not occurred."***

6    143.   According to the Department of Labor, "the Voluntary Fiduciary
7    Corrections Program (VFCP) is a voluntary enforcement program that allows plan
8    officials to identify and fully correct certain transactions such as prohibited
9    purchases, sales and exchanges; improper loans; delinquent participant contributions;
10   and improper plan expenses." The program is intended to provide relief from
11   enforcement programs which can significantly increase the cost of correction
12   through penalties and excise taxes and ensure that the plan is restored back to the
13   condition it would have been in had the breach not occurred. Accordingly, the Labor
14   Department provides a calculator to determine lost earnings which was used to arrive
15   at $53,523,698.53. The data comes directly from the Defendants' own tax filing
16   income statements and balance sheets in conjunction with median return lags across
17   all plan years.   It should be noted that the program is not available once an
18   investigation has occurred and additional penalties and excise taxes would apply.

19   //

20   //

21   //

22   //

23   //

24   //

25   //

26   //

27   //

28   //

An official website of the United States government. Here's how you know ⌄

**U.S. DEPARTMENT OF LABOR**

## Employee Benefits Security Administration

TOPICS ⌄     WORKERS ⌄     EMPLOYERS AND ADVISERS ⌄     RESOURCES ⌄     LAWS AND REGULATIONS ⌄

DOL › EBSA Home › VFCP Calculator

# VFCP Calculator – Lost Earnings

Please see instructions to assure correct data entry.

**Principal:** [          ]

**Loss Date:** [     ] / [     ] / [     ]
mm/dd/yyyy

**Recovery Date:** [     ] / [     ] / [     ]
mm/dd/yyyy

**Final Payment Date:** [     ] / [     ] / [     ]
mm/dd/yyyy

[ Enter/Calculate ]   [ Reset/Start Over ]   View Instructions

**Lost Earnings**

| Principal | Loss Date | Recovery Date | Final Payment Date | Amount Due | Total |
|---|---|---|---|---|---|
| $1,612,762 | 3/1/2010 | 6/30/2021 | 6/30/2021 | $1,476,071.16 | $3,088,833.16 |
| $1,873,836 | 1/1/2011 | 6/30/2021 | 6/30/2021 | $1,539,066.11 | $3,412,902.11 |
| $2,289,609 | 1/1/2012 | 6/30/2021 | 6/30/2021 | $1,657,357.22 | $3,946,966.22 |
| $2,872,795 | 1/1/2013 | 6/30/2021 | 6/30/2021 | $1,837,990.38 | $4,710,785.38 |
| $3,294,121 | 1/1/2014 | 6/30/2021 | 6/30/2021 | $1,844,126.18 | $5,138,247.18 |
| $3,691,453 | 1/1/2015 | 6/30/2021 | 6/30/2021 | $1,785,759.01 | $5,477,212.01 |
| $3,682,703 | 1/1/2016 | 6/30/2021 | 6/30/2021 | $1,515,052.30 | $5,197,755.30 |
| $4,344,704 | 1/1/2017 | 6/30/2021 | 6/30/2021 | $1,444,533.63 | $5,789,237.63 |
| $4,698,193 | 1/1/2018 | 6/30/2021 | 6/30/2021 | $1,197,522.37 | $5,895,715.37 |
| $4,921,802 | 1/1/2019 | 6/30/2021 | 6/30/2021 | $850,897.82 | $5,772,699.82 |
| $4,680,443 | 1/1/2020 | 6/30/2021 | 6/30/2021 | $412,901.35 | $5,093,344.35 |
| Principal Amount Total: $37,962,421 | | | Lost Earnings Total: $15,561,277.53 | Total: | Total: $53,523,698.53 |

-58-
CLASS ACTION COMPLAINT

### D.    Defendants Failed to Diversify the Plan's Investments

144.    U.S. Code §1104(a)(1)(C) states, "A fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries… by diversifying the investments of the plan so as to minimize the risk of large losses…"

145.    Breach of duty under ERISA to diversify constitutes an independent basis of liability, separate from a breach of general duty of prudence imposed on trustees. Employee Retirement Income Security Act of 1974, § 404(a)(1)(C), 29 U.S.C.A. § 1104(a)(1)(C), and *Liss v. Smith*, 991 F. Supp. 278, 301 (S.D.N.Y. 1998)

146.    "…[T}here is no "per se" violation of ERISA section requiring diversification of plan assets, as each case turns on its unique facts and circumstances. *Id*.  To establish a violation, a plaintiff must demonstrate that the portfolio is not diversified "on its face." *Id*.  Determinations as to whether ERISA's diversification requirement was breached require factual findings and are usually made on the basis of expert testimony at trial. *Id*. Once the plaintiff has established a failure to diversify, the burden shifts to the defendant to show that it was "clearly prudent" not to diversify. *In Re Unisys Savings Plan Litigation*, 74 F.3d 420, 438 (3d Cir.1996). Prudence is evaluated at the time of the investment without the benefit of hindsight.

147.    A violation of the diversification requirement may arise from any of the following:

a. concentration of investments in a single issuer (often the employer-sponsor),

b. failure to diversify by type of investment,

c. concentration of investments in a single geographic area,

d. failure to take plan liquidity needs into account, and/or,

e. concentration of plan assets in a single investment.[12]

---

[12] Handbook on ERISA Litigation, Third Edition, 2006, by James F. Jorden, Waldemar, Plepsen, Stephen Goldberg, §4.03[A].

148.   Defendants failed to diversify by type of investment and thus fell below the reasonable standard of care.   Reviewing Defendants' first IRS Form 5500 submission in 2010, the Plan and Trust's equity funds were well over 90% correlated with one another. For illustration purposes, a participant who invests equally across three equity funds and one fixed income/stable value option during a stock market loss of 30% would require that their portfolio generate a subsequent gain of 43% just to break even. In this scenario, the account value decline during a stock market loss of 30% is 22.5%, including the fixed income/stable value holding. Based on modern portfolio theory principals, utilizing non-correlated investments (equity investments especially) is one of the most effective ways to reduce the potential for large losses which may dramatically shorten the recovery period.

149.   The same correlation of over 90% remained through the Relevant Time Period, as demonstrated by reviewing Defendants' IRS Form 5500 filings for three distinct periods of time: (1) the mutual funds contained on 12/31/2010 and stated in the Defendants' 2010 Form 5500 filing; (2)  the selected/retained mutual funds as of



//

151.   "One of the central findings of Modern Portfolio Theory [is] that … huge and essentially costless gains [can be obtained by] diversifying [a] portfolio thoroughly." John H. Langbein, the Reporter for the Uniform Prudent Act and Chancellor Kent professor of law and legal history at Yale University law school, in "The Uniform Prudent Investor Act and the Future of Trust Investing," Iowa Law Review, Volume 81, 1996, pages 641-69.[13]

152.   Although equities provide potential for higher upside than lower-risk investments like bonds, they also expose the plan to the potential for greater losses. Moreover, diversifying investments is important to reduce risk and uncertainty because different asset classes generally do not increase or decrease in value at the same time. Indeed, diversification is so fundamental an investment concept and so critical to protecting plan assets that Congress explicitly included it as part of a fiduciary's duties. 29 U.S.C. 1104(a)(1)(C).

153.   Defendants had no adequate annual review or other process in place to fulfill their continuing obligation to monitor the diversity and correlation of Plan investments or, in the alternative, failed to follow the processes, as evidenced by high correlation of equities offered by the Plan.

### CLASS ACTION ALLEGATIONS

154.   Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows:

155.   All participants in or beneficiaries of the SeaWorld Parks and Entertainment 401(K) PLAN, and the SWBG, LLC 401(K) PLAN through the date of judgment (the "Class Period").

---

[13] John H. Langbein is Sterling Professor Emeritus of Law and Legal History and Professorial Lecturer in Law at Yale. He is an eminent legal historian and a **leading American authority on trust**, probate, **pension, and investment law**. He teaches and writes in the fields of Anglo-American and European legal history, **modern comparative law, trust and estate law, and pension and employee benefit law (ERISA).** He was the reporter and principal drafter for the Uniform Prudent Investor Act (1994), which governs fiduciary investing in most American states, and he was Associate Reporter for the American Law Institute's Restatement (Third) of Property: Wills and Other Donative Transfers (3 vols. 1999-2011).

156.    The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of January 1, 2018, the Plan had over 17,300 participants with account balances.

157.    There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

(a) whether Defendant is a fiduciary of the Plan;

(b) whether Defendant breached its fiduciary duties of loyalty and prudence with respect to the Plan;

(c) whether Defendant had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendant breached their duty to monitor other fiduciaries of the Plan;

(e) whether Defendant breached its duty to diversify investments; and

(f) the extent of damage sustained by Class members and the appropriate measure of damages.

158.    Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

159.    Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches in particular.

160.    Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

161.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and

CLASS ACTION COMPLAINT

beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duties of Prudence and Loyalty

### (Against All Defendants)

162.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

163.   Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

164.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

//

165.   Common law and ERISA's duty of prudence required Defendant to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

166.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high cost relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

167.   In addition, Defendants may have failed to monitor or control excessive compensation paid for recordkeeping services, if any resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

168.   In addition, Defendants may have failed to monitor or control excessive compensation paid for shareholder or financial advising services, if any resulted from the unnecessary payment of those services as a percentage of assets.

169.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own

duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

170.     As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.'

## SECOND CAUSE OF ACTION

**Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers**

**(Against All Defendants)**

171.     Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

172.     Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

173.     A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to //

CLASS ACTION COMPLAINT

perform their fiduciary obligations in accordance with ERISA and common law trusts.

174.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

175.   Defendants breached its fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

176.   As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would

CLASS ACTION COMPLAINT

1  not have suffered these losses, and Plan participants would have had more money
2  available to them for their retirement.

3     177.   Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29
4  U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendant is liable to
5  disgorge all fees received from the Plan, directly or indirectly, and profits thereon,
6  and restore all losses suffered by the Plan caused by its breach of the duty to
7  monitor, and such other appropriate equitable relief as the Court deems proper.

8                        **THIRD CAUSE OF ACTION**
9            **Failure to Follow the Terms of the Plan Documents**
10                        **(Against all Defendants)**

11     178.   Plaintiffs repeat and reallege the above paragraphs as though fully set
12  forth herein.

13     179.   Courts have stressed that § 404(a)(1)(D) and common law trusts
14  imposes a duty of "independent significance" and that compliance with subdivision
15  (B)'s general duty to act with "care, skill, prudence, and diligence" will not excuse a
16  fiduciary who fails to act in accordance with plan documents.

17     180.   The Defendants' 401(k) plan may be disqualified from favorable tax
18  treatment for operational failures, which occur if a plan fails to operate in accordance
19  with statutory requirements or if it fails to follow the terms of the plan document.  26
20  U.S.C.A. §§ 401(a), 501(a). The Defendants have the burden of proof when
21  challenging the Commissioner of Internal Revenue's determination that a defined
22  contribution plan is disqualified from favorable tax treatment.  26 U.S.C.A. §§
23  401(a), 501(a).

24     181.   Defendants failed to take any corrective action in response to the
25  imprudent funds that were contained in the Plan portfolio.  Such corrective action is
26  required by the Plan document.  This would have been easy for Defendants to do
27  under correction programs offered by both the IRS and Department of Labor.
28  //

182.   Defendants failed to allocate Plan administrative expenses in a reasonable, uniform, and non-discriminatory way, which violated section 7.04(C)(2) of the Plan document.

183.   Along the same vein, Defendants failed to adopt or follow an expense policy, the absence of which undoubtedly resulted in the overly excessive fees and other charges imposed on Plan participants by Defendants and CSPs.

184.   Had Defendants adhered to their governing plan documents as ERISA requires, many of the breaches detailed previously in this Complaint may not have occurred, or the consequences of them may have been lessened. Defendants chose not to follow the document's provisions, in violation of their fiduciary duties.

185.   Defendants' actions repeatedly violated the following provisions from its Defined Contribution Plan and Trust Document since inception of the plan.

a. "Alienation or Assignment. Except as permitted under applicable statute or regulation, a Participant or Beneficiary may not assign, alienate, transfer or sell any right or claim to a benefit or distribution from the Plan, and any attempt to assign, alienate, transfer or sell such a right or claim shall be void, except as permitted by statute or regulation. Any such right or claim under the Plan shall not be subject to attachment, execution, garnishment, sequestration, or other legal or equitable process."

b. "The Trust shall be held, invested, reinvested and administered by the Trustee in accordance with the terms of the Plan and this Agreement solely in the interest of Participants and their Beneficiaries and *for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan.* The ***Employer is a Named Fiduciary for investment purposes*** if the Employer directs investments pursuant to this subsection. Any investment

direction shall be made in writing by the Employer, investment manager, or Named Fiduciary, as applicable."

186.   Lastly, in the Defined Contribution Plan and Trust Document, it states:

*a.*   "Responsibilities regarding administration of Trust. ***The Trustee, the Employer and the Plan Administrator shall each discharge their assigned duties and responsibilities under this Agreement and the Plan solely in the interest of Participants and their Beneficiaries in the following manner;   for the exclusive purpose of providing benefits to Participants and their Beneficiaries and defraying reasonable expenses of administering the Plan; with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims***: by ***diversifying the available investments under the Plan so as to minimize the risk of large losses***, unless under the circumstances it is clearly prudent not to do so; and ***in accordance with the provisions of the Plan*** insofar as they are consistent with the provisions of ERISA. The Trustee may employ agents, attorneys, accountants and other third parties to provide counsel on behalf of the Plan, where the Trustee deems advisable. The **Trustee may reimburse such persons from the Trust for reasonable expenses and compensation incurred as a result of such employment. The Trustee shall keep full and accurate accounts of all receipts, investments, disbursements and other transactions hereunder, including such specific records as may be agreed**

1
2
3
4
5
6

> **upon in writing** between the Employer and the Trustee. All
> such accounts, books and records shall be **open to inspection**
> **and audit at all reasonable times by any authorized**
> **representative of the Trustee or the Plan Administrator. A**
> **Participant may examine only those individual account**
> **records pertaining directly to him."**

7   187.   Proceeding under the assumption that the Prudential Plan Document

8   provided by the Plan's recordkeeper is reflective of the actual governing plan

9   documents used in preceding years, the following violations appear to have occurred.

10   188.   Defendants violated provisions of the plan documents by failing to

11   take corrective action after the harms of their previously imprudent investment and

12   management decisions came to light.

13   189.   Section 7.08 of the Plan document states that the plan administrator, in

14   conjunction with the employer and trustee, may undertake such correction of plan

15   failures as the plan administrator deems necessary. These corrections include

16   following the procedures of either the IRS' Employee Plans Compliance Resolution

17   System (EPCRS) or the Labor Department's Voluntary Fiduciary Correction

18   Program (VFCP).

19   190.   The section states that these actions include corrections to preserve tax

20   status, corrections to breach fiduciary violations, and corrections to "unwind" a

21   prohibited transaction under ERISA.

22   191.   The Plan document provides the plan administrator with wide

23   discretion in taking action to remedy duty breaches and other violations so that Plan

24   participants' harm is limited as much as possible.

25   192.   Adhering to the document and correcting the breaches once they were

26   exposed would have helped at least slow the loss of Plan participants' assets, or

27   possibly even began the critical "alternative remedy of restoring plan participants to

28   //

CLASS ACTION COMPLAINT

1   the position in which they would have occupied but for the breach of trust." *Eaves v.*
2   *Penn*, 587 F.2d 453, 462 (10th Cir. 1978).

3       193.    However, Defendants did the exact opposite. Upon receiving
4   knowledge or indications that both their investment decisions and transaction history
5   were likely in violation of ERISA, they failed to undertake any of the options
6   provided to them under this Plan document, or under the two external corrective
7   programs that it points fiduciaries to (VFCP or EPCRS).

8       194.    Defendants further violated the provisions of the Plan document
9   by failing to allocate plan expenses in a reasonable, uniform, and nondiscriminatory
10   manner.

11       195.    From the applicable section of the Plan document 7.04(C)(2) –
12   "Allocation of Plan expense." This section states that the plan administrator has
13   discretion as to how to allocate plan expenses, which expenses will be allocated to
14   individual accounts, and to draft and adopt an expense policy in accordance with
15   these decisions. However, the Plan document also says that this discretion must be
16   wielded in a "reasonable, uniform, and nondiscriminatory manner."

17       196.    The allocation of expenses in the Plan was anything but
18   reasonable, uniform, and nondiscriminatory. Defendants chose to pay many of their
19   costs out of Trust and participant funds directly, and the very nature of paying CSPs
20   and parties in interest using funds from participant directed defined contributions is
21   fraught with risk because everything hinges on the funds chosen by the individual
22   participants. As demonstrated previously, the funds chosen by Defendants had totally
23   arbitrary and ever-changing mixtures of 12b-1 fees, finder's fees, soft-dollar
24   compensation, shareholder service fees, and sub-T/A fees (some of which were
25   dollars per investment owned and others were percentage of assets).

26       197.    In practice, this means that participants who chose to invest in the
27   riskier, imprudent funds with unnecessary and unreasonably high fees bore more of
28   //

CLASS ACTION COMPLAINT

the brunt of the plan expenses than did a participant who picked the lesser of the imprudent funds from Defendants' investment menu.

198.   This method of Plan expense allocation results in inconsistent and unreasonable payments from different participants, discriminating against some based on their investment choices. This can hardly be the outcome expected under section 7.04(C)(2) of the Plan document.

199.   There are other plan documents such as the Investment Policy statement and directives and guidelines from the Investment Committee that are in sole possession of the Defendants and have not yet been produced.  Once those documents are obtained, Plaintiff may amend the complaint to add additional provisions of the governing Plan Documents that have been violated.

200.   Repeated Failure to follow the guidelines of the Plan Documents compounded the already-existing issues surrounding Plan administration and investment decision described in this Complaint, allowing them to proceed to even worse degrees.

201.   Defendants' actions directly and proximately caused substantial harm to Plaintiffs and the putative class, and as a result, Defendants are liable for all resulting loss and financial damages.  Plaintiffs seek remedies available to them under these circumstances, including reimbursement for all losses, injunctive relief, and removal of the Plan's managers.

//

//

//

//

//

//

//

//

CLASS ACTION COMPLAINT

# PRAYER FOR RELIEF

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class Counsel;
- Find and declare that Defendants have breached their fiduciary duties as described above;
- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;
- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;
- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);
- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;
- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;
- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;
- Order equitable restitution against Defendants;
- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

CLASS ACTION COMPLAINT

1        • Order the payment of interest to the extent it is allowed by law; and

2        • Grant other equitable or remedial relief as the Court deems

3            appropriate.

4

5   **PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE**

6                              **BY LAW.**

7

8

9   Dated: August 9, 2021            **CHRISTINA HUMPHREY LAW, P.C.**

10                                **TOWER LEGAL GROUP, P.C.**

11

12

13                By:   *Christina A. Humphrey*

14                     CHRISTINA A. HUMPHREY

15                     JAMES A. CLARK

16                     RENEE P. ORTEGA

17                     Attorneys for Plaintiffs

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

# EXHIBIT A

| Name | Expense Ratio | Manager Name | Manager Start Date | Manager Tenure (Years) | Allocation US Stocks | Allocation Non-US Stocks | Allocation US Bonds | Allocation Non-US Bonds | Allocation Cash | Top-10 Holdings % | Number of Holdings | Turnover Rate | Average Price/Earnings Ratio | Average Price/Book Ratio | Average Market Cap ($millions) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| American Century Mid Cap Value Inv | 0.98 | Davidson/Liss/Toney/Woglom | 3/31/2014 | 15.76 | 87.59 | 9.46 | 0.00 | 0.00 | 2.95 | 22.46 | 96 | 53 | 16.49 | 2.14 | $ 15,516.11 |
| American Century Mid Cap Value R6 | 0.63 | Davidson/Liss/Toney/Woglom | 3/31/2014 | 15.76 | 87.59 | 9.46 | 0.00 | 0.00 | 2.95 | 22.46 | 96 | 53 | 16.49 | 2.14 | $ 15,516.11 |
| American Century One Choice In Ret Inv | 0.77 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 33.19 | 11.09 | 33.82 | 9.34 | 12.48 | 73.90 | 21 | 19 | 19.19 | 2.75 | $ 47,000.41 |
| American Century One Choice In Ret R6 | 0.42 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 33.19 | 11.09 | 33.82 | 9.34 | 12.48 | 73.90 | 21 | 19 | 19.19 | 2.75 | $ 47,000.41 |
| American Century One Choice 2020 Inv | 0.77 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 33.42 | 11.21 | 33.66 | 9.30 | 12.34 | 73.81 | 24 | 18 | 19.19 | 2.75 | $ 46,826.68 |
| American Century One Choice 2020 R6 | 0.42 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 33.42 | 11.21 | 33.66 | 9.30 | 12.34 | 73.81 | 24 | 18 | 19.19 | 2.75 | $ 46,826.68 |
| American Century One Choice 2025 Inv | 0.79 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 36.24 | 13.24 | 31.30 | 9.27 | 9.88 | 72.37 | 23 | 18 | 19.11 | 2.68 | $ 44,337.71 |
| American Century One Choice 2025 R6 | 0.44 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 36.24 | 13.24 | 31.30 | 9.27 | 9.88 | 72.37 | 23 | 18 | 19.11 | 2.68 | $ 44,337.71 |
| American Century One Choice 2030 Inv | 0.81 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 39.08 | 15.48 | 28.81 | 9.05 | 7.52 | 72.49 | 24 | 20 | 19.03 | 2.61 | $ 42,101.65 |
| American Century One Choice 2030 R6 | 0.46 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 39.08 | 15.48 | 28.81 | 9.05 | 7.52 | 72.49 | 24 | 20 | 19.03 | 2.61 | $ 42,101.65 |
| American Century One Choice 2035 Inv | 0.84 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 42.51 | 18.19 | 24.30 | 7.56 | 7.38 | 71.11 | 24 | 17 | 18.96 | 2.56 | $ 40,051.54 |
| American Century One Choice 2035 R6 | 0.49 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 42.51 | 18.19 | 24.30 | 7.56 | 7.38 | 71.11 | 24 | 17 | 18.96 | 2.56 | $ 40,051.54 |
| American Century One Choice 2040 Inv | 0.86 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 45.78 | 21.04 | 19.88 | 6.14 | 7.11 | 72.00 | 21 | 23 | 18.93 | 2.54 | $ 38,448.49 |
| American Century One Choice 2040 R6 | 0.51 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 45.78 | 21.04 | 19.88 | 6.14 | 7.11 | 72.00 | 21 | 23 | 18.93 | 2.54 | $ 38,448.49 |
| American Century One Choice 2045 Inv | 0.89 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 50.00 | 22.94 | 17.15 | 5.30 | 4.55 | 73.90 | 22 | 21 | 18.89 | 2.52 | $ 38,336.81 |
| American Century One Choice 2045 R6 | 0.54 | Wilson/Weiss/Gabudean/Rajappa | 12/31/2004 | 13.01 | 50.00 | 22.94 | 17.15 | 5.30 | 4.55 | 73.90 | 22 | 21 | 18.89 | 2.52 | $ 38,336.81 |
| American Century One Choice 2050 Inv | 0.91 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 54.03 | 24.80 | 14.52 | 4.50 | 2.11 | 75.82 | 21 | 27 | 18.82 | 2.48 | $ 38,112.60 |
| American Century One Choice 2050 R6 | 0.56 | Wilson/Weiss/Gabudean/Rajappa | 5/30/2008 | 11.59 | 54.03 | 24.80 | 14.52 | 4.50 | 2.11 | 75.82 | 21 | 27 | 18.82 | 2.48 | $ 38,112.60 |
| American Century One Choice 2055 Inv | 0.91 | Weiss/Wilson/Gabudean/Rajappa | 3/31/2011 | 8.76 | 55.77 | 25.57 | 12.67 | 3.91 | 2.04 | 76.38 | 20 | 27 | 18.83 | 2.48 | $ 38,141.76 |
| American Century One Choice 2055 R6 | 0.56 | Weiss/Wilson/Gabudean/Rajappa | 3/31/2011 | 8.76 | 55.77 | 25.57 | 12.67 | 3.91 | 2.04 | 76.38 | 20 | 27 | 18.83 | 2.48 | $ 38,141.76 |
| American Century One Choice 2060 Inv | 0.91 | Gabudean/Weiss/Wilson/Rajappa | 9/30/2015 | 4.25 | 57.43 | 26.26 | 10.92 | 3.38 | 1.98 | 77.23 | 20 | 21 | 18.82 | 2.48 | $ 38,152.77 |
| American Century One Choice 2060 R6 | 0.56 | Gabudean/Weiss/Wilson/Rajappa | 9/30/2015 | 4.25 | 57.43 | 26.26 | 10.92 | 3.38 | 1.98 | 77.23 | 20 | 21 | 18.82 | 2.48 | $ 38,152.77 |
| American Funds AMCAP R5 | 0.41 | Huntington/Crosthwaite/Richter | 5/1/1996 | 23.68 | 84.84 | 6.35 | 0.00 | 0.00 | 8.81 | 22.32 | 202 | 32 | 23.91 | 4.21 | $ 63,984.33 |
| American Funds AMCAP R6 | 0.36 | Huntington/Crosthwaite/Richter | 5/1/1996 | 23.68 | 84.84 | 6.35 | 0.00 | 0.00 | 8.81 | 22.32 | 202 | 32 | 23.91 | 4.21 | $ 63,984.33 |
| American Funds Capital World Gr&Inc R5 | 0.49 | Lee/Barroso/Riley/Gordon | 2/1/2006 | 13.92 | 44.93 | 49.48 | 0.10 | 0.42 | 4.52 | 15.94 | 351 | 49 | 17.09 | 2.32 | $ 74,967.77 |
| American Funds Capital World Gr&Inc R6 | 0.44 | Lee/Barroso/Riley/Gordon | 2/1/2006 | 13.92 | 44.93 | 49.48 | 0.10 | 0.42 | 4.52 | 15.94 | 351 | 49 | 17.09 | 2.32 | $ 74,967.77 |
| American Funds Europacific Growth R5 | 0.53 | Grace/Lee/Lyckeus/Knowles | 6/1/2002 | 17.59 | 1.59 | 89.75 | 0.00 | 0.07 | 8.59 | 20.92 | 322 | 35 | 18.06 | 2.28 | $ 44,148.14 |
| American Funds Europacific Growth R6 | 0.49 | Grace/Lee/Lyckeus/Knowles | 6/1/2002 | 17.59 | 1.59 | 89.75 | 0.00 | 0.07 | 8.59 | 20.92 | 322 | 35 | 18.06 | 2.28 | $ 44,148.14 |
| American Funds US Government Sec R5 | 0.31 | MacDonald/Betanzos/Tuazon | 11/1/2009 | 10.17 | 0.00 | 0.00 | 95.43 | 0.50 | 4.07 | 26.97 | 423 | 350 | | | |
| American Funds US Government Sec R6 | 0.25 | MacDonald/Betanzos/Tuazon | 11/1/2009 | 10.17 | 0.00 | 0.00 | 95.43 | 0.50 | 4.07 | 26.97 | 423 | 350 | | | |
| BNY Mellon Bond Market Index I | 0.15 | Rogers/Benson/Shu | 2/11/2010 | 9.89 | 0.00 | 0.00 | 86.12 | 7.34 | 6.03 | 7.34 | 2,487 | 125.67 | | | |
| BNY Mellon Bond Market Index Inv | 0.40 | Rogers/Benson/Shu | 2/11/2010 | 9.89 | 0.00 | 0.00 | 86.12 | 7.34 | 6.03 | 7.34 | 2,487 | 125.67 | | | |
| ClearBridge Appreciation I | 0.67 | Glasser/Kagan | 12/31/2001 | 18.01 | 98.28 | 0.54 | 0.00 | 0.00 | 1.17 | 32.43 | 72 | 10 | 21.01 | 3.29 | $ 184,959.14 |
| ClearBridge Appreciation IS | 0.58 | Glasser/Kagan | 12/31/2001 | 18.01 | 98.28 | 0.54 | 0.00 | 0.00 | 1.17 | 32.43 | 72 | 10 | 21.01 | 3.29 | $ 184,959.14 |
| Columbia Mid Cap Index A | 0.45 | Shteyn/Lo | 8/1/2011 | 8.42 | 100.12 | 0.06 | 0.00 | 0.00 | -0.18 | 6.84 | 403 | 17 | 20.02 | 2.16 | $ 5,476.80 |
| Columbia Mid Cap Index Inst2 | 0.20 | Shteyn/Lo | 8/1/2011 | 8.42 | 100.12 | 0.06 | 0.00 | 0.00 | -0.18 | 6.84 | 403 | 17 | 20.02 | 2.16 | $ 5,476.80 |
| Columbia Small Cap Index A | 0.45 | Shteyn/Lo | 8/1/2011 | 8.42 | 98.62 | 1.50 | 0.00 | 0.00 | -0.12 | 6.13 | 606 | 22 | 18.57 | 1.82 | $ 1,725.27 |
| Columbia Small Cap Index Inst2 | 0.20 | Shteyn/Lo | 8/1/2011 | 8.42 | 98.62 | 1.50 | 0.00 | 0.00 | -0.12 | 6.13 | 606 | 22 | 18.57 | 1.82 | $ 1,725.27 |
| Invesco Oppenheimer Developing Market | 1.00 | Leverenz | 5/1/2007 | 12.68 | 0.67 | 88.46 | 0.00 | 0.00 | 4.66 | 41.78 | 100 | 7 | 19.04 | 2.95 | $ 42,389.86 |
| Invesco Oppenheimer Developing Mkts Rl | 0.83 | Leverenz | 5/1/2007 | 12.68 | 0.67 | 88.46 | 0.00 | 0.00 | 4.66 | 41.78 | 100 | 7 | 19.04 | 2.95 | $ 42,389.86 |
| Loomis Sayles Small Cap Growth N | 0.82 | Burns/Slavik | 1/6/2005 | 14.99 | 92.82 | 3.04 | 0.00 | 0.00 | 4.14 | 16.24 | 101 | 67 | 31.87 | 4.22 | $ 2,967.65 |
| Loomis Sayles Small Cap Growth Retail | 1.19 | Burns/Slavik | 1/6/2005 | 14.99 | 92.82 | 3.04 | 0.00 | 0.00 | 4.14 | 16.24 | 101 | 67 | 31.87 | 4.22 | $ 2,967.65 |
| MFS Value R4 | 0.57 | Gorham/Chitkara/Cannan | 1/21/2002 | 17.95 | 90.37 | 8.34 | 0.00 | 0.00 | 1.29 | 28.11 | 84 | 11 | 19.61 | 2.59 | $ 88,485.31 |
| MFS Value R6 | 0.47 | Gorham/Chitkara/Cannan | 1/21/2002 | 17.95 | 90.37 | 8.34 | 0.00 | 0.00 | 1.29 | 28.11 | 84 | 11 | 19.61 | 2.59 | $ 88,485.31 |
| PIMCO Income Adm | 1.30 | Ivascyn/Murata/Anderson | 3/30/2007 | 12.76 | 0.65 | 0.11 | 89.73 | -1.50 | 6.15 | 93.12 | 7,269 | 472 | | | $ 4,062.86 |
| PIMCO Income Instl | 1.05 | Ivascyn/Murata/Anderson | 3/30/2007 | 12.76 | 0.65 | 0.11 | 89.73 | -1.50 | 6.15 | 93.12 | 7,269 | 472 | | | $ 4,062.86 |
| Pioneer Select Mid Cap Growth R | 0.66 | Winston/John/Sobell | 5/15/2009 | 10.64 | 93.25 | 5.98 | 0.00 | 0.00 | 0.78 | 17.96 | 121 | 82 | 30.62 | 4.27 | $ 14,618.76 |
| Pioneer Select Mid Cap Growth Y | 0.78 | Winston/John/Sobell | 5/15/2009 | 10.64 | 93.25 | 5.98 | 0.00 | 0.00 | 0.78 | 17.96 | 121 | 82 | 30.62 | 4.27 | $ 14,618.76 |
| Principal SmallCap Value II Instl | 1.04 | Fennessey/Welch | 6/2/2009 | 10.59 | 95.14 | 2.31 | 0.00 | 0.00 | 2.55 | 11.68 | 1,421 | 76.1 | 14.87 | 1.56 | $ 1,954.18 |
| Principal SmallCap Value II R6 | 1.01 | Fennessey/Welch | 6/2/2009 | 10.59 | 95.14 | 2.31 | 0.00 | 0.00 | 2.55 | 11.68 | 1,421 | 76.1 | 14.87 | 1.56 | $ 1,954.18 |
| Western Asset Core Plus Bond I | 0.45 | Lindbloom/Leech/Scholnick | 12/31/2006 | 13.01 | 0.00 | 0.00 | 82.95 | 16.01 | 0.05 | 14.66 | 2,445 | 105 | | | |
| Western Asset Core Plus Bond IS | 0.42 | Lindbloom/Leech/Scholnick | 12/31/2006 | 13.01 | 0.00 | 0.00 | 82.95 | 16.01 | 0.05 | 14.66 | 2,445 | 105 | | | |

* Data as of December 31, 2019

**The Investment Advisor**

The funds' investment advisor is American Century Investment Management, Inc. (the advisor). The advisor has been managing mutual funds since 1958 and is headquartered at 4500 Main Street, Kansas City, Missouri 64111.

The advisor is responsible for managing the investment portfolios of the funds and directing the purchase and sale of the underlying American Century Investments funds in which they invest. The advisor also arranges for transfer agency, custody and all other services necessary for the funds to operate. Additionally, the advisor is responsible for the selection and management of the underlying funds' portfolio investments.

For certain services it provides to each fund and the underlying funds, the advisor receives a unified management fee based on a percentage of the daily net assets of each class of shares of the fund. The amount of the fee is calculated daily and paid monthly in arrears. Out of that fee, the advisor pays all expenses of managing and operating the fund except brokerage expenses, taxes, interest, fees and expenses of the independent directors (including legal counsel fees), extraordinary expenses, and expenses incurred in connection with the provision of shareholder services and distribution services under a plan adopted pursuant to Rule 12b-1 under the Investment Company Act of 1940. The difference in unified management fees among the classes is a result of their separate arrangements for non-Rule 12b-1 shareholder services. It is not the result of any difference in advisory or custodial fees or other expenses related to the management of the fund's assets, which do not vary by class. For all classes other than the R6 Class, the advisor may pay unaffiliated third parties who provide recordkeeping and administrative services that would otherwise be performed by an affiliate of the advisor.

| Management Fees Paid by the Fund to the Advisor as a Percentage of Average Net Assets for the Fiscal Year Ended July 31, 2020 | Investor, A, C and R Classes | I Class | R6 Class |
|---|---|---|---|
| One Choice In Retirement Portfolio | 0.74% | 0.54% | 0.39% |
| One Choice 2025 Portfolio | 0.76% | 0.56% | 0.41% |
| One Choice 2030 Portfolio | 0.78% | 0.58% | 0.43% |
| One Choice 2035 Portfolio | 0.81% | 0.61% | 0.46% |
| One Choice 2040 Portfolio | 0.83% | 0.63% | 0.48% |
| One Choice 2045 Portfolio | 0.86% | 0.66% | 0.51% |
| One Choice 2050 Portfolio | 0.88% | 0.68% | 0.53% |
| One Choice 2055 Portfolio | 0.88% | 0.68% | 0.53% |
| One Choice 2060 Portfolio | 0.88% | 0.68% | 0.53% |
| One Choice 2065 Portfolio | N/A[1] | N/A[1] | N/A[1] |