**CHRISTINA HUMPHREY LAW, P.C.**
Christina A. Humphrey (SBN 226326)
591 Telegraph Canyon Rd, #376
Chula Vista, CA  91910
Telephone: (805) 618-2924
Facsimile: (805) 618-2939
Email: christina@chumphreylaw.com

**TOWER LEGAL GROUP, P.C.**
James A. Clark (SBN 278372)
Renee P. Ortega (SBN 283441)
11335 Gold Express Drive, Ste. 105
Gold River, CA 95670
Telephone: (916) 361-6009
Facsimile: (916) 361-6019
Email: james.clark@towerlegalgroup.com
Email: renee.parras@towerlegalgroup.com

[Attorneys for Plaintiffs]

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FERNANDO COPPEL, ELIZABETH FLORES, MIRIAM GARCIA, PABLO MARTINEZ, TYLER MITCHELL, MICHELI ORTEGA, JUDITH URIOSTEGUI, ELIZABETH USSELMAN, individually and as a representative of a Putative Class of Participants and Beneficiaries, on behalf of the SWBG, LLC 401(K) PLAN (FKA SEAWORLD PARKS AND ENTERTAINMENT 401(K) PLAN), <br><br> Plaintiffs, <br><br> v. <br><br> SEAWORLD PARKS & ENTERTAINMENT, INC. ("SEAWORLD"); SWBG ORLANDO CORPORATE OPERATIONS GROUP, LLC ("SWBG"); BOARD OF DIRECTORS OF SEAWORLD AND SWBG, INVESTMENT COMMITTEE OF SEAWORLD PARKS & ENTERTAINMENT 401(K) PLAN/ SWBG, LLC 401(K) PLAN; MARK G. SWANSON (CEO); ELIZABETH GULACSY (CFO); ALLIANT INSURANCE SERVICES, INC., and DOES 1 through 50, <br><br> Defendants. | Case No. 21cv1430-CAB-WVG <br><br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** |

FIRST AMENDED CLASS ACTION COMPLAINT

## TABLE OF CONTENTS

INTRODUCTION ……………………………………………………………………………..1

JURISDICTION AND VENUE………………………………………………………………….5

THE PARTIES……………………………………………………………………........5

Plaintiffs…………………………………………………………………..…………….....5

Defendants……………………………………...……………………………..……………...7

Parties in Interest…………………………..………………………………..…………….....8

DEFENDANTS' FIDUCIARY OBLIGATIONS….……………………………………………..9

DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE

FEES………………………………………………………………………………….......11

THE ESTABLISHMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON

FOR THE COMPLAINT'S ALLEGATIONS…………………………………………..……12

FACTUAL ALLEGATIONS…………………………………………………………….......14

    A.    Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Fund Share Classes as Plan Investment Options…………..………………………...…....14

    B.    Defendants Paid MassMutual and Alliant Unreasonable Fees, Failed to Monitor them, and further Failed to make Requests for Proposals from Other Service Providers…………………………………………………………….…....36

      Mass Mutual……………………………………………………………………….....37

      Alliant……………………………………………………………………..…41

    C.    Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care…………………………………………………..42

      1.    Defendants Chose and Continued to Include Investments Lagging in Benchmark Comparisons……………………………………………..…43

      2.    Defendants Failed to Consider Index Fund Alternatives to its Actively Managed Funds………………………………………………………45

FIRST AMENDED CLASS ACTION COMPLAINT

3. Defendants Imprudently Maintained the Plan's Investment in the MassMutual Stable Value Option, When Lower Share Classes Existed and Other Investment Vendors Offered Superior Alternatives……………………….48

a. MassMutual Excessive Spread Fees……………………...……………...51

b. Failure to Submit RFP's……………………………………………...53

c. Defendants and Alliant Used the Wrong Benchmark for the Stable Value Fund……………………………………………….........54

d. Failure to Diversify…………………………………………………...54

D. Defendants Breached the Duty of Loyalty and Prudence by Hiring and Retaining Service Providers that were Inherently Conflicted……………………...…...55

E. CLASS ACTION ALLEGATIONS……………………………………………...60

FIRST CAUSE OF ACTION Breach of Fiduciary Duty of Prudence and Loyalty (Prudence Against All Defendants and Loyalty as to Alliant Only)………………..….61

SECOND CAUSE OF ACTION Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers (Against All Defendants) ………………………………………………………...….64

PRAYER FOR RELIEF………………………………………………………….66

FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs Fernando Coppel, Elizabeth Flores, Miriam Garcia, Pablo Martinez, Tyler Mitchell, Micheli Ortega, Judith Uriostegui, and Elizabeth Usselman (collectively "Plaintiffs"), individually and as representatives of participants and beneficiaries of the SWBG, LLC 401(K) PLAN (FKA SEAWORLD PARKS & ENTERTAINMENT 401(K) PLAN) (the "Plan"), bring this action under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§1001 et seq., on behalf of the Plan against the former Plan sponsor, SEAWORLD PARKS & ENTERTAINMENT, INC. ("SPE" or "Seaworld"), current Plan sponsor, SWBG ORLANDO CORPORATE OPERATIONS GROUP, LLC ("SWBG"), the Board of Directors of Seaworld and SWBG, the Investment Committee of SEAWORLD PARKS & ENTERTAINMENT 401(K) PLAN/ SWBG, LLC 401(K) PLAN ("Committee"), Mark G. Swanson (CEO), Elizabeth Gulacsy (CFO and IRS Form 5500 Signatory), ALLIANT INSURANCE SERVICES, INC. ("Alliant" or "Financial Advisor" or "FA") and John Does 1-50 (collectively the "Defendants"), for breaching their fiduciary duties in the management, operation and administration of the Plan.

## INTRODUCTION

1. This action is brought by current and former participants / beneficiaries of the SWBG Plan to recover mismanaged 401k retirement funds. The 401k plan has become the dominant source of retirement savings for most Americans. Unlike defined-benefit pensions, which provide set payouts for life, 401(k) accounts rise and fall with financial markets, and therefore, the proliferation of 401(k) plans has exposed workers to big drops in the stock market and high fees from Wall Street money managers. This action is filed to recover in excess of $53,523,698.53 in funds owed back to the Plan on behalf of participants / beneficiaries. These retirement funds are significant to the welfare of the class.

2. Federal law affords employers the privilege of enticing and retaining employees by setting up retirement and defined contribution plans pursuant to 26

-1-

FIRST AMENDED CLASS ACTION COMPLAINT

U.S.C. §401 ("401(k) plans). These plans provide employees investment options with tax benefits that inure to the benefits of the employees and, necessarily, to the employers by increasing the "net" compensation their employees receive via tax deferment. To enjoy this benefit, employers must follow the rules and standards proscribed by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et. seq.* ("ERISA").

3. Seaworld and SWBG chose to accept the benefits of federal and state tax deferrals for their employees via a 401(k) plan, and the owners and executives of both have benefitted financially for years from the same tax benefits. However, Defendants have not followed ERISA's standard of care. This lawsuit is filed after careful consultation with experts and publicly available documents to return benefits taken from Plan participants by Defendants.

4. SWBG ORLANDO OPERATIONS GROUP, LLC, is a subsidiary of SeaWorld Entertainment, Inc., an American theme park and entertainment company headquartered in Orlando Florida. The company owns or licenses a portfolio of recognized brands, including SeaWorld, Busch Gardens®, Aquatica®, Discovery Cove®, Sesame Place®, and Sea Rescue®. The company has developed a portfolio of 12 differentiated theme parks that are grouped in key markets across the United States. During 2019, the company hosted approximately 22.6 million guests in its theme parks and generated total revenues of $1.40 billion and reported net income of $89.5 million.[1]

5. The Plan at issue is a defined contribution retirement plan or a 401(k) plan, established on March 1, 2010, pursuant to 29 U.S.C. §1002(2)(A) and §1002(34) of ERISA, that enables eligible participants to make tax-deferred contributions from their salaries to the Plan. As of December 31, 2020, the Plan had 18,401 participants with account balances and $292,465,160.00 in assets.

//

---

[1] SeaWorld Entertainment 2019 Annual Report, p. 3.

FIRST AMENDED CLASS ACTION COMPLAINT

6.      Effective January 1, 2016, the Plan Governing Document was amended to reflect a change in the Plan Sponsor from SeaWorld Parks & Entertainment, Inc. ("Seaworld" or "SPE"), to SWBG, LLC,[2] and a corresponding change was made to the Plan name from SeaWorld Parks & Entertainment 401(k) Plan to SWBG, LLC 401(k) Plan.  No other changes to the Plan or Plan document were identified in connection with that Amendment.  Since the Amendment, SWBG Orlando Corporate Operations Group, LLC ("SWBG"), has been the sponsor and administrator of the Plan as defined under 29 U.S.C §§ 1002(16)(B) and 1002(16)(A)(i).

7.      ERISA imposes strict fiduciary duties of prudence and loyalty on covered retirement plan fiduciaries. An ERISA fiduciary must discharge his responsibility "with the care, skill, prudence, and diligence" that a prudent person "acting in a like capacity and familiar with such matters" would use. 29 U.S.C. § 1104(a)(1). A plan fiduciary must act "solely in the interest of [plan] participants and beneficiaries." *Id*. A fiduciary's duties include "defraying reasonable expenses of administering the plan," 29 U.S.C. § 1104(a)(1)(A)(ii), and a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

8.      This case is another example of a large plan filling its 401(k) plan with expensive funds when identical, cheaper funds were available, and overpaying Covered Service Providers, when the Plan had more than sufficient bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds. Specifically, Seaworld, SWBG, the Committee, individual Defendants, and Alliant, breached their fiduciary duties of prudence and loyalty to the Plan by:

a. Offering and maintaining higher cost share classes when identical lower cost class shares were available and could have been offered to participants;

---

[2] According to Defendant's Motion to Dismiss (Doc 29-1), p. 3, FN 1, SWBG, LLC and Orlando Corporate Operations Group, LLC, are actually the same entity, SWBG Orlando Operations Group, LLC ("SWBG").

FIRST AMENDED CLASS ACTION COMPLAINT

b. Overpaying for Covered Service Providers by paying variable direct and indirect compensation fees through revenue sharing arrangements with the funds offered as investment options under the Plan, which exceeded costs incurred by plans of similar size with similar services;

c. Imprudently choosing and retaining expensive mutual funds while less expensive index funds were available and could have been offered to participants;

d. Selecting conflicted dual registered investment advisors and brokers who were incentivized to choose higher fee mutual funds because they received not only brokerage commissions from funds but insurance commissions for annuity products;

e. Failing to engage in a competitive bidding process by submitting a Request for Proposal to multiple service providers including recordkeepers, shareholder service and financial advisers.

9. Plaintiffs were injured during the Relevant Time Period by the Defendants' lack of loyalty, imprudent skill and flawed processes in breach of their fiduciary duties. As a result of Defendants' actions, participants paid additional unnecessary operating expenses with no value to the participants and resulting in a loss of compounded returns.

10. Plaintiffs, individually and as the representatives of a putative class consisting of the Plan's participants and beneficiaries, bring this action on behalf of the Plan under 29 U.S.C. §§ 1132(a)(2) and (3) to enforce Defendants' liability under 29 U.S. C. §1109(a), to make good to the Plan all losses resulting from their breaches of fiduciary duties, and to restore to the Plan any lost profits. In addition, Plaintiffs seek to reform the Plan to comply with ERISA and to prevent further breaches of fiduciary duties and grant other equitable and remedial relief as the Court may deem appropriate.

//

-4-

FIRST AMENDED CLASS ACTION COMPLAINT

**JURISDICTION AND VENUE**

11.   Plaintiffs bring this action pursuant to 29 U.S.C. §1132(a), which provides that participants or beneficiaries in an employee retirement plan may pursue a civil action on behalf of the plan to remedy breaches of fiduciary duty and other violations of ERISA for monetary and appropriate equitable relief.

12.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, because it is a civil action arising under the laws of the United States, and exclusive jurisdiction under ERISA §502(e)(1), 29 U.S.C. §1132(e)(1).

13.   This Court has personal jurisdiction over Defendants because it transacts business in this District, resides in this District, and/or has significant contacts with this District, one or more Plaintiffs reside and were employed in this District, and because ERISA provides for nationwide service of process.

14.   Venue is proper in this District pursuant to ERISA §502(e)(2), 29 U.S.C. §1132(e)(2), because the Plan is administered in this District, many violations of ERISA took place in this District, and Defendants conduct business in this District. Venue is also proper in this District pursuant to 28 U.S.C. §1391(b) because Plaintiffs were employed in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**THE PARTIES**

*Plaintiffs*

15.   Plaintiff Fernando Coppel resides in La Jolla, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Coppel was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in the some or all of the funds which are at issue in this action.

16.   Plaintiff Elizabeth Flores resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea

FIRST AMENDED CLASS ACTION COMPLAINT

World Drive, San Diego, California 92019. Flores was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

17. Plaintiff Miriam Garcia resides in Chula Vista, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Garcia is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2001 and upon information and belief invested in some or all of the funds which are at issue in this action.

18. Plaintiff Pablo Martinez resides in Boulder City, Nevada, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Martinez was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

19. Plaintiff Tyler Mitchell resides in Santee, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92019. Mitchell was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

20. Plaintiff Micheli Ortega resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Ortega is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2014 and upon information and belief invested in some or all of the funds which are at issue in this action.

21. Plaintiff Judith Uriostegui resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Uriostegui is a participant in the Plan under 29 U.S.C. § 1002(7) and has been since approximately 2014 and invested in some or all of the funds which are at issue in this action.

-6-
FIRST AMENDED CLASS ACTION COMPLAINT

22.    Plaintiff Elizabeth Usselman resides in San Diego, California, and was an employee of SeaWorld Parks and Entertainment, located in this District at 500 Sea World Drive, San Diego, California 92109. Usselman was a participant in the Plan under 29 U.S.C. § 1002(7) during the Relevant Time Period and upon information and belief invested in some or all of the funds which are at issue in this action.

23.    Coppel, Flores, Garcia, Martinez, Mitchell, Ortega, Uriostegui, and Usselman (Plaintiffs) have standing under 29 U.S.C. §1132(a)(2) to bring this action on behalf of the Plan because Defendants' reckless and flawed actions caused actual harm to an ERISA plan in which the Plaintiffs participate. Plaintiffs suffered an injury in fact by investing in the higher cost mutual fund shares when lower cost shares of the same fund were available to the Plan; by paying excessive fees to Covered Service Providers and investing in a menu of options that were not well diversified. Defendants are liable to the Plan to make good the Plan's losses under 29 U.S.C. § 1109(a).

**Defendants**

24.    Defendant SEAWORLD PARKS & ENTERTAINMENT, INC ("SPE") is the former sponsor and administrator of the Plan (until 2016) and maintains its principal place of business at 6240 Sea Harbor Drive, Orlando, FL 32821. This entity is registered with the State of California and upon information and belief, still operates as a co-sponsor and administrator and/or fiduciary of the Plan.

25.    Defendant SWBG ORLANDO CORPORATE OPERATIONS GROUP, LLC ("SWBG") is the current sponsor and administrator of the Plan (as of 2016) and maintains its principal place of business at 6240 Sea Harbor Drive, Orlando, FL 32821. This entity is registered with the State of California.

26.    The Company Defendants, acting through its Board of the Directors of appointed the 401(k) Investment Committee to control and manage the operation and

-7-
FIRST AMENDED CLASS ACTION COMPLAINT

the administration of the Plan.  Accordingly, SPE and SWBG had a concomitant fiduciary duty to monitor and supervise those appointees.

27.    Defendant "Does" or the names of the individuals on the Board of Directors and 401(k) Investment Committee during the Relevant Time Period are unknown at this time and are named as "John Does" until the "Does" are known and can be named through amendment to this Complaint.

28.    Upon information and belief, Defendants Mark G. Swanson, C.E.O. and Elizabeth Gulacsy, C.F.O, for OCOG, were/are members of the 401(k) Investment Committee and in their capacity as officers of the corporation and/or committee members, had discretionary authority to control the operation, management, and administration of the Plan.

29.    The Committee contracted with Alliant Insurance Services, LLC ("Alliant"), to serve as the Plan's Financial Advisor.

30.    SWBG, OCOG, the BOD, members of the Committee, the Directors and Officers, signatories to the IRS Form 5500, and Alliant are fiduciaries to the Plan under 29 U.S.C. §1002(21)(A)(i) and (iii) because they have sole authority to amend or freeze or terminate, in whole or part, the Plan or the trust, and have discretionary authority to control the operation, management and administration of the Plan, including the selection and compensation of the providers of administrative services to the Plan and the selection, monitoring, and removal of the investment options made available to participants for the investment of their contributions and provision of their retirement income.

***Parties in Interest***

31.    Finally, although not named Defendants, the Covered Service Providers serve as "Parties of Interest" to this Litigation.  Massachusetts Mutual Life Insurance Company ("MassMutual") served as the recordkeeper of the Plan until December 31, 2019, when Prudential Retirement Insurance and Annuity Company ("Prudential") replaced MassMutual as recordkeeper.  LPL Financial, LLC, ("LPL") was the

-8-

FIRST AMENDED CLASS ACTION COMPLAINT

designated "shareholder service provider" (essentially a financial advisor and likely a fiduciary) to the Plan until sometime in 2014 when Alliant Insurance Services, LLC, became the Plan's Financial Advisor.  Because Alliant is a fiduciary, it is named as a Defendant herein.

## DEFENDANTS' FIDUCIARY OBLIGATIONS

32.    ERISA and common law trusts imposes strict fiduciary duties of loyalty and prudence upon Defendants as Plan fiduciaries. 29 U.S.C. §1104(a)(1)(A) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries" for the "exclusive purpose of (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan."

33.    29 U.S.C. §1104(a)(1)(B) and common law requires a plan fiduciary to discharge his obligations "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims."

34.    ERISA and common law further imposes an independent obligation upon Defendants as Plan fiduciaries to diversify the investment options of the Plan. U.S. Code §1104(a)(1)(C) requires a plan fiduciary to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries… by diversifying the investments of the plan so as to minimize the risk of large losses…"

35.    A fiduciary's duties include a continuing duty to monitor investments and remove imprudent ones. *Tibble v. Edison Int'l*, 135 S. Ct. 1823, 1829 (2015).

36.    29 U.S.C. §1106(a)(1)(C) and 29 U.S.C. §1108(b)(2) and common law allows a fiduciary of an employee benefit plan to enter into an agreement with a party in interest for the provision of administrative services such as recordkeeping to the Plan "if no more than reasonable compensation is paid therefor." MassMutual, and Prudential are "parties in interest" under 29 U.S.C. §1106(a)(1)(C).

-9-

FIRST AMENDED CLASS ACTION COMPLAINT

37. 29 U.S.C. §1132(a)(2) and common law authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under 29 U.S.C. §1109.

38. Section 1109(a) and common law provides "[a]ny person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach."

39. "One appropriate remedy in cases of breach of fiduciary duty is the restoration of the trust beneficiaries to the position they would have occupied but for the breach of trust." Restatement (Second) of Trusts § 205(c) (1959); see *Eaves v. Penn*, 587 F.2d at 463.

40. The Defendants' 401(k) plan may be disqualified from favorable tax treatment for operational failures, which occur if a plan fails to operate in accordance with statutory requirements or if it fails to follow the terms of the plan document. 26 U.S.C.A. §§ 401(a), 501(a). The Defendants have the burden of proof when challenging the Commissioner of Internal Revenue's determination that a defined contribution plan is disqualified from favorable tax treatment. 26 U.S.C.A. §§ 401(a), 501(a).

41. Defendants' repeated depletion and allocation of trust asset prices (the reduction of daily gross asset values (GAVs) by the funds' expenses resulting in net asset value prices/(NAVs) which is what posts each evening on MassMutual's website for participants) and excessive compensation to covered service providers (CSP) show a repeated negligence for tax laws and raises questions beyond the trust's losses as to whether they were even "qualified" to serve as fiduciaries. Their own plan's "birth certificate" or IRS Determination Letter states that tax-exemption "…will depend on its effect in operation…1.401-1(b)(3))."

//

//

Your plan's continued qualification in its present form will depend on its effect in operation (Income Tax Regulations Section 1.401-1(b)(3)). We may review the status of the plan in operation periodically.

**DEFINED CONTRIBUTION 401(K) PLANS AND IMPACT OF EXCESSIVE FEES**

42.    In a defined contribution plan, participants' retirement benefits are limited to the value of their own individual accounts, which is determined solely by employee and employer contributions plus the amount gained through investment in the options made available in the plan less expenses. See 29 U.S.C. §1002(34). Typically, plan participants direct the investment of their accounts, choosing from the lineup of plan investment options chosen by the plan sponsor.

43.    Because retirement savings in defined contribution plans grow and compound over the course of the employee participants' careers, poor investment performance and excessive fees can dramatically reduce the amount of benefits available when the participant is ready to retire. Over time, even small differences in fees and performance compound and can result in vast differences in the amount of savings available at retirement. As the Supreme Court explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 135 S. Ct. at 1825. Thus, violations and damages continue over time.

44.    The impact of excessive fees on employees' and retirees' retirement assets is dramatic. The U.S. Department of Labor has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career. U.S. Dep't of Labor, A Look at 401(k) Plan Fees, at 1–2 (Aug. 2013).[3]

45.    "As a simple example, if a beneficiary invested $10,000, the investment grew at a rate of 7% a year for 40 years, and the fund charged 1% in fees each year, at the end of the 40-year period the beneficiary's investment would be worth

[3] https://www.dol.gov/sites/default/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/401kFeesEmployee.pdf

-11-

FIRST AMENDED CLASS ACTION COMPLAINT

$100,175. If the fees were raised to 1.18%, or 1.4%, the value of the investment at the end of the 40-year period would decrease to $93,142 and $85,198, respectively. Beneficiaries subject to higher fees for materially identical funds lose not only the money spent on higher fees, but also "lost investment opportunity"; that is, the money that the portion of their investment spent on unnecessary fees would have earned over time. A trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical—other than their lower cost—to products the trustee has already selected." *Tibble v. Edison International* (9th Cir. 2016) 843 F.3d 1187, 1198.

46.    The marketplace for retirement plan services is established and competitive.  In 2020, the Plan had 18,401 participants with account balances and $292,465,160 in assets.  As a result, the Plan has tremendous bargaining power to demand low-cost administrative and investment management services and well-performing, low-cost investment funds.  It also had the power to ask for a waiver of many of the fees charged by CSP.

## **THE ESTABLISHEMENT OF THE TRUST AND THE DOCUMENTS RELIED UPON FOR THE COMPLAINT'S ALLEGATIONS**

47.    Each year since the formation of the plan/trust on March 1, 2010, the Defendants' Annual Returns/Reports of Employee Benefit Plan to the U.S. Departments of Treasury and Labor ("Forms 5500" which are "Open to Public Inspection" and downloaded from www.efast.dol.gov) indicated on page 2 that their Plan and Trust's "Funding Arrangement" line 9a(3) was "Trust" and the Plan and Trust's "Benefit Arrangement" line 9b(3) was also via a "Trust."

48.    This trust funding/benefit is echoed by Justice Sotomayer's comments in *Thole v. US Bank* (2020) 140 S.Ct. 1615, 1625 [emphasis added]:

> **"ERISA expressly required the creation of a trust in which petitioners are the beneficiaries: "[A]ll assets" of the plan "shall be held in trust" for petitioners' "exclusive" benefit. 29 U. S. C. §§1103(a), (c)(1); see also §1104(a)(1). These requirements exist**

-12-

FIRST AMENDED CLASS ACTION COMPLAINT

**regardless whether the employer establishes a defined-benefit or defined-contribution plan. §1101(a). Similarly, the Plan Document governing petitioners' defined-benefit plan states that, at "'all times,'" all plan assets "'shall'" be in a "'trust fund'" managed for the participants' and beneficiaries' "'exclusive benefit.'" App. 60– 61. \*\*\*This arrangement confers on the "participants [and] beneficiaries" of a defined-benefit plan an equitable stake, or a "common interest," in "the financial integrity of the plan." *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U. S. 134, 142, n. 9 (1985)."**

49. The underlying allegations in this Complaint are based on the Defendants' actions at the time the conduct was certified and reported to the U.S. Departments of Treasury and Labor. The Plan Document used herein was the Massachusetts Mutual Life Insurance Company VOLUME SUBMITTER PROFIT SHARING/401(k) PLAN or sometimes referred to as the Defined Contribution Plan and Trust Document or "prototype" or "volume submitter." The Defendants did not provide all Plan governing documents on written requests on behalf of the employees representing the class so this information will be requested in discovery.

50. In addition to the prototype Plan Document, the underlying allegations in this Complaint are also based on Plaintiffs' documents as well as the Defendants' past Forms 5500 filed with U.S. Departments of Treasury and Labor found at www.efast.dol.gov, and mutual fund prospectuses found at https://www.sec.gov/edgar/searchedgar. The below chart summarizes the source of allegations:

51. The Form 5500 Series is part of ERISA's overall reporting and disclosure framework, which is intended to assure that employee benefit plans are

-13-

FIRST AMENDED CLASS ACTION COMPLAINT

operated and managed in accordance with certain prescribed standards and that participants and beneficiaries, as well as regulators, are provided or have access to sufficient information to protect the rights and benefits of participants and beneficiaries under employee benefit plans."

## FACTUAL ALLEGATIONS

**A.   Defendants Caused the Plan Participants to Pay Excessive Fees and Lose Returns by Failing to Offer, Monitor, and Investigate Available Lower Cost Mutual Fund Share Classes as Plan Investment Options.**

52.   Share class violations are the most clear and obvious breaches of fiduciary duty in the Plan.  Defendants have provided over 25 choices with clear share class violations which based on partial disclosures in the IRS Forms 5500 add up to well over $10 million dollars in damages.

53.   Share class violations are very clear violations of fiduciary duty as outlined in *Tibble v.Edison,* 2017 U.S. Dist. LEXIS 130806, *40 (C.D. Cal. Aug. 16, 2017).  *"Because the institutional share classes are otherwise identical to the retail share classes, but with lower fees, a prudent fiduciary would know immediately that a switch is necessary. Thus, the manner that is reasonable and appropriate to the particular investment action and strategies involved … would mandate a prudent fiduciary – who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs – to switch share classes immediately."*

54.   Defendants selected the Plan's investment options.  In this case, MassMutual, the Plan's recordkeeper, provided the Defendants with a universe of pooled investment options from which to select a subset to offer Plan Participants. Defendants chose and continued to maintain (until approximately the end of 2019) a

//

-14-

FIRST AMENDED CLASS ACTION COMPLAINT

pool of investment options offered by MassMutual which benefitted MassMutual, LPL, and Alliant at the expense of participants and beneficiaries of the Plan.

55.    The Plan offered 29 investment options,[4] with 28 mutual funds and one guaranteed investment contract fund (similar to a stable value fund but less liquidity and herein referred to as a "GIC").

56.    A mutual fund is a company that pools money from many investors and invests the money in securities such as stocks, bonds, and short-term debt. The combined holdings of the mutual fund are known as its portfolio. Investors buy shares in mutual funds. Each share represents an investor's part ownership in the fund and the income it generates.  In a 401(k) plan, the participants (investors) do not actually own shares of the funds they choose, the trust does; thus, the participants have a beneficial interest in the shares that the trust holds.

57.    Mutual fund companies are regulated by the Securities and Exchange Commission ("SEC") under the Investment Company Act of 1940. The Securities Act of 1933 requires mutual fund companies to prepare and register with the SEC mutual fund shares offered to the public and to make a prospectus describing the mutual fund shares available to prospective investors.

58.    Mutual funds make a profit by charging investors operating expenses, which are expressed as a percentage of the total assets in the fund. Operating expenses include fund management fees, marketing and distribution fees, administrative expenses and other costs.

59.    A single mutual fund is effectively one portfolio managed by one investment adviser or team that may be offered through multiple "classes" of its shares to investors. Each class represents an identical interest in the mutual fund's portfolio. The principal difference between the classes is that the mutual fund will

//

---

[4] There was no "brokerage window" option made available where the participant, through a designated brokerage account, could buy and sell a wide range of investments that are outside the limited scope of Plan's 29 menu options.

FIRST AMENDED CLASS ACTION COMPLAINT

charge different marketing, distribution and service expenses depending on the class chosen.

60. For example, one share class in a mutual fund may charge an annual expense ratio of 1% of the gross assets of the fund, while a different class share in that same fund with the same advisors and the same investments charges an annual expense ratio of .50%. Thus, an investor who purchases the share class with a lower operating expense will realize a .50% greater annual return on his/her investment compared to an investor who purchases the share class with the higher operating expense. Generally, lower class shares are available to larger investors, such as 401(k) plans like the Plan.

61. An insurance company like MassMutual intentionally offers a pool of investment options to 401(k) plans like that of the Defendants that includes more expensive investment options because MassMutual receives additional compensation from the mutual funds for offering them to clients like Defendants ("pay to play"), which is separate and in addition to the revenue sharing charged participants. Thus, MassMutual stands to gain millions of dollars (if not tens of millions) from these types of arrangements.

62. As explained below, throughout the Relevant Time Period, Defendants have had the option to switch to a non-pooled arrangement which provided for identical investments with lower share classes, bargain for lower share classes within its pooled arrangement with MassMutual, to request fee waivers from MassMutual, to switch to a flat fee payment for MassMutual's recordkeeping services, or to just negotiate a lower rate. There is no evidence that Defendants engaged in any of those actions.

63. A Plan's fiduciaries must "avoid unwarranted costs" by being aware of the "availability and continuing emergence" of alternative investments that may have "**significantly different costs**."[1] Adherence to these duties requires ***regular***

---

[1] Restatement (Third) of Trusts ch. 17, intro. note (2007); see also Restatement (Third) of Trusts § 90 cmt. B (2007)

-16-

FIRST AMENDED CLASS ACTION COMPLAINT

*performance of an "adequate investigation" of existing investments in a plan to determine whether any of the plan's investments are "improvident" or if there is a "superior alternative investment" to any of the plan's holdings.[2]*

64.    Since the inception of the Plan on March 1, 2010, Defendants offered higher cost mutual fund share classes as investment options for the Plan even though 90% of the time lower cost class shares of those exact same mutual funds with the same attributes were readily available to the Plan throughout its duration.  All of the funds had sufficient assets and attributes to qualify for the lowest cost share classes available and to qualify for a waiver of fees.

**Summary Table**

|  | 2019 | | 2018 | | 2017 | | 2016 | | 2015 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Total # of funds | 29 | | 29 | | 29 | | 29 | | 28 | |
| *Funds with Cheaper Available Share Classes* | 26 | 90% | 26 | 90% | 26 | 90% | 26 | 90% | 25 | 89% |

65.    The following chart illustrates the differences in the operating costs and returns between the share classes chosen by Defendants and the least expensive share class available as of 1/1/2015.  These are funds that Defendants chose to include in the menu of fund options prior to 2015 and have continued to offer to participants as of December 31, 2019.  The fund name listed in the first row and shaded grey represents the share class chosen by Defendants.  The second fund name listed and not shaded represents the cheaper share class Defendants could have chosen which was available to them throughout the duration of the Plan.  The bolded line represents the difference in costs (expenses charged), 12-month yield and the investment returns for the one- and annualized three-, five- and ten-year performance periods ending 12/31/2019. Additionally, to highlight the harm caused by the Defendants' imprudent selection of high-cost share classes, the five-year cumulative

("Cost-conscious management is fundamental to prudence in the investment function.").

[2] Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt., 712 F.3d 705, 718-19 (2d Cir. 2013).

-17-

FIRST AMENDED CLASS ACTION COMPLAINT

returns are included. <u>The average annual return difference calculated from the cumulative total return (far right column) is higher than both the expense ratio and annualized five-year return in all but one case</u>. This difference represents the loss of compounding associated with higher expenses, a concept that will be explored further below.

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century Mid Cap Value Inv* | 0.98 | 1.46 | 28.88 | 7.75 | 8.63 | 51.27 | |
| *American Century Mid Cap Value R6* | 0.63 | 1.79 | 29.31 | 8.14 | 9.00 | 53.86 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.33** | **-0.43** | **-0.39** | **-0.37** | **-2.59** | **-0.52** |
| *American Century One Choice In Ret Inv* | 0.75 | 1.70 | 15.85 | 6.96 | 4.96 | 27.39 | |
| *American Century One Choice In Ret R6* | 0.40 | 2.48 | 16.26 | 7.28 | 5.29 | 29.40 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.78** | **-0.41** | **-0.32** | **-0.33** | **-2.01** | **-0.40** |
| *American Century One Choice 2020 Inv* | 0.77 | 1.52 | 16.02 | 7.19 | 5.15 | 28.54 | |
| *American Century One Choice 2020 R6* | 0.42 | 2.06 | 16.45 | 7.51 | 5.47 | 30.51 | |
| **Cost of Expensive** | **-0.35** | **-0.54** | **-0.43** | **-0.32** | **-0.32** | **-1.97** | **-0.39** |

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| **Share Classes** | | | | | | | |
| *American Century One Choice 2025 Inv* | 0.77 | 1.45 | 17.37 | 7.79 | 5.55 | 31.01 | |
| *American Century One Choice 2025 R6* | 0.42 | 2.34 | 17.77 | 8.13 | 5.88 | 33.07 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.89** | **-0.40** | **-0.34** | **-0.33** | **-2.06** | **-0.41** |
| *American Century One Choice 2030 Inv* | 0.79 | 1.53 | 18.57 | 8.33 | 5.94 | 33.44 | |
| *American Century One Choice 2030 R6* | 0.44 | 2.06 | 18.99 | 8.68 | 6.25 | 35.41 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.53** | **-0.42** | **-0.35** | **-0.31** | **-1.97** | **-0.39** |
| *American Century One Choice 2035 Inv* | 0.82 | 1.42 | 20.01 | 8.94 | 6.35 | 36.05 | |
| *American Century One Choice 2035 R6* | 0.47 | 2.44 | 20.37 | 9.23 | 6.67 | 38.11 | |
| **Cost of Expensive Share** | **-0.35** | **-1.02** | **-0.36** | **-0.29** | **-0.32** | **-2.06** | **-0.41** |

-19-

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| Classes | | | | | | | |
| *American Century One Choice 2040 Inv* | 0.84 | 1.46 | 21.32 | 9.59 | 6.76 | 38.69 | |
| *American Century One Choice 2040 R6* | 0.49 | 2.02 | 21.71 | 9.91 | 7.09 | 40.85 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.56** | **-0.39** | **-0.32** | **-0.33** | **-2.16** | **-0.43** |
| *American Century One Choice 2045 Inv* | 0.87 | 1.29 | 22.72 | 10.22 | 7.19 | 41.50 | |
| *American Century One Choice 2045 R6* | 0.52 | 2.34 | 23.16 | 10.57 | 7.54 | 43.83 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-1.05** | **-0.44** | **-0.35** | **-0.35** | **-2.33** | **-0.47** |
| *American Century One Choice 2050 Inv* | 0.89 | 1.34 | 24.08 | 10.73 | 7.49 | 43.50 | |
| *American Century One Choice 2050 R6* | 0.54 | 1.89 | 24.38 | 11.08 | 7.83 | 45.78 | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.55** | **-0.30** | **-0.35** | **-0.34** | **-2.28** | **-0.46** |

-20-

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Funds Capital World Gr&Inc R5* | 0.47 | 1.93 | 25.68 | 12.24 | 8.18 | 48.16 | |
| *American Funds Capital World Gr&Inc R6* | 0.42 | 1.98 | 25.74 | 12.29 | 8.22 | 48.44 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.05** | **-0.06** | **-0.05** | **-0.04** | **-0.28** | **-0.06** |
| *American Funds Europacific Growth R5* | 0.51 | 1.32 | 27.37 | 12.40 | 7.36 | 42.63 | |
| *American Funds Europacific Growth R6* | 0.46 | 1.36 | 27.40 | 12.45 | 7.41 | 42.96 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.04** | **-0.03** | **-0.05** | **-0.05** | **-0.33** | **-0.07** |
| *BNY Mellon Bond Market Index Inv* | 0.40 | 2.77 | 8.12 | 3.58 | 2.57 | 13.53 | |
| *BNY Mellon Bond Market Index I* | 0.15 | 2.53 | 8.49 | 3.84 | 2.84 | 15.03 | |
| **Cost of Expensive Share** | **-0.25** | **0.24** | **-0.37** | **-0.26** | **-0.27** | **-1.50** | **-0.30** |

-21-

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| **Classes** | | | | | | | |
| *Clearbridge Appreciation I* | 0.66 | 1.33 | 30.21 | 15.26 | 11.25 | 70.41 | |
| *Clearbridge Appreciation IS* | 0.57 | 1.41 | 30.32 | 15.37 | 11.36 | 71.26 | |
| **Cost of Expensive Share Classes** | **-0.09** | **-0.08** | **-0.11** | **-0.11** | **-0.11** | **-0.85** | **-0.17** |
| *Columbia Mid Cap Index A* | 0.45 | 1.14 | 25.66 | 8.73 | 8.52 | 50.50 | |
| *Columbia Mid Cap Index Inst2* | 0.20 | 1.35 | 25.99 | 9.02 | 8.79 | 52.39 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.21** | **-0.33** | **-0.29** | **-0.27** | **-1.89** | **-0.38** |
| *Columbia Small Cap Index A* | 0.45 | 1.02 | 22.30 | 7.90 | 9.05 | 54.22 | |
| *Columbia Small Cap Index Inst2* | 0.20 | 1.18 | 22.61 | 8.17 | 9.33 | 56.21 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.16** | **-0.31** | **-0.27** | **-0.28** | **-1.99** | **-0.40** |
| *Invesco Developing Markets Y* | 1.00 | 0.51 | 24.31 | 13.93 | 6.43 | 36.56 | |

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *Invesco Developing Markets R6* | 0.83 | 0.68 | 24.53 | 14.13 | 6.62 | 37.78 | |
| **Cost of Expensive Share Classes** | **-0.17** | **-0.17** | **-0.22** | **-0.20** | **-0.19** | **-1.22** | **-0.24** |
| *Loomis Sayles Small Cap Growth Retail* | 1.20 | 0.00 | 26.23 | 16.99 | 11.23 | 70.26 | |
| *Loomis Sayles Small Cap Growth N* | 0.82 | 0.00 | 26.65 | 17.41 | 11.63 | 73.34 | |
| **Cost of Expensive Share Classes** | **-0.38** | **0.00** | **-0.42** | **-0.42** | **-0.40** | **-3.08** | **-0.62** |
| *MFS Value R4* | 0.58 | 1.92 | 30.08 | 11.34 | 9.40 | 56.71 | |
| *MFS Value R6* | 0.47 | 2.01 | 30.18 | 11.45 | 9.51 | 57.50 | |
| **Cost of Expensive Share Classes** | **-0.11** | **-0.09** | **-0.10** | **-0.11** | **-0.11** | **-0.79** | **-0.16** |
| *Western Asset Core Plus Bond I* | 0.45 | 3.63 | 12.28 | 5.76 | 4.66 | 25.58 | |
| *Western Asset Core Plus Bond IS* | 0.42 | 3.66 | 12.32 | 5.79 | 4.67 | 25.64 | |
| **Cost of Expensive Share Classes** | **-0.03** | **-0.03** | **-0.04** | **-0.03** | **-0.01** | **-0.06** | **-0.01** |

66.     Defendants offered higher cost share classes rather than readily available lower cost options to Plan participants for a decade before finally

-23-

FIRST AMENDED CLASS ACTION COMPLAINT

acknowledging their imprudent actions and changing share classes in January 2020. Defendants, however, did not seek to correct the harm caused to their participants by putting the Plan back into the condition it would have been in had the breaches not occurred as mandated by ERISA and the IRS. By choosing and maintaining higher cost share classes for a decade instead of available lower cost shares as illustrated above, Defendants caused Plan participants/beneficiaries harm. The harm was not simply just forcing them to pay higher fees, but also lost yield and returns participants rely on for retirement income as a result of those higher fees on nearly every mutual fund offered through the Plan. In doing so, Defendants undermined the very purpose of the trust: Employee Retirement Income Security for participants/beneficiaries. The erosive effect of excessive fees and the resulting lost returns compounds over time.

67. In acknowledgement that service provider fees were excessive and that lower cost share classes are beneficial, Defendants appear to have shifted a limited number of funds into lower (but not the lowest available) share classes in 2016. Defendants, however, failed to correct the harm caused by previous excessive fees and imprudently continued to add new higher cost funds than what was available to participants after 2015 (see below for changes and additions). Again, all of the funds had sufficient assets and attributes to qualify for the lowest cost share classes available:

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *American Century One Choice 2055 Inv* | 0.89 | 1.32 | 24.54 | 10.89 | 7.61 | 44.30 | |
| *American Century One Choice* | 0.54 | 1.95 | 24.85 | 11.23 | 7.96 | 46.66 | |

-24-

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *2055 R6* | | | | | | | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.63** | **-0.31** | **-0.34** | **-0.35** | **-2.36** | **-0.47** |
| *American Century One Choice 2060 Inv* | 0.89 | 1.34 | 24.88 | 11.03 | N/A | N/A | |
| *American Century One Choice 2060 R6* | 0.54 | 1.69 | 25.45 | 11.43 | N/A | N/A | |
| **Cost of Expensive Share Classes** | **-0.35** | **-0.35** | **-0.57** | **-0.40** | | | |
| *American Funds AMCAP R5* | 0.39 | 0.70 | 26.67 | 15.07 | 10.98 | 68.35 | |
| *American Funds AMCAP R6* | 0.34 | 0.75 | 26.74 | 15.15 | 11.04 | 68.81 | |
| **Cost of Expensive Share Classes** | **-0.05** | **-0.05** | **-0.07** | **-0.08** | **-0.06** | **-0.46** | **-0.09** |
| *American Funds US Government Sec R5* | 0.29 | 2.17 | 5.60 | 2.76 | 2.23 | 11.66 | |
| *American Funds US Government Sec R6* | 0.23 | 2.22 | 5.59 | 2.79 | 2.29 | 11.99 | |
| **Cost of Expensive Share Classes** | **-0.06** | **-0.05** | **0.01** | **-0.03** | **-0.06** | **-0.33** | **-0.07** |

-25-

FIRST AMENDED CLASS ACTION COMPLAINT

| Fund Name | Expense Ratio ("basis points") | Yield 12-Month (%) | Average Annualized Returns (Ending 12/31/19) 1-Year% | Average Annualized Returns (Ending 12/31/19) 3-Year% | Average Annualized Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% | Cumulative Total Returns (Ending 12/31/19) 5-Year% /5 |
|---|---|---|---|---|---|---|---|
| *Pioneer Select Mid Cap Growth Y* | 0.79 | 0.00 | 33.01 | 17.60 | 11.40 | 71.56 | |
| *Pioneer Select Mid Cap Growth K* | 0.67 | 0.00 | 33.21 | 17.75 | 11.53 | 72.57 | |
| **Cost of Expensive Share Classes** | **-0.12** | **0.00** | **-0.20** | **-0.15** | **-0.13** | **-1.01** | **-0.20** |
| *PIMCO Income Adm* | 1.34 | 5.56 | 7.78 | 5.42 | 5.40 | 30.08 | |
| *PIMCO Income Instl* | 1.09 | 5.81 | 8.05 | 5.68 | 5.66 | 31.69 | |
| **Cost of Expensive Share Classes** | **-0.25** | **-0.25** | **-0.27** | **-0.26** | **-0.26** | **-1.61** | **-0.32** |
| *Principal SmallCap Value II Instl* | 0.98 | 0.88 | 23.19 | 4.08 | 6.28 | 35.60 | |
| *Principal SmallCap Value II R6* | 0.96 | 0.91 | 23.24 | 4.11 | 6.30 | 35.73 | |
| **Cost of Expensive Share Classes** | **-0.02** | **-0.03** | **-0.05** | **-0.03** | **-0.02** | **-0.13** | **-0.03** |

-26-

FIRST AMENDED CLASS ACTION COMPLAINT

68.    The extra fees cost Plan participants millions of dollars per year (not including the loss of compounded returns). For example, the class A shares of the target-date funds alone cost participants over $900,000 in 2015 over their least expensive option.

69.    Defendants demonstrated a lack of basic skill and loyalty when selecting and continuing to retain investments. As an example, by merely comparing the annualized five-year returns ending 12/31/2009 of two share classes of the exact same fund selected by the Defendants in 2010 they couldn't help but see the growth disparity. The share class they selected had an annualized five-year growth rate of 16.72% while its otherwise identical, but lower cost sister share class posted a 19.29% return over the same period (2.57% more). Using simple math, the Defendants would conclude that receiving twenty-five basis points in revenue sharing was less than half of the investment loss each year of fifty-one basis points (2.57 divided by 5 equals 0.514%) incurred by the trust and participants/beneficiaries. Of the twenty-five available mutual funds selected by the Defendants the same imprudent selection problem exists for twenty-two (approximately 90%) of mutual funds' share classes selected by the Defendants (at inception of the plan on 3/1/2010). This is simply the reverse of compounded interest or yield investors seek and Einstein discussed when he noted that **compound interest is the most powerful force in the universe**: "Compound interest is the 8th wonder of the world. ***He who understands it, earns it; he who doesn't, pays it.***"

70.    It is important to note that fifty-basis points or one-half of one percent (0.5%) directly reduces the expected rate of return commensurately for the participants/beneficiaries' account by ten percent (10%) or more. Applying the typical annual return of stocks and bonds of 5% per year according to Buffett and the Wharton School, the following hypothetical is presented to demonstrate the

-27-
FIRST AMENDED CLASS ACTION COMPLAINT

imprudence of selecting inappropriate share classes:   Using the median income at www.usdebtclock.org of $35,431 (and the average savings percent of 7%) fifty basis points in reduced returns due to excessive costs is a lost opportunity to make an additional $2,480 (assuming 4.5% versus 5% over ten years).

71.     While Defendants may argue that the fees are necessary and allowed, they miss the larger argument that one-tenth of that, $248, is NOT "reasonable" for recordkeeping. With respect to the current situation, while the numbers *may* differ, the principle holds true. Rather than incurring unnecessary losses, Defendants could have simply demanded the recordkeeper (MassMutual) accept a more reasonable charge of $40 annually for each of the 17,208 participants/beneficiaries (listed on line 6g of the Defendants' 2010 Annual Return/Report of Employee Benefit Plan) or they would request a proposal (RFP) from other recordkeepers.  The Defendants did not attempt to negotiate a flat fee as opposed to an asset-based for recordkeeping, nor did they attempt to negotiate lower fees or request to be moved into lower share classes with less asset-based fees.

72.     As discussed later in the complaint, a forty dollar per "record" or "account" charge is a more reasonable and equitable payment method instead of asset-based" pay. Based on the plan's financials since 2010 that show an average annual growth rate of sixteen percent (16%) per annum, the lifetime average revenue sharing of fifty-basis points given the Rule of 72 means covered service providers (CSP) pay would double every 4.5 years. As it stands, MassMutual's pay nearly tripled between 2010 and 2019 despite the fact that the number of participants that had to be record kept remained largely flat.

73.     If flat rate per capita charges were used by the Defendants then MassMutual's sub-accounting costs would have been only $400 dollars over ten years ($40 * 10) and the participants/beneficiaries would have kept two thousand more dollars each in compounded returns (again based on the median income and

-28-

FIRST AMENDED CLASS ACTION COMPLAINT

savings rates). Finally, the trust would have had an estimated $35 million MORE dollars in it (2,000 * 17,208).

74. Defendants were aware that higher operating costs would reduce the amount Plan participants realized returns on their investments because Defendants included the following statement regarding fees in the Plan's 29 CFR 2550.404a-5 annual disclosures to the participants: "The cumulative effect of fees and expenses can substantially reduce the growth of your retirement savings. However, fees and expenses are only two of the many factors to consider when deciding what investment is appropriate for you. For more information about the long-term effect of fees and expenses, visit the U.S. Department of Labor's Web site at https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf. " Defendants failed to use the Plan's bargaining power to leverage lower cost mutual fund options for the Plan participants.

75. MassMutual, the Plan's recordkeeper until December 31, 2019, and other Covered Service Providers, LPL and Alliant (collectively, "CSPs"), were on the receiving end of excessive fees being charged to participants. The money taking side originates at the mutual fund end. Each mutual fund takes the revenue sharing daily (1/365th) from the gross asset value (GAV) of their mutual funds at 4pm (accrued for weekends and holidays). The resulting net asset values (NAVs) are updated by MassMutual every evening so participants/beneficiaries' account balances match the trust's total fund NAVs. The trust is the funds' holder of record.

76. Upon information and belief, at the end of every month, the mutual funds transmit their revenue sharing dollars to MassMutual. Despite being the keeper of records MassMutual does not track which participants actually paid the cost of their recordkeeping (paid through SEC Rule 12b-1 and/or "sub-transfer agency" fees). So, in the event MassMutual were to allocate "pro-rata" (based on account size) those revenue sharing credits that exceed their "required revenue" to run the

FIRST AMENDED CLASS ACTION COMPLAINT

plan, those credits would go to current holders of those funds. Effectively, a participant could be credited with another participant's payment. The Defendants must monitor their services agreements when billing based on assets (not per person) so an agreement to pay twenty basis points for recordkeeping in year one when the agreement is first executed will become out of date in one or two years as the plan's assets rapidly grow. As already noted, the Plan grew at 16% annually from 2010 to 2019 so pay raises of 16% could occur for MassMutual, LPL and/or Alliant for pay based on assets. This is true even when most of the growth occurred as a result of the increase of participant contributions and not the service providers' services. Futher, even if MassMutual hypothetically credited money that exceeded "required revenue" back to participants individually, any credits would be late (so separated persons miss their credits) and inequitably attributed and would destroy the compounding effect of the revenue sharing funds.

77.    Lastly, the information available for Defendants to make an informed assessment as to costs and returns available for each share class was readily available in each fund's annual prospectus at the time the choices were made.  For example, Defendants included the Columbia Mid Cap Index Fund Class A as an investment option available to participants since 2010. The information provided in the Columbia Mid Cap Index annual prospectuses clearly shows a significant difference in fees and investment returns between the Class A and Institutional Share Class. The Defendants' actions to choose high-cost *index* funds is a clear reason for Plaintiffs to question Defendant's skill and loyalty. The two Columbia Index funds had an R5 or Institutional share class available for twenty basis points (0.2%/yr), but the Defendants selected the "A" share class that cost 0.45%/yr. Logically one would ask why since they are index funds which are by their nature chosen for their low-costs, however, reading the Defendants' Forms 5500 makes the motive clearer:

a.    "MassMutual received estimated 12b-1 Fees of 0.25% with respect to plan assets held in the Columbia Small Cap Index Fund (MF-B2)"

-30-

FIRST AMENDED CLASS ACTION COMPLAINT

b.     "MassMutual received estimated 12b-1 Fees of 0.25% with respect to plan assets held in the Columbia Mid Cap Index Fund (MF-B8)."

78.     ". . . **Rule 12b-1 fees depress mutual fund returns**. . . . [U]sing fund assets to compensate intermediaries increases a fund's expense ratio . . . [C]osts associated with ***distribution of shares should be borne by the investor directly out of their own assets***."[5] [Emphasis added]

79.     The 2015 prospectus warns that "[t]hese payments may create a conflict of interest by influencing the broker-dealer or other intermediary and your financial advisor to recommend the Fund over another investment." The relevant information provided in the 2020 prospectus and 2015 prospectus is quoted below, with the fees, expenses and returns for comparison highlighted. The same information was available for Defendants to review and analyze at the time decisions were being made in 2010 also:

**Columbia Mid Cap Index**

**2019 Prospectus Expense Data**

**SUMMARY OF THE FUND**

**Investment Objective**

Columbia Mid Cap Index Fund (the Fund) seeks total return before fees and expenses that corresponds to the total return of the Standard & Poor's (S&P) MidCap 400® Index.

**Fees and Expenses of the Fund**

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund. An investor transacting in a class of Fund shares without any front-end sales charge, contingent deferred sales charge, or other asset-based fee for sales or distribution may be required to pay a commission to the financial intermediary for effecting such transactions. Such commission rates are set by the financial intermediary and are not reflected in the tables for example below.

//

//

//

---

[5] *Issues in Mutual Fund Revenue Sharing Payments* by John a. Haslem, Professor emeritus of Finance in the Robert H. Smith School of Business at the University of Maryland, jhaslem@rhsmith.umd.edu, 2012.

-31-

**Annual Fund Operating Expenses** (expenses that you pay each year as a percentage of the value of your investment)

| | **Class A** | **Class Inst** | **Class Inst2** | **Class3** |
|---|---|---|---|---|
| Management fees | 0.20% | 0.20% | 0.20% | 0.20% |
| Distribution and service (12b-1) fees | 0.25% | 0.00% | 0.00% | 0.00% |
| Other Expenses | 0.13% | 0.13% | 0.07% | 0.03% |
| **Total Annual Fund Operating Expenses** | 0.58% | 0.33% | 0.27% | 0.23% |
| Less: Fee waivers and/or expense reimbursements[6] | (0.13%) | (0.13%) | (0.07%) | (0.03%) |
| Total Annual Fund Operating Expenses After Fee Waiver | 0.45% | 0.20% | 0.20% | 0.20% |

## 2020 Prospectus Performance Data

**Average Annual Total Returns (for periods ended December 31, 2019)**

| | **Share Class Inception Date** | **1 Year** | **5 Years** | **10 Years** |
|---|---|---|---|---|
| **Class A** | 05/31/2000 | | | |
| returns before taxes | | 25.66% | 8.52% | 12.20% |
| returns after taxes on distributions | | 24.03% | 6.60% | 10.71% |
| **Class Inst** returns before taxes | 03/31/2000 | 25.95% | 8.79% | 12.49% |
| **Class Inst2** returns before taxes | 11/08/2012 | 25.99% | 8.79% | 12.50% |
| **Class Inst3** returns before taxes | 03/01/2017 | 25.97% | 8.80% | 12.49% |
| **S&P MidCap 400 Index** (reflects no deductions for fees, expenses or taxes) | | 26.20% | 9.03% | 12.72% |

---

[6] Columbia Management Investment Advisers, LLC and certain of its affiliates have contractually agreed to waive fees and/or to reimburse expenses (excluding transaction costs and certain other investment related expenses, interest, taxes, acquired fund fees and expenses, and infrequent and/or unusual expenses) through June 30, 2021, unless sooner terminated at the sole discretion of the Fund's Board of Trustees. Under this agreement, the Fund's net operating expenses subject to applicable exclusions, will not exceed the annual rates of 0.45% for Class A, 0.20% for Class Inst2 and 0.20% for Class Inst3.

-32-

FIRST AMENDED CLASS ACTION COMPLAINT

## 2015 Prospectus Expense Data

**Investment Objective**

Columbia Mid Cap Index Fund (the Fund) seeks total return before fees and expenses that corresponds to the total return of the Standard & Poor's (S&P) MidCap 400® Index.

**Fees and Expenses of the Fund**

This table describes the fees and expenses that you may pay if you buy and hold shares of the Fund.

**Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment)**

|  | Class A | Class I | Class R5 | Class Z |
|---|---|---|---|---|
| Management Fees[7] | 0.20% | 0.20% | 0.20% | 0.20% |
| Distribution and/or service (12b-1) fees | 0.25% | 0.00% | 0.00% | 0.00% |
| Other Expenses[8] | 0.21% | 0.01% | 0.06% | 0.21% |
| **Total annual Fund operating expenses** | 0.66% | 0.21% | 0.26% | 0.41% |
| Less: Fee waivers and/or expense reimbursements[9] | (0.21%) | (0.01%) | (0.06%) | (0.21%) |
| **Total annual Fund operating expenses after fee waivers and/or expense reimbursements** | 0.45% | 0.20% | 0.20% | 0.20% |

//

[7] Management fees reflect the combination of advisory and administrative services fees under one agreement providing for a single management fee. Advisory fees and administrative services payable pursuant to separate prior agreements amounted to 0.10% and 0.10% of average daily net assets of the Fund, respectively.

[8] Other expenses for Class A, Class R5 and Class Z shares have been restated to reflect current fees paid by the fund

[9] Columbia Management Investment Advisers, LLC and certain of its affiliates have contractually agreed to waive fees and/or to reimburse expenses (excluding transaction costs and certain other investment related expenses, interest, taxes, acquired fund fees and expenses, and extraordinary expenses) until June 30, 2016, unless sooner terminated at the sole discretion of the Fund's Board of Trustees. Under this agreement, the Fund's net operating expenses, subject to applicable exclusions, will not exceed the annual rates of 0.45% for Class A, 0.20% for Class I, 0.20% for Class R5 and 0.20% for Class Z.

-33-

FIRST AMENDED CLASS ACTION COMPLAINT

**2015 Prospectus Performance Data**

**Average Annual Total Returns (for periods ended December 31, 2014)**

|  | Share Class Inception Date | 1 Year | 5 Years | 10 Years |
|---|---|---|---|---|
| **Class A** | 05/31/2000 |  |  |  |
| returns before taxes |  | 9.2% | 16% | 9.31% |
| returns after taxes on distributions |  | 7.67% | 14.99% | 8.24% |
| returns after taxes on distributions and sale of Fund shares |  | 6.40% | 12.93% | 7.49% |
| **Class I** returns before taxes | 09/27/2010 | 9.63% | 16.34% | 9.59% |
| **Class R5** returns before taxes | 11/08/2012 | 9.51% | 16.33% | 9.58% |
| **Class Z** returns before taxes | 03/31/2000 | 9.52% | 16.31% | 9.57% |
| **S&P MidCap 400 Index** (reflects no deductions for fees, expenses or taxes) |  | 9.77% | 16.53% | 9.71% |

80.    The Columbia Mid-Cap 2015 Prospectus also included a section entitled "Choosing Your Share Class" that set forth the eligibility requirements for investing in each class.  The Class A shares Defendants chose are made available to the general public for investment, require a minimum $2,000 investment and charge maximum distribution and/or service fees of .25%.  On the other hand, the R5 class shares are available to group retirement plans that maintain plan-level or omnibus accounts with the fund with no minimum investment and charge no (0) maximum distribution and/or service fees. Similar information above can be provided for 90% of the funds, including the target-date funds, in the Plan.

-34-

FIRST AMENDED CLASS ACTION COMPLAINT

81. Wasting the trust's money (i.e., participants/beneficiaries' money) violates subsections (A), (B) and (D) of ERISA Section 404(a)(1) above. In devising and implementing strategies for the investment and management of trust assets, **trustees are obligated to "minimize costs**." Uniform Prudent Investor Act (the "UPIA") §7. 44. Additionally, an analysis of each attribute of the different share classes reveals that there is <u>no</u> difference between the share classes other than costs and performance returns as a consequence of costs, all borne by the participants. A chart attached hereto as Exhibit A demonstrates that for each of the 26 of the 29 available funds where Defendants could have offered a cheaper share class, the share classes all shared the same manager, manager start date, manager tenure, allocations in stocks, bonds, cash, same percentage of top holdings, number of holdings, turnover rate, average price/earnings ratios, price/book ratios, and average market cap.

82. Defendants did not systemically and regularly review or institute other processes in place to fulfill their continuing obligation to monitor Plan investments and reduce Plan costs, or, in the alternative, failed to follow the processes, as evidenced by:

    a. The offering of higher cost share classes as Plan investment options when lower cost options of the same funds were available; and

    b. Defendants continued to add high-cost A shares in 2015 with the addition of the American Century One Choice 2055 target-date fund vintage. Subsequently, they replaced the A shares with the less expensive, but still high-cost "Inv" shares in 2016.

83. Defendants must "systematically and regularly" review (1) covered service providers (CSP) and (2) the investment menu for participants/beneficiaries. Defendants must annually file certified Forms 5500 and indicate on Schedule H, Line 4d whether there were any "non-exempt payments

-35-

FIRST AMENDED CLASS ACTION COMPLAINT

to parties in interest." To avoid perjury the Defendants must ensure the plan and trust's providers, as well as funds' manager's fees, are "necessary for operation of the plan." If they are not, the Defendants need to consider removal to ensure that there were no non-exempt transactions. Reviewing the trust's providers and funds every three to six months gives the Defendants time to avoid a "failure to act" violation. Coupled with the fact that 1) thousands of workers leave each year (sweeping out an average of $1,719,403 of plan assets each month (or over $20 million per year) based on the Defendants' 2010 to 2019 Forms 5500) and 2) because actively managed funds are prone to underperformance. According to Standard and Poor's SPIVA: 2020 Mid-Year Active vs. Passive Scorecard: "Through June, more than 87% (87.2%) of all domestic stock fund managers had underperformed the broad S&P Composite 1500 Index since June 2005."
https://www.spglobal.com/spdji/en/documents/spiva/spiva-us-mid-year-2020.pdf.
The point being that participants who suffer harm from excessive payments and lagging returns continually leave the plan thus guaranteeing losses with little recourse for recovery.

84. The total amount of excess mutual fund expenses paid by Plan participants over the past six years, which correspondingly reduced the return on the Plan participants' investments, resulted in over ten million dollars of damages to participants.

**B. Defendants Paid MassMutual and Alliant Unreasonable Fees, Failed to Monitor them, and further Failed to make Requests for Proposals from Other Service Providers**

85. Defendants have a duty to prudently select covered service providers (CSP). Courts that have considered the issue have made it clear that "the failure to exercise due care in selecting . . . a fund's service providers constitutes a breach of a trustees' fiduciary duty." 28 U.S.C. § 1108(b)(2) states services must be necessary for the plan's operation. Department of Labor guidance has also emphasized the

-36-

FIRST AMENDED CLASS ACTION COMPLAINT

importance of prudently selecting service providers.[10] The DOL has observed that, when selecting a service provider, "the responsible plan fiduciary must engage in an objective process." *Id*. Such a process must be "designed to elicit information necessary to assess the qualifications of the service provider, the quality of the work product, and the reasonableness of the fees charged in light of the services provided." *Id*. Furthermore, "such process should be designed to avoid self-dealing, conflicts of interest or other improper influence." *Id*.  Although the DOL has offered such general guidance, it has also cautioned that prudent selection of a service provider "will depend upon the particular facts and circumstances." *Id*.

### *MassMutual*

86.   Recordkeeping is a necessary service for every defined contribution plan. Recordkeeping services for a qualified retirement plan, like the Plan, are essentially fixed and largely automated. It is a system where costs are driven purely by the number of inputs and the number of transactions. In essence, it is a computer-based bookkeeping system.

87.   The cost of recordkeeping and administrative services depends on the number of participants, not the amount of assets in the participant's account.

88.   The greatest cost incurred in incorporating a new retirement plan into a recordkeeper's system is for upfront setup costs. After the Plan account is set up, individual accounts are opened by entering the participant's name, age, SSN, date of hire and marital status. The system also records the amount a participant wishes to contribute each pay period through automated payroll deductions. Participants can go on-line and change their contribution rate at any time.

89.   There are numerous recordkeepers in the marketplace who are capable of providing a high level of service to the Plan, and who will readily respond to a request for proposal. These recordkeepers primarily differentiate themselves based

//

---

[10] DOL Info. Letter to Theodore Konshak (Dec. 1, 1997).

-37-

FIRST AMENDED CLASS ACTION COMPLAINT

on service and price, and vigorously compete for business by offering the best service for the best price.

90.    Because the cost of recordkeeping services depends on the number of participants, not on the amount of assets in the participant's account, the cost of providing recordkeeping services to a participant with a $100,000 account balance is the same for a participant with $1,000 in her retirement account.

91.    Recordkeepers for defined contribution plans are generally compensated through direct payments from the plan (participants) or employer.  Although for a portion of mostly smaller plans a second process exists, through indirect payments via a practice known as revenue sharing.

92.    In a revenue sharing arrangement, a mutual fund or other investment vehicle directs a portion of the expense ratio—the asset-based fees it charges to investors—to the 401(k) plan's recordkeeper putatively for providing marketing, recordkeeping and administrative services for the mutual fund. These fees include: Rule 12b-1 fees, which are paid by the Funds to the recordkeeper as compensation for its services and expenses in connection with the sale and distribution of fund shares; shareholder service fees; and sub-transfer agency fees. The payments are **not** tied to actual expenses incurred by the recordkeeper for services rendered.

93.    Revenue sharing arrangements allow recordkeepers to immediately take fees netted from every fund from each account.  A prudent fiduciary needs to track every penny of revenue from each account and reconcile that account by crediting back a sufficient amount to ensure that the recordkeeper is not receiving unreasonable compensation.  Most fiduciaries do not properly track or verify this process and rely on the recordkeeper assertion that all payments are reasonable.  Secondly, most do not obtain competitive bids to determine if costs are reasonable.  Here, Defendants breached their fiduciary duty by not investigating and monitoring whether the asset-based fees paid to MassMutual exceeded actual fees incurred for administrative expenses (and were therefore unreasonable) and whether proper

FIRST AMENDED CLASS ACTION COMPLAINT

rebates were being issued to affected participants. Also, there is no documentation that they bid out services.

94. Plans report Administrative Costs to the IRS on their annual 5500 filing. The bulk of administrative costs are in record keeping and they are reported in Schedule C part 2, line 1. Defendants reported paying MassMutual $117,450 in direct costs on their 2015 5500. They reported that they paid MassMutual $540,274 in direct costs on their 2019 5500 for the same service - an increase of over 360% (with only an increase of 1,149 participants, an increase of less than 7%). The costs of administration did not increase by 360%; in addition, both numbers hide and understate total fees.

95. Much of these hidden costs are a result of revenue sharing and conflicts of interest already touched upon. The SEC fined MassMutual $2.1 million in 2021 for hiding their conflicts of interest in excessive administrative costs using revenue sharing games and share class violations.[i] MassMutual even overcharged their own employees and paid a $31 million settlement in 2016.[ii]

96. Given the lack of faith in disclosed numbers by MassMutual, Plaintiffs have estimated what is believed to be much closer to the true cost. The Defense complains that Plaintiffs should not be allowed to estimate numbers. However, Plaintiffs are forced to estimate because the Plan breached its fiduciary duty by hiding the fees in a revenue sharing scheme.

97. Plaintiffs originally underestimated the true recordkeeping/ administrative facts. A more inclusive calculation time period of 2014 through 2019, the Plan paid recordkeeping costs of $102, $107, $89, $94, $94 and $95 per participant based on stated asset-based fee + 12(b)1 fees + Sub-TA fees + Annuity based fees+ undisclosed Annuity Spreads. These fees are too high in relation to the services provided.

//

//

-39-

FIRST AMENDED CLASS ACTION COMPLAINT

98.     Based on the number of Plan participants and the assets in the Plan, a reasonable recordkeeping fee for the Plan is approximately $40 per participant (15th Annual NEPC 2020 Defined Contribution Plan & Fee Survey: https://f.hubspotusercontent00.net/hubfs/2529352/2020%20DC%20Plan%20and%20 Fee%20Survey/2020%20NEPC%20DC%20Plan%20Progress%20Report.pdf.

99.     In addition, in comparison with similar plans involving similar numbers of participants, and for materially similar services provided, Seaworld's administrative costs exceed those of other plans by $30-$40, as demonstrated on the below table:

**SeaWorld Peer Group**

| Cost per Participant | Name of Plan | Participants |
|---|---|---|
| $48.81 | ADT SECURITY CORP | 16,296 |
| $49.31 | I. A. T. S. E.LOCAL NO. ONE, | 18,329 |
| $49.43 | AIR LIQUIDE & AIRGAS | 18,295 |
| $49.98 | PROMEDICA HEALTH SYSTEM, | 16,861 |
| $50.19 | MULTICARE HEALTH SYSTEM | 13,606 |
| $51.83 | SCHNEIDER NATIONAL, | 16,018 |
| $52.78 | STAPLES, INC. | 15,116 |
| $53.40 | JOHN MUIR HEALTH | 15,760 |
| $53.64 | SIX CONTINENTS HOTELS | 13,260 |
| $54.46 | HCL AMERICA, | 15,119 |
| $54.98 | GIANT EAGLE, INC. | 13,600 |
| $57.96 | SEDGWICK | 15,244 |
| $59.10 | COCA-COLA BOTTLERS | 18,890 |
| **$94.77** | SEAWORLD | 17,000 |

100.    Failing to align CSP fees with industry benchmarks shifts the burden to the Defendants to justify allowing participants to pay unreasonably high fees. The unreasonable fees paid to MassMutual through its revenue sharing arrangements directly resulted from Defendants' failing to monitor MassMutual's fees and compare it with other service providers and market rates.

//

-40-

FIRST AMENDED CLASS ACTION COMPLAINT

***Alliant***

101.   According to the Forms 5500 filed for the Plan, Alliant, the financial advisor, made a total of $1,005,669 during 2014 to 2019 plan years (or an average of almost $168,000 (163,540, 232,444, 179,199, 135,934, 148,625, 145,927, respectively)) and made money through revenue sharing arrangements (therefore being incentivized to choose expensive investments).   Because neither the Defendants nor Alliant acted to exchange the share classes of the mutual funds with their least expensive option, it is unclear what Alliant brought to the Plan and its participants/beneficiaries. The vast majority of funds in the plan caused financial harm through high costs and lagging returns and as such, Alliant breached its fiduciary duty to the Plan. Furthermore, Alliant's asset-based fees charged to the Plan were disproportionately high for the "services" provided to it.

102.   Lastly, upon information and belief, Defendants failed to perform comparisons of Alliant with the marketplace for other plans of similar size.   For example, Plan Participants paid ALLIANT INSURANCE SERVICES, LLC ("Alliant", EIN# 33-0785439) $163,440 according to Defendants' 2014 Form 5500 for "Financial Advisor" services.   In that same year, "ALLIANT RETIREMENT SERVICES") also EIN #33-0785439) charged the similarly sized LHC Group 401(k) plan $38,354.

103.   Defendants failed to use the Plan's bargaining power to leverage its service providers to charge lower administrative fees for the Plan participants.

104.   Defendants failed to take any or adequate action to monitor, evaluate or reduce Alliant's fees in proportion to the services provided, by:

   a.   Choosing mutual fund share classes with lower revenue sharing for the Plan;

   b.   Seeking competing bids from other providers for services;

   c.   Monitoring costs to compare with the costs being charged for similar sized plans in the marketplace; or

-41-

FIRST AMENDED CLASS ACTION COMPLAINT

d.  upon information and belief, negotiating with Alliant to cap the amount of revenue sharing or ensure that any excessive amounts were returned to the Plan (until after 2019).

105.    The amount of compensation paid to service providers vastly exceeds any relative DOL and IRS prohibited transaction "reasonable compensation" exemption for "cost plus reasonable profit." Despite periodic acknowledgements that fees were too high Defendants failed to correct previous excessive fee prohibited transactions. Evidence of such would be found on Schedule G of the Form 5500 and the filing of IRS Form 5330 (Excise tax for Benefit Plans) which is reported in the Independent Auditors' Report attached to the Form 5500. Correction includes U.S. Departments of Treasury and Labor 20% and 100% (tier 2) excise taxes respectively for every affected plan year.

## C.    Defendants Selected and Maintained Imprudent Funds that Fell Below the Reasonable Standard of Care

106.    An ERISA plan fiduciary's breach of the duty of prudence hinges on infirmities in the selection process for investment and a failure to investigate alternatives; when beneficiaries claim the fiduciary made an imprudent investment, actual knowledge of the breach will usually require some knowledge of how the fiduciary selected the investment. Employee Retirement Income Security Act of 1974 § 404, 29 U.S.C.A. § 1104(a)(1).

107.    The Investment Policy Statement (IPS), meeting minutes and other information used at the time the investments were selected and subsequently monitored are in sole possession of the Defendants and are material for a trier of fact to determine what level of effort, skill and participant loyalty were applied to the investment selection and monitoring process.

108.    Accordingly, most courts carefully analyze first whether the fiduciary conducted an adequate investigation. *Bussian v. RJR Nabisco, Inc. II*, 223 F.3d 286,

-42-

FIRST AMENDED CLASS ACTION COMPLAINT

If so, courts typically look to whether the decision was reasonable in light of the beneficiaries' interests.

### 1. Defendants Chose and Continued to Include Investments Lagging in Benchmark Comparisons

109.   Plaintiffs do not have access to the Defendants' Investment Policy Statement (IPS), a plan document, but do have the MassMutual Sample investment policy.[11] It states:

a.   "The particular investments should pursue the following standards:

i.   Performance equal to or greater than the median return for an appropriate, style-specific benchmark and peer group over a specified time period.

ii.   Specific risk and risk-adjusted return measures should be established and agreed to by [Plan Sponsor/investment committee] and be within a reasonable range relative to an appropriate, style-specific benchmark and peer group.

iii.   Demonstrated adherence to the stated investment objective.

iv.   Competitive fees compared to similar investments."

110.   Applying these standards which are similar to those at Fidelity, Vanguard, T. Rowe, etc., the Defendants' initial selection processes do not match these elements. For example, the ClearBridge Appreciation Fund added in 2013 had a prior annual median return of a loss of (0.56%) per year (from 1997 to 2012). Clearbridge Appreciation lagged its primary prospectus benchmark in seven of the ten years prior to Defendants' selection of the fund. Not surprisingly, the fund continued to lag in five of the seven years after its inclusion and was kept as an option after Prudential took over recordkeeping functions in 2020.

111.   In addition, using U.S. Securities and Exchange Commission (SEC) prospectus data pulled for the time when the Defendants' conduct would have been

---

[11] Plaintiffs anticipate obtaining the IPS in discovery.

-43-

FIRST AMENDED CLASS ACTION COMPLAINT

performed (based on their own Forms 5500 Schedules and financial statements located at www.efast.dol.gov), seventy-four percent (74%) of the 2010 trust assets were invested in funds that paid out the highest amount of revenue sharing (0.60%):

      i.     American Century Livestrong Income Portfolio A;

      ii.    American Century Livestrong 2015 Portfolio A;

      iii.   American Century Livestrong 2020 Portfolio A

      iv.   American Century Livestrong 2025 Portfolio A

      v.    American Century Livestrong 2030 Portfolio A

      vi.   American Century Livestrong 2035 Portfolio A

      vii.  American Century Livestrong 2040 Portfolio A

      viii.  American Century Livestrong 2045 Portfolio A

      ix.   American Century Livestrong 2050 Portfolio A.

112. The American Century target-date funds were added at the Plan's inception with a negligible track record and maintained through 2019 despite poor returns, high fees and overt conflicts of interest. It is notable that these funds paid out the highest indirect revenue and as the default investment quickly attracted over 70% of the Plan's assets. Despite having every reason not to select them initially and, after doing so to remove them, Defendants, in clear evidence of imprudence, continued to hold them for ten years.

113. Simply looking at the 2025 vintage of the American Century target date funds which held the majority of participants/beneficiaries' savings, this fund (like all of its "sister" funds) existed for only five years at the time of the Defendants' actions to add them in 2010 (formed 8/31/2004). More importantly, the prospectuses for 2009 back to 2005 indicate the Defendant-selected fund reported an arithmetic total loss versus its prospectus benchmark of -11.19% (or a median annual loss of -4.2% per year (-8.68%; 8.50%; -0.79%; -6.03%; -4.19%)) respectively for years 2009 back to 2005). The Defendants could have chosen from one hundred and thirty-three (133) other target date funds like Fidelity, Vanguard, T. Rowe, etc. (with

-44-

FIRST AMENDED CLASS ACTION COMPLAINT

longer track records across a variety of market cycles, larger asset bases (indicating they frequently survived the vetting process of other plan fiduciaries) and readily available options without SEC Rule 12b-1 and/or "sub-transfer agency" fees)).

### 2. Defendants Failed to Consider Index Fund Alternatives to its Actively Managed Funds

114. The Restatement of Trusts (Third) requires a plan fiduciary, not only to benchmark the fees of actively managed funds, but also to identify the additional costs that result from the use of actively managed funds. It is necessary to identify these costs so that the plan sponsor can determine whether the additional costs are justified by a reasonable expectation of additional returns. The Complaint does this in the table below and the methodology used – comparing the fees of actively managed funds to the fees of passively managed funds invested in the same asset class -- is appropriate.[12] The Plan spent an additional $11 million chasing excess returns. While a few funds may have outperformed despite excessive fees over limited time periods, overwhelmingly the suite of funds as a whole underperformed primarily due to the excessive fees and lack of skill. Because Defendants did not have a viable methodology for identifying fund managers with the skill necessary to outperform the market, an entire $11 million amount was wasted.

**Mutual fund Index Comparison**

| | Current Fund | EXP | Comparable Index Fund | EXP | Excess Expense |
|---|---|---|---|---|---|
| ACMVX | American Century Mid Cap Value Inv | 0.98 | Vanguard VMVAX Mid-Cap Value | 0.07 | 1300% |
| DBMIX | BNY Mellon Bond Market Index Inv | 0.40 | Vanguard VBTLX Total Bond Fund | 0.05 | 700% |

---

[12] The Complaint calculates the amount through 2019. A calculation of the loss, through trial, would require updating the calculation and calculating lost investment opportunity costs, which is true for most calculations alleged in the Complaint.

-45-

FIRST AMENDED CLASS ACTION COMPLAINT

| | Current Fund | EXP | Comparable Index Fund | EXP | Excess Expense |
|---|---|---|---|---|---|
| SAPYX | ClearBridge Appreciation I | 0.66 | Vanguard VFIAX S&P 500 | 0.04 | 1550% |
| ACRNX | Columbia Acorn Inst | 0.86 | Vanguard VMGMX Mid Cap Growth | 0.07 | 1129% |
| NTIAX | Columbia Mid Cap Index A | 0.45 | Vanguard VIMAX Mid Cap index | 0.05 | 800% |
| NMSAX | Columbia Small Cap Index A | 0.45 | Vanguard VSMAX Small Cap Index | 0.05 | 800% |
| FSTAX | Fidelity Advisor® Strategic Income A | 0.97 | Vanguard VBTLX Total Bond Fund | 0.05 | 1840% |
| FRVLX | Franklin Small Cap Value A | 1.06 | Vanguard VSIAX small cap value | 0.07 | 1414% |
| ODVYX | Invesco Developing Markets Y | 0.97 | Vanguard VEMAX Emerging Markets | 0.10 | 870% |
| VASCX.lw | Invesco Small Cap Discovery A LW | 1.40 | "Vanguard VSGAX Small Cap Growth Index      " | 0.07 | 1900% |
| JMCVX | Janus Henderson Mid Cap Value T | 0.99 | Vanguard VMVAX Mid-Cap Value | 0.07 | 1314% |
| LCGRX | Loomis Sayles Small Cap Growth Retail | 1.19 | Vanguard VSGAX Small Cap Growth Index | 0.07 | 1600% |
| MIXAX | MainStay Short Term Bond A (MainStay Indexed Bond) | 0.75 | Vanguard VBTLX Total Bond Fund | 0.05 | 1400% |
| MEIJX | MFS Value R4 | 0.58 | Vanguard VVIAX Value Index | 0.05 | 1060% |

-46-

FIRST AMENDED CLASS ACTION COMPLAINT

| | Current Fund | EXP | Comparable Index Fund | EXP | Excess Expense |
|---|---|---|---|---|---|
| PIINX | PIMCO Income Adm | 1.34 | Vanguard VBTLX Total Bond Fund | 0.05 | 2580% |
| PTRAX | PIMCO Total Return Admin | 0.95 | Vanguard VBTLX Total Bond Fund | 0.05 | 1800% |
| GROYX | Pioneer Select Mid Cap Growth Y | 0.79 | Vanguard VMGMX Mid Cap Growth | 0.07 | 1029% |

* Exact fees may vary slightly over the course of class period

* There are other slight under 10% share class violations of funds which have been excluded.

115. The Restatement Third of Trusts provides that "[i]f the extra costs and risks of an investment program are substantial, these added costs and risks must be justified by realistically evaluated return expectations." Restatement (Third) of Trusts § 90, cmt. h(2). In the investment industry, this comparison must be made by comparing the performance of actively managed funds to the performance of broad market indexes and index fund alternatives.[13] The use of actively managed funds is justified only when the additional expected returns sufficiently exceed the known additional costs.[14]

116. Defendants failed its fiduciary duty by setting up an investment structure that does not properly consider lower cost higher performing investment options. The 2018 First Circuit Court of Appeal's decision in *Brotherton* outlines how a loss in a plan should be evaluated. The First Circuit said: "So to determine whether there was a loss, it is reasonable to compare the actual returns on that portfolio to the returns that would have been generated by a portfolio of benchmark

[13] The only significant difference, in this context, between indexes and index funds is that, indexes do not include fees. Thus, the performance of an index fund, which tracks an index, is the appropriate measure of the returns from investing in the index *net of fees.*

[14] For an apples-to-applies comparison, the returns must be adjusted for risk, which in this context is a function of volatility.

-47-

FIRST AMENDED CLASS ACTION COMPLAINT

funds or indexes comparable but for the fact that they do not claim to be able to pick winners and losers, or charge for doing so.

117. Restatement (Third) of Trusts, § 100 cmt. b(1) – 29 – (loss determinations can be based on returns of suitable index mutual funds or market indexes…") Most importantly the First Circuit confirms that the burden of proof is on the plan fiduciary to prove their expensive active management was worth it. Many studies have shown that while higher-cost mutual funds may outperform a less-expensive option, such as a passively managed index fund, over the short term, they rarely do so over a longer term.

### 3. Defendants Imprudently Maintained the Plan's Investment in the MassMutual Stable Value Option, When Lower Share Classes Existed and Other Investment Vendors Offered Superior Alternatives

118. The MassMutual SAGIC Core I (Separate Account Guaranteed Investment Account) is a type of stable value fund.

119. Stable value funds generally are not SEC registered mutual funds. Single Company fixed annuity contracts that are structured as an insurance company general account, or an insurance company separate account, are solely regulated by the State Insurance Commissioner selected by the insurance company. Synthetic based stable value funds are run by a Registered Investment Advisor (RIA) regulated by the SEC, but use a small amount of synthetic GIC's which sometimes are state regulated. The differences between the different types of funds are critical from a fiduciary standpoint.

120. A stable value account in a retirement plan is (i) similar to a money market fund in that it provides principal protection, and (ii) similar to a bond fund in that it provides higher consistent returns over time. Stable value funds are able to do this because participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee participants will not lose money by ensuring the fund transacts at book value. Synthetic Stable value

-48-

FIRST AMENDED CLASS ACTION COMPLAINT

accounts "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund that results from fluctuations in interest rates associated with bond funds.[15]  Single fixed annuity contracts are set by the insurance company at their discretion.

121.   The 401(k) marketplace for the largest plans, if they offer stable value funds, offer "synthetic" stable value funds, which are the least risky, because the fund owns the securities in the underlying funds which typically are 95%+ of the funds value.  The annuity part or wrap is not only typically divided between insurers but only typically comprises 1-5% of the value at risk.    While the majority of plans the size of Seaworld use a lower risk synthetic stable value product, there are still some Separate Account and General Account products.  Separate account products, such as the MassMutual GIC, where the assets of the underlying funds are held in the separate account of an insurance carrier are riskier, because they are not owned by the Plan but sit on the balance sheet of the insurer where they take on near 100% of the single entity credit and liquidity risk of MassMutual.

122.   In recent years, large 401(k) plans fled fixed annuity products backed by the general account of a single insurance company due to concerns about single entity credit and liquidity risk. Following the high-profile default failures of GIC Issuers in 1992 and 1993 by Executive and Confederation Life, the Federal Reserve expressed concerns about the high risk of the insurance company general account products and the flimsy nature of the state guarantees backing the insurance contracts.  The industry immediately responded by offering more separate account contracts, which put creditors in line ahead of general account contracts but still resulted in 100% single entity credit and liquidity exposure.  Synthetic value was

[15] *See* Stable Value Fund v. Money Market Fund, Financial Web describing difference between stable value funds and money market funds), available at: http://www.finweb.com/investing/stable-value-fund-vs-money-market-fund.html#axzz44EaLfQnQ

-49-

FIRST AMENDED CLASS ACTION COMPLAINT

created in 1995 and by 1999 most the largest plans were in a synthetic based stable value fund.  Synthetic Stable value continued to gain market share over the next 20 years going into smaller and smaller plans.  Some general account and separate accounts have existed in plans under $1 billion because of a lack of litigation until recently.

123.   In September 2010 the trade group for State Government 401(k) plans, the National Association of Government Defined Contribution Administrators, (NAGDCA), created a brochure with the following characterization of insurance company general account stable value funds. "Due to the fact that the plan sponsor does not own the underlying investments, the portfolio holdings, performance, risk, and management fees are generally not disclosed.  This limits the ability of plan sponsors to compare returns with other SVFs [stable-value funds]. It also makes it nearly impossible for plan sponsors to know the fees (which can be increased without disclosure) paid by participants in these funds—a critical component of a fiduciary's responsibility.

124.   In this case, MassMutual placed the proceeds of the stable value fund in a insurance company separate account at MassMutual.   MassMutual received spread fees – the difference between the returns made by MassMutual on the assets in the segregated account and the crediting rate paid to participants. Insurance company balance sheets allow leverage and have tax advantages that add to profits and return.

125.   An insurance company GIC, such as the MassMutual GIC here, is subject to the single entity credit risk of the insurance company that issues the contract. The crediting rate, set in advance by the insurance company and reset from time to time in its sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.  Thus, Defendants had the opportunity and duty to evaluate the investment in advance; this is not a case of judging an investment with the benefit of hindsight.  Further, Defendants should

//

FIRST AMENDED CLASS ACTION COMPLAINT

have specifically negotiated in the contract that MassMutual was a fiduciary and that it cold exit at no costs if MassMutual was downgraded for any reason.

126.   There is substantial liquidity risk because there is no outside market for these contracts. MassMutual has full control over spread fees and thus has the ability to set (and manipulate) crediting rates.

127.   As of 2017, the MassMutual GIC had $17,649,415 of assets for which MassMutual charged an "administrative fee" plus earned an undisclosed "spread."

128.   As an ERISA fiduciary, Defendants had an obligation to monitor the fees and performance of the GIC and to remove or replace it where a substantially identical investment option can be obtained from the same provider at a lower cost. *See, e.g., Tibble v. Edison Int'l*, 843 F.3d 1187, 1198 (9th Cir. 2016) ("[A] trustee cannot ignore the power the trust wields to obtain favorable investment products, particularly when those products are substantially identical -- other than their lower cost -- to products the trustee has already selected.").  The single entity annuity contract also constrains liquidity and the ability to replace it with exit charges.

### a. MassMutual Excessive Spread Fees

129.   Defendants did not have a viable methodology for monitoring the costs or performance of the MassMutual GIC. Not only were comparable products available from other providers with higher crediting rates, but *identical or substantially identical* products were available to Defendants from MassMutual and other stable value providers with higher crediting rates and lower spread fees. In fact, the MassMutual GIC consistently returned 72 to 20 basis points less than the *very same type of fund* offered by MassMutual to other similarly situated retirement plans.

130.   The difference in spread frees and crediting rates in this case is tragic. The following chart compares the crediting rate of the Defendants stable value fund to the crediting rate of the same general account products offered by MassMutual to other plans:

-51-
FIRST AMENDED CLASS ACTION COMPLAINT

**MassMutual Annuity Share Class Violations**

| Rate Paid to Seaworld | | Best Rate Paid by MassMutual | Difference |
|---|---|---|---|
| 2014 | 2.85% | 3.52% | -0.67% |
| 2015 | 3.15% | 3.77% | -0.62% |
| 2016 | 2.55% | 3.27% | -0.72% |
| 2017 | 3.10% | 3.30% | -0.20% |
| 2018 | 3.40% | 3.68% | -0.28% |

MassMutual can arbitrarily raise its fees by the rate in its SAGIC annuity product. Allowing this type of product with its lack of transparency, excessive fees and single entity credit and liquidity risk is a fiduciary breach.

131.  Higher spread fees result in lower crediting rates. It is the excess spread that Defendants failed to monitor. Taking inflation into account, the difference in real dollar terms was even more pronounced, with real (net of inflation) returns for the Plan near zero.

132.  Defendants did not have to scour the marketplace to find a better performing fund, it simply had to make an effort, which it failed to make, to determine whether the same fund was available at a lower cost. Fact sheets showing the available rates of market rate MassMutual funds and similar products from other providers were readily available had Defendants exercised even a minimal amount of due diligence. This is demonstrated in the below chart as only one example:

**MassMutual Annuity vs. nonprofit TIAA**

| | Rate Paid to Seaworld | Best Rate Paid by TIAA RC | Difference | Estimated Assets | Estimated Loss to Fund without Compounding |
|---|---|---|---|---|---|
| 2014 | 2.85% | 3.75% | 0.90% | 13,929,000 | $125,361.00 |
| 2015 | 3.15% | 3.75% | 0.60% | 14,991,000 | $89,946.00 |
| 2016 | 2.55% | 3.75% | 1.20% | 18,133,000 | $217,596.00 |
| 2017 | 3.10% | 4.25% | 1.15% | 16,887,000 | $194,200.50 |
| 2018 | 3.40% | 4.25% | 0.85% | 17,984,000 | $152,864.00 |
| | | | | | **$779,967.50** |

FIRST AMENDED CLASS ACTION COMPLAINT

133.    This breach of fiduciary duty alone resulted in a loss of $779,967.50 (before compounding) to participants' retirement savings. This loss from the excessive fee spread is something a competent, prudent, and diligent fiduciary would have known was happening in advance and would have been able to avoid.

134.    A prudent fiduciary – that is, a fiduciary that monitors the investment, understands the pricing mechanism, and informs itself of the crediting rates and spread fees available in the market – would have known that MassMutual's stable value product would underperform and that being a stable value product it would continue to underperform in a stable manner.

135.    On the basis of the excessive spread fees alone, the MassMutual stable value fund was an imprudent investment which should have been removed from the Plan.

**b. Failure to Submit RFP's**

136.    A plan the size of Seaworld's has considerable bargaining power in the marketplace. There are any number of stable value products available to plans that are simply not available to plans with funds of a smaller size.

137.    To take advantage of this bargaining power, Defendants, through Alliant, should have submitted requests for proposal to stable value fund providers. Products from any number of providers were available with better products, lower fees, and higher crediting rates.

138.    Other plans with stable value assets of this size have bid out their stable value funds and obtained better products. To obtain better rates, all that Defendants had to do was ask.

139.    Defendants did not make a regular practice of submitting requests for proposal for the stable value fund, or for that matter, recordkeeping and other services.

//

-53-

FIRST AMENDED CLASS ACTION COMPLAINT

*c. Defendants and Alliant Used the Wrong Benchmark for the Stable Value Fund*

140.   One reason Defendants and Alliant failed to recognize the underperformance of the stable value fund was that they were using the wrong benchmark to measure the performance of the fund.

141.   The benchmark MassMutual designated to measure the performance of the stable value fund, the 90-Day T-Bill, was the wrong benchmark.  It showed the stable value fund as outperforming its benchmark, when the fund was consistently underperforming appropriate benchmarks.

142.   The 90-Day T-Bill is an appropriate benchmark for a money market fund, which invests in short term securities with an average duration of approximately 60 days. The money market funds for which the 90-Day T-Bill is appropriate are the retirement plan equivalent of checking accounts. Stable value funds, on the other hand, typically invest in securities with higher credit risk with an average duration of three to five years. The five-year constant duration treasury index is a more appropriate benchmark. Better still is the Hueler index which is specific to stable value funds. Other appropriate benchmarks in this case are general account stable value funds offered to other similarly situated plans.

143.   MassMutual, by designating the 90-day T-Bill, was covering up the below market crediting rates and excessive spread fees.  Defendants should have been aware of this issue when it was occurring and removed the fund from the investment options or made a request for proposal to MassMutual for a higher crediting rate or to other providers.

*d. Failure to Diversify*

144.   The funds invested in the MassMutual stable value account also were not adequately diversified. The risk and return characteristic of the fund depended entirely on the creditworthiness and rates declared by a single entity, MassMutual.

-54-

FIRST AMENDED CLASS ACTION COMPLAINT

145. ERISA § 1104(a)(1)(C) provides that a fiduciary shall discharge his duties "by diversifying the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so."

146. The MassMutual stable value fund is not diversified. The MassMutual GIC is a contract, a piece of paper, subject to the single entity credit risk of MassMutual, as the issuer of the contract. The return of the investment depends on crediting rates set at the discretion of a single provider, MassMutual. The crediting rate, set by MassMutual alone, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest.

147. Following the high-profile failure or near failure of a number of stable value providers during the credit crisis of 2008-9, the trend among fiduciaries in large plans is to avoid general account stable value funds because of credit risk concerns and to select more diversified stable value products.

148. There may be circumstances under which it may clearly be prudent not to diversify the assets of a plan invested in a stable value fund, but this is not such a case. Here, MassMutual pocketed more than 200 basis points in excess fees and failed to provide the rate of return that would ordinarily compensate for the Plan's failure to fully diversify its investments.

149. Thus, the MassMutual stable value fund was imprudent and should have been removed from the Plan.

**D.     Defendants Breached the Duty of Loyalty and Prudence by Hiring and Retaining Service Providers that were Inherently Conflicted**

150. Alliant Retirement Consulting is a dual registered investment advisor ("RIA") and broker.  They can receive not only brokerage commissions from funds but insurance commissions for annuity products. Broker consultants or dual

//

FIRST AMENDED CLASS ACTION COMPLAINT

registered RIA's have an inherent conflict of interest to recommend what pays them the most through mutual fund soft dollars, revenue sharing sources, "finder's fees".[16]

151.   The SEC in 2019 fined dozens of RIA firms for excessive mutual fund fees.   The Plan's former financial advisor, LPL, was one of those firms paying over $17 million in fines for putting investors in higher fee mutual fund share classes.[17]

152.   These dual-registered RIAs were selling higher fee mutual funds when lower cost share classes were available. Dr. Nicole Boysen of Northeastern University in Boston has written a paper which shows that finds RIA's which both charge fees and commissions (dual registration) use higher fee lower performing mutual fund families that kick them back the most in "revenue sharing."

153.   Boysen created a list of high fee underperforming mutual funds preferred by dual registered RIA's. Names include American Century American Funds, Mass Mutual, Oppenheimer/Invesco PIMCO all held in the Plan in this case.[18]

154.   SeaWorld's selection of conflicted broker advisors is a major fiduciary breach which has led to the excessive fees in funds and administration.   A plan cannot blindly rely on third-party advice especially if it is conflicted.

155.   A fiduciary's independent investigation of the merits of a particular investment is at the heart of the prudent person standard….The failure to make an independent investigation and evaluation of a particular plan investment is a breach of fiduciary duty. *Fink v. National Sav. & Trust Co.*, 772 F.2d 951, 957 (D.C.C. 1985).

---

[16]      Blind reliance on a [broker] whose livelihood [is] derived from commissions he is able to garner is the antithesis of [a fiduciary's duty to conduct an] independent investigation. *Liss v. Smith*, 991 F.Supp.2d 297, 300 (S.D.N.Y 1998); *Gregg v. Transportation Workers of America Intern.*, 343 F.3d 833, 841 (6th Cir. 2003).

[17] March 11, 2019    Https://www.sec.gov/litigation/admin/2019/ia-5199.pdf

[18] https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3360537

FIRST AMENDED CLASS ACTION COMPLAINT

156.   The focus is on whether the fiduciary engaged in a reasoned decision-making process, consistent with that of a 'prudent man acting in [a] like capacity.' *DiFelice v. U.S. Airways*, 497 F.3d 410, 420 (4th Cir. 2007).

157.   In selecting third-parties, the courts have consistently held that plans must only use third-parties that are experienced, objective and otherwise qualified to provide such services. The objectiveness requirement is often used by the courts to rule that a plan's reliance on a third-party was not justifiable due to inherent conflicts of interest issues of the third-party.

158.   In the *Liss v. Smith* decision the court held that a plan's reliance on a commission-based insurance agent (like Alliant) was not justifiable, stating that "Blind reliance on a [broker] whose livelihood [is] derived from commissions he is able to garner is the anti-thesis of [a fiduciary's duty to conduct an] independent investigation."   *Liss v. Smith*, 991 F.Supp.2d 297, 300 (S.D.N.Y 1998); *Gregg v. Transportation Workers of America Intern.*, 343 F.3d 833, 841 (6th Cir. 2003).

159.   The same is true for the Plan's recordkeeper until 2019, MassMutual. MassMutual was incentivized to offer a group annuity that includes mutual funds that paid them the most soft dollars.   This fact is established in MassMutual's Administrative Services Agreement with Defendants.   The Agreement states at Exhibit C:

> *The Estimated Recordkeeping Revenue is the portion of each Investment Option's annual expense ratio that MassMutual retains as compensation for its performance of recordkeeping services. With respect to the nonproprietary investment fund families, MassMutual has entered into arrangements with distributors of, or investment advisors to, certain investment fund families pursuant to which MassMutual will make these funds available for investment by the Plan.   MassMutual periodically reviews each such mutual fund family to determine whether to continue to offer such funds, and reserves the right to remove such funds from its standard offering. As part of MassMutual's arrangements with the investment manager, MassMutual may provide shareholder services to, and receive fees from, some of the funds in which Plan assets are invested. The shareholder services may include investment fund recordkeeping and accounting services in connection with the Plan's purchase or sale of*

FIRST AMENDED CLASS ACTION COMPLAINT

*shares, processing investment fund sales and redemption transactions involving the Plan. As compensation for such shareholder services, MassMutual receives fees from such funds, which are disclosed on the Schedule of Investments.* The estimated recordkeeping revenue is provided to illustrate both the estimated revenue received in connection with each Investment Option and MassMutual's relative financial interests. The revenue retained is a part of, and is not in addition, to other expenses incurred by the Plan under this Agreement. Further information regarding the revenue derived from different classes of Investment Options is contained in other materials provided to plan sponsors or is available through the plan's MassMutual representative. If you would like to receive an estimate of how much MassMutual may receive in fees during a particular time period, you may obtain such information by calling your MassMutual representative.

160. Defendants may claim that the higher revenue sharing fees are needed to help pay recordkeeping costs. Some employers choose this higher fee approach paying rebates or revenue sharing (essentially kickbacks) to allegedly defray the record keeping costs. However, this is not a justification for higher fees, but a sign of possible other fiduciary breaches.

161. In a new May 2021 study by experts from the Federal Reserve and leading professors, completed by Irina Stefanescu, a Member of the Board of Governors of the Federal Reserve, and two professors, the study concluded "[R]ebates do translate into higher expense ratios in the retirement setting . . . Consequently, participants face higher all-in fees in revenue sharing plans." Higher fees are not associated with better performance; to the contrary, "The future performance of revenue-sharing funds is weaker than that of non-sharing funds. The bulk of the under-performance is driven by higher fees, though revenue sharing funds display lower performance even after accounting for fees."[19]

162. Since *Tibble v. Edison* was decided in 2015, it has been abundantly clear to fiduciaries to retirement plans that they have an obligation to select the lowest possible share class of investment options. "It is not prudent to select higher

[19] Pool, Sialm, and Stefanescu, Mutual Fund Revenue Sharing in 401(k) Plans, May 14, 2021, available at: https://ssrn.com/abstract=3752296

-58-

FIRST AMENDED CLASS ACTION COMPLAINT

cost versions of the same fund even if a fiduciary believes fees charged to plan participants by the "retail" class investment were the same as the fees charged by the "institutional" class investment, net of the revenue sharing paid by the funds to defray the Plan's recordkeeping costs.  Fiduciaries should not "choose otherwise imprudent investments specifically to take advantage of revenue sharing."[20]  In cases where the lowest available share class is not used, a bad practice in general, a fiduciary must demonstrate that the plan has demanded and received a rebate of fees equal to the difference in the share class.

163.  "[V]ery little about the mutual fund industry," including revenue sharing practices, "can plausibly be described as transparent[.]" *Leimkuehler v. Am. United Life Ins. Co.*, 713 F.3d 905, 907 (7th Cir. 2013).

164.  If an employee skimmed money from his employer every day, but then told employer after he was caught, that well he put most of the money back, so the stealing is OK it is still a breach of fiduciary duty. The reality is recordkeeping rebates are very small compared to the overall excessive fees of the plan.  It is the burden of the defendant to document exact cash rebates into participant accounts that offset their excessive fees.

165.  Revenue sharing can result in unequal fees among participants. Suppose an executive at Seaworld is smart enough to be in all 0 revenue share funds (ie Vanguard), which contribute near $0 in administrative costs.   However, the low-level employee who does not choose an option defaults into paying excessive fees because she is in the QDIA option (American Century target date fund) with huge amounts in revenue sharing. Her excess fees are only in part going for her own recordkeeping expenses, but in part subsidizing the recording keeping costs of the executive who invested in the non-revenue sharing funds.   It is highly doubtful that one in a thousand participants understand how their hidden revenue sharing charges subsidize other workers.

---

[20] Tibble, 2017 WL 3523737, at * 8.

-59-

FIRST AMENDED CLASS ACTION COMPLAINT

166. As such, Defendants not only breached their fiduciary duty by choosing and retaining revenue sharing funds, but also by retaining and choosing Service Providers who were conflicted and incentivized to choose funds that provided them more soft revenue dollars.

**E. CLASS ACTION ALLEGATIONS**

167. Plaintiffs bring this action in a representative capacity on behalf of the Plan and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and a Class defined as follows: All participants in or beneficiaries of the SeaWorld Parks and Entertainment 401(K) PLAN, and the SWBG, LLC 401(K) PLAN through the date of judgment (the "Relevant Time Period or Class Period").[21]

168. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. As of December 31, 2019, the Plan had over 18,401 participants with account balances.

169. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class, which predominate over questions that may affect individual class members, include, *inter alia*:

(a) whether Defendants are a fiduciaries of the Plan;

(b) whether Defendants breached fiduciary duties of loyalty and prudence with respect to the Plan;

(c) whether Defendants had a duty to monitor other fiduciaries of the Plan;

(d) whether Defendants breached their duty to monitor other fiduciaries of the Plan;

(e) the proper form of equitable and injunctive relief; and

---

[21] Plaintiffs reserve their right to propose other or additional classes or subclasses in their motion for class certification or subsequent pleadings in this action.

-60-

FIRST AMENDED CLASS ACTION COMPLAINT

(f) the proper measure of monetary relief.

170.  Plaintiffs' claims are typical of those of the Class because their claims arise from the same event, practice and/or course of conduct as other members of the Class.

171.  Plaintiffs will adequately protect the interests of the Class and have retained counsel experienced in class action litigation in general and ERISA class actions involving fiduciary breaches.

172.  Plaintiffs have no interests that conflict with those of the Class. Defendant does not have any unique defenses against any of the Plaintiffs that would interfere with their representation of the Class.

173.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Joinder of all participants and beneficiaries is impracticable, the losses suffered by individual participants and beneficiaries may be too small for individual members to enforce their rights through individual actions, and the common questions of law and fact predominate over individual questions. Given the nature of the allegations, no class member has an interest in individually controlling the prosecution of this matter, and Plaintiffs are not aware of any difficulties likely to be encountered in the management of this matter as a class action.

174.  In the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final, injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### Breach of Fiduciary Duty of Prudence and Loyalty

### (Prudence Against All Defendants and Loyalty as to Alliant Only)

175.  Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

-61-

176.   Defendants were fiduciaries of the Plan under ERISA §§3(21) and/or 402(a)(1), 29 U.S.C. §§1002(21) and/or 1102(a)(1) and under common law trust law because they were either designated in the Plan documents as the Plan Administrator, a named fiduciary under the Plan, performed discretionary Plan-related fiduciary functions, including the selection and monitoring of investment options for the Plan, and/or the negotiation over services and fees for the Plan, and/or were responsible for the administration and operation of the Plan.

177.   As a fiduciary of the Plan, Defendants were required, pursuant to ERISA §404(a)(1), 29 U.S.C. §1104(a)(1) and common law, to act: "(A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan"; and "(B) to discharge their duties on an ongoing basis with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."

178.   Common law and ERISA's duty of prudence required Defendants to give appropriate consideration to those facts and circumstances that, given the scope of its fiduciary investment duties, it knew or should have known were relevant to the particular investments of the Plan and to act accordingly. *See* 29 C.F.R. §2550.404a-1. The Supreme Court has concluded that this duty is "a continuing duty to monitor [plan] investments and remove imprudent ones." *Tibble*, 135 S. Ct. at 1828.

179.   As described above, Defendants failed to act prudently and in the best interest of the Plan and its participants and breached its fiduciary duties in various ways. Defendants failed to make decisions regarding the Plan's investment lineup based solely on the merits of each investment and what was in the best interest of Plan participants. Defendants selected and retained investment options in the Plan despite their high-cost relative to other comparable investments and failed to investigate the availability of lower-cost share classes of certain mutual funds in the

-62-

FIRST AMENDED CLASS ACTION COMPLAINT

Plan. A prudent fiduciary in possession of this information would have removed these investment options, replaced them with more prudent and lower cost alternatives, and/or used the size, leverage and bargaining power of the Plan to secure significantly reduced fees for comparable investment strategies.

180.   In addition, Defendants (with the exception of Alliant) failed to monitor or control excessive compensation paid for recordkeeping services, if any resulted from the unnecessary payment of recordkeeping and other services both directly and as a percentage of assets.

181.   In addition, Defendants (with the exception of Alliant) failed to monitor or control excessive compensation paid for shareholder or financial advising services, if any resulted from the unnecessary payment of those services as a percentage of assets.

182.   In addition, Alliant breached the duty of loyalty by operating under a continuous conflict of interest stemming from its role as investment manager of the Plan's actively managed funds, which it failed to disclose to participants.

183.   Defendants knowingly participated in each fiduciary breach of the other Plan fiduciaries, knowing that such acts were a breach, and enabled the other Plan fiduciaries to commit fiduciary breaches by failing to lawfully discharge their own duties. Defendants knew of the fiduciary breaches of the other Plan fiduciaries and failed to make any reasonable and timely effort under the circumstances to remedy the breaches. Accordingly, each defendant is also liable for the losses caused by the breaches of its co-fiduciaries under 29 U.S.C. §1105(a).

184.   As a direct and proximate result of these breaches, the Plan, Plaintiffs and members of the Putative Class suffered substantial losses in the form of higher fees or lower returns on their investments than they would have otherwise experienced. Additionally and regardless of the losses incurred by Plaintiffs or any member of the Class, pursuant to ERISA §§502(a)(2) and (a)(3), and 409(a), 29 U.S.C. §§1132(a)(2) and (a)(3), and 1109(a), and common law trusts, Defendants

-63-

and any non-fiduciary which knowingly participated in these breaches are liable to disgorge all profits made as a result of Defendant's breaches of the duties of loyalty and prudence, and such other appropriate equitable relief as the Court deems proper.'

## SECOND CAUSE OF ACTION

## Breach of Fiduciary Duties in Violation of Duty to Investigate and Monitor Investments and Covered Service Providers

## (Against All Defendants)

185.   Plaintiffs repeat and reallege the above paragraphs as though fully set forth herein.

186.   Defendants had overall oversight responsibility for the Plan and control over the Plan's investment options through its authority to limit or remove the other Plan fiduciaries.

187.   A monitoring fiduciary must ensure that the monitored fiduciaries are performing their fiduciary obligations, including those with respect to the investment and monitoring of plan assets, and must take prompt and effective action to protect the Plan and participants when the monitored fiduciaries fail to perform their fiduciary obligations in accordance with ERISA and common law trusts.

188.   Defendants also had a duty to ensure that other Plan fiduciaries possessed the needed qualifications and experience to carry out their duties (or used qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendant.

189.   Defendants breached its fiduciary monitoring duties by, among other things:

(a) failing to monitor and evaluate the performance of other Plan fiduciaries or have a system in place for doing so, standing idly by as the Plan suffered losses as a

-64-

FIRST AMENDED CLASS ACTION COMPLAINT

result of other Plan fiduciaries' election to continue to pay fees that were significantly higher than what the Plan could have paid for a substantially identical investment products readily available elsewhere, as detailed herein;

(b) failing to monitor the processes by which the Plan's investments were evaluated, which would have alerted a prudent fiduciary to the excessive costs being incurred in the Plan to the substantial detriment of the Plan and the Plan's participants' retirement savings, including Plaintiffs and members of the Class; and

(c) failing to remove fiduciaries whose performance was inadequate, as they continued to maintain excessively costly investments in the Plan, all to the detriment of the Plan and Plan participants' retirement savings;

(d) failing to institute competitive bidding for covered service providers.

190.   As a direct and proximate result of these breaches of the duty to monitor, the Plan, Plaintiffs, and members of the Class suffered millions of dollars of losses. Had Defendant complied with its fiduciary obligations, the Plan would not have suffered these losses, and Plan participants would have had more money available to them for their retirement.

191.   Pursuant to ERISA §502(a)(2) and (a)(3), and ERISA §409(a), 29 U.S.C. §1132(a)(2) and (a)(3), and 29 U.S.C. §1109(a), Defendant is liable to disgorge all fees received from the Plan, directly or indirectly, and profits thereon, and restore all losses suffered by the Plan caused by its breach of the duty to monitor, and such other appropriate equitable relief as the Court deems proper.

//
//
//
//
//
//

FIRST AMENDED CLASS ACTION COMPLAINT

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of the Plan and all similarly situated Plan participants and beneficiaries, respectfully request the Court:

- Certify the Class, appoint Plaintiffs as class representatives, and appoint Christina Humphrey Law, P.C. and Tower Legal Group, P.C. as Class Counsel;

- Find and declare that Defendants have breached their fiduciary duties as described above;

- Find and adjudge that Defendants are liable to make good to the Plan all losses to the Plan resulting from each breach of fiduciary duties, and to otherwise restore the Plan to the position it would have occupied but for the breaches of fiduciary duty;

- Determine the method by which Plan losses under 29 U.S.C. §1109(a) should be calculated;

- Order Defendants to provide an accounting necessary to determine the amounts Defendants must make good the Plan under §1109(a);

- Find and adjudge that Defendants must disgorge all sums of money received from their use of assets of the Plan;

- Impose a constructive trust on any monies by which Defendants were unjustly enriched as a result of breaches of fiduciary duty or prohibited transactions, and cause Defendants to disgorge such monies and return them to the Plan;

- Surcharge against Defendants and in favor of the Plan all amounts involved in any transactions which an accounting reveals were improper, excessive, and/or in violation of ERISA;

- Order equitable restitution against Defendants;

- Award to Plaintiffs and the Class their attorney's fees and costs under 29 U.S.C. §1132(g)(1) and the common fund doctrine;

-66-

- Order the payment of interest to the extent it is allowed by law; and
- Grant other equitable or remedial relief as the Court deems appropriate.

**PLAINTIFFS DEMAND A TRIAL BY JURY OF ALL ISSUES SO TRIABLE BY LAW.**

Dated: December 22, 2021

**CHRISTINA HUMPHREY LAW, P.C.**
**TOWER LEGAL GROUP, P.C.**

By: _____
CHRISTINA A. HUMPHREY
JAMES A. CLARK
RENEE P. ORTEGA
Attorneys for Plaintiffs

-67-
FIRST AMENDED CLASS ACTION COMPLAINT